**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAIME GONZALEZ, PATRICIA WRIGHT, KEVIN WEST, and GERALD BOEHM, On behalf of themselves and all others similarly similarly situated,    ) ) ) ) ) | |

JAIME GONZALEZ, PATRICIA WRIGHT,  )
 KEVIN WEST, and GERALD BOEHM,  )
 On behalf of themselves and all others similarly  )
 similarly situated,  )
   )
           Plaintiffs,  )
  v.  ) Civil Action No. 13-cv-1378
   )
OWENS CORNING and OWENS  )
 CORNING SALES, LLC,  )
   )
           Defendants.  )

_____

EDWARD MAAG and DIANE MAAG, on  )
 behalf of themselves and all others similarly  )
 situated,  )
           Plaintiffs,  )
  v.  ) Civil Action No. 14-cv-0826
   )
OWENS CORNING and OWENS  )
 CORNING SALES, LLC,  )
           Defendants.  )

_____

## <u>OPINION</u>

**CONTI, Chief District Judge**

      These putative class actions were filed against Owens Corning and Owens Corning Sales, LLC (collectively, "Owens Corning" or "defendants") and arise out of Owens Corning's manufacture and sale of allegedly defective Oakridge-brand fiberglass asphalt roofing shingles. One case was filed against Owens Corning in this court, and three separate cases were filed in federal district courts in other states. Those other federal district courts transferred the three cases to this court. After being transferred two of those cases were consolidated for all

purposes with the case filed here at civil action 13-1378.[1] (ECF No. 45.)  The last case transferred to this court (Civ. No. 14-0826) was consolidated at civil action 13-1378 only for pretrial purposes. (14-cv-826, ECF No. 14.)  The named plaintiffs in the four cases are Patricia Wright ("Wright"), Kevin West ("West"), Jaime Gonzalez ("Gonzalez"), Gerald Boehm ("Boehm"), and Edward and Diane Maag (the "Maags") (collectively, "plaintiffs" or the "named plaintiffs").

      The procedural history, facts, and legal claims pertinent to each of the cases will be discussed in detail in the findings of fact that follow.  By way of summary, plaintiffs contend that Owens Corning acted unlawfully by manufacturing Oakridge-brand shingles in accordance with defective design specifications, and by promising that all Oakridge-brand shingles would last for at least 25 years, when, due to those defective design specifications all Oakridge-brand shingles were "vulnerable" or "susceptible" to lasting no more than 20 years.

      Plaintiffs filed a motion for class certification, seeking to certify classes pursuant to Federal Rules of Civil Procedure 23(b)(1)(B), (b)(2), and (b)(3). (ECF No. 150.)  Plaintiffs' motion was fully briefed by the parties, and the court conducted a hearing on the motion on December 17, 2015. (ECF Nos. 151-54, 161-62, 164-66, 169-70, 12/17/2015 Minute Entry.)  Thereafter, the parties filed proposed findings of fact and conclusions of law. (ECF Nos. 176-77.)  Several weeks later, plaintiffs volunteered a notice of supplemental authority in further support of their motion for class certification. (ECF No. 179.)  Owens Corning filed a short response thereto, and stated its willingness to more fully respond at the court's request. (ECF No. 180.)  The court did not request further briefing.

---

[1] Citations to the record that are not preceded by any civil action number are made to the docket of the lead case pending at 13-cv-1378.

The court concludes that the proposed Rule 23(b)(1)(B) class cannot be certified because the named plaintiffs ask this court to answer a question that the Court of Appeals for the Third Circuit already answered. Owens Corning cannot, and has stated that it will not, relitigate the issue. In addition, the appellate court answered the question in a way that makes it impossible for this court to enter any classwide rulings with respect to the effect that Owens Corning's bankruptcy proceedings have on proposed class members' claims.

The court also concludes that the proposed Rule 23(b)(2) and Rule 23(b)(3) classes cannot be certified because, among other reasons, the named plaintiffs seek to pursue relief under various state-law theories that are not the same for all members of a proposed class, it is impossible to determine whether an owner is a member of the class, and the record contradicts any finding that either all (or even most or many) Oakridge-brand shingles suffer from an common defect or Owens Corning represented that its Oakridge-brand shingles would not crack, degranulate, fragment, or deteriorate for, or would have a useful life of, at least 25 years. Plaintiffs proffer no evidence about how often Owens Corning manufactured shingles "at or near" the allegedly defective "low-end" of its specifications. FOF 181. The only statistical evidence in the record reflects that only one half of one percent of Oakridge-brand shingle installations result in a warranty claim, and only half of the approximately 300 warranty claim shingles tested by plaintiffs measured "at or near" the allegedly defective "low end" of Owens Corning's design specifications. The record reflects that plaintiffs acknowledge that not all Oakridge-brand shingles will be manufactured "at or near" the allegedly defective "low end" of Owens Corning's design specifications, and plaintiffs never identify how near the "low end" of Owens Corning's design specifications a measurement must be to qualify as design defect. With respect to plaintiffs' claims that Owens Corning made misstatements about its Oakridge-brand

shingles, plaintiffs fail to establish that Owens Corning made uniform representations about the

expected useful life of Oakridge-brand shingles, or about whether the shingles would experience

any form of deterioration for a set number of years.

Under those circumstances and as more fully explained in the findings of fact and

conclusions of law, the court will deny plaintiffs' motion for class certification.

## FINDINGS OF FACT[2]

### A. The Proposed Classes

#### 1. The Originally-Proposed Classes

**FOF 1:**     In their initial briefing on the motion for class certification, plaintiffs moved to

certify the following classes:

> **Rule 23(b)(1)(B) Impaired Judgments Class**:  All individuals and entities
> that own a building or structure physically located in the United States on
> which Owens Corning's Oakridge-brand shingles are or have been installed,
> where those shingles were purchased on or before September 26, 2006.
>
> **Rule 23(b)(2) Injunctive Relief Class** and **Rule 23(b)(3) Monetary Relief
> Class:**  All individuals and entities that own a building or structure
> physically located in the states of California, Illinois, Pennsylvania, or Texas
> on which Owens Corning's Oakridge-brand shingles are or have been
> installed from 1992 through 2012.

(ECF No. 154 at 23.)

---

[2] The court makes these factual findings in furtherance of its obligations to conduct a rigorous
analysis of plaintiffs' motion for class certification.  Among those obligations is that this court
resolve all factual disputes relevant to class certification, including disputes touching on the
elements of the causes of action being asserted and the merits of a claim, and make explicit
findings that plaintiffs satisfied their burden to prove each of the requirements of Rule 23 by a
preponderance of the evidence. Reyes v. Netdeposit, LLC, 802 F.3d 469, 484 (3d Cir. 2015);
Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013);  In re Hydrogen Peroxide
Antitrust Litig., 552 F.3d 305, 307, 316 n.14, 317, 321 (3d Cir. 2008).

**FOF 2:**    With respect to the originally-proposed Rule 23(b)(1)(B) class, plaintiffs

explained in their initial briefing in support of the motion for class certification that "class

members nationwide are vulnerable to Owens Corning asserting a dischargeability

defense against them" even though the Court of Appeals for the Third Circuit ruled in

favor of Wright and West on this bankruptcy-based defense during the pendency of the

instant case. (ECF No. 154 at 34); <u>Wright v. Owens Corning</u>, 679 F.3d 101 (3d Cir.

2012).

    a.   In October 2000, Owens Corning voluntarily filed for bankruptcy relief

       under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy

       Court for District of Delaware. <u>Wright</u>, 679 F.3d at 103; <u>Wright v. Owens

       Corning</u>, 450 B.R. 541, 545 (W.D. Pa. 2011).

    b.   Owens Corning's final reorganization plan was confirmed on September 26,

       2006. <u>Wright</u>, 679 F.3d at 103; <u>Wright</u>, 450 B.R. at 545.

    c.   In <u>Wright</u>, the court of appeals refused to retroactively apply a newly-

       announced bright-line legal test for determining whether a claim is

       discharged by a bankruptcy court's entry of a confirmation order. <u>Wright</u>,

       679 F.3d at 107-09.  The court of appeals instead engaged in a fact-specific

       inquiry, as required under the previously-applicable legal test, and

       concluded that Wright's and West's claims were not discharged by Owens

       Corning's bankruptcy proceedings. <u>Id.</u>; see FOF 229-31.

**FOF 3:**    The originally-proposed Rule 23(b)(2) and Rule 23(b)(3) classes shared the same

class definition.  Membership in the proposed Rule 23(b)(2) class, therefore, was

coterminous with membership in the proposed Rule 23(b)(3) class.  Owners were not

required to demonstrate any kind of shingle deterioration, property damage, or actual repair or replacement costs in order to obtain relief.

    a. At the hearing on plaintiffs' class certification motion, in response to questions from the court about the seeming redundancy of the proposed Rule 23(b)(2) and Rule 23(b)(3) classes, plaintiffs clarified that the proposed Rule 23(b)(2) injunctive relief class was intended to be an alternative in the event that the court declined to certify the proposed Rule 23(b)(3) monetary relief class. (ECF No. 173 at 37-38.)

    b. Plaintiffs explained at the hearing on their class certification motion that if the court refused to certify the Rule 23(b)(3) monetary relief class, then members of the proposed Rule 23(b)(2) class would obtain a declaration that the shingles are defective or that Owens Corning did not provide what was promised. (ECF No. 173 at 38-39.)

**FOF 4:** Plaintiffs sought to litigate four categories of legal claims on behalf of the classes proposed under Rules 23(b)(2) and 23(b)(3): (1) breach of express warranty (PA owners only); (2) breach of implied warranty of merchantability (PA, CA, and TX owners); (3) violation of state-specific consumer protection statutes (CA, TX, and IL owners); and (4) unjust enrichment (PA, CA, TX, and IL owners). (ECF No. 154 at 40-45.)

    a. The unjust enrichment claim was the only cause of action on which plaintiffs sought class certification under the laws of all four states in which the named-plaintiffs' structures are located.  The three remaining causes of action were being pursued on behalf of varying combinations of owners located in the states of Pennsylvania, Illinois, California, and Texas. (Id. at 45.)

b. The named plaintiffs' operative complaints assert numerous legal claims for which class certification was not being sought.

    i. For example, although Gonzalez, Boehm, and the Maags plead breach of express warranty claims under Texas, California, and Illinois law, respectively, plaintiffs sought to pursue only the breach of express warranty claim asserted by Wright under Pennsylvania law on behalf of the class. FOF 21, 46, 70, 88.

    ii. Similarly, although West and the Maags plead breach of implied warranty claims under Illinois law, the named plaintiffs sought to certify that legal claim on behalf of those owners whose structures are located in Pennsylvania, California, or Texas. Therefore, while owners in those three states would have their breach of implied warranty claims adjudicated on a classwide basis, owners in Illinois would not, and West and the Maags would, instead, affirmatively abandon those claims on behalf of the class. (ECF No. 173 at 21-32); FOF 21, 46, 70, 88.

**FOF 5:** In a footnote to their opening brief, plaintiffs suggested certification of an alternative "liability-only class under Rule 23(c)(4), with damages handled in separate proceedings." (ECF No. 154 at 37 n.17; ECF No. 170 at 14.) Plaintiffs did not propose a list of issues that would be decided as part of such a class, but instead argued generally that a "liability-only class will fairly and efficiently advance this litigation" "[g]iven the parties' dispute regarding an intrinsic product defect as well as Owens Corning's

deceptive representations about the reliability and durability of Oakridge." (ECF No. 170 at 15.)

**2.  The Currently-Proposed Classes**

**FOF 6:**  In their proposed findings of fact and conclusions of law, plaintiffs seek certification of the same three classes under Rules 23(b)(1)(B), (b)(2), and (b)(3), with minor modifications having been made to the originally-proposed class definitions.  The modifications made to the proposed class definitions are indicated below with strikethrough, underlining, and highlighting, and are discussed in substance in the findings of fact that follow.

> **Rule 23(b)(1)(B) ~~Impaired~~ ==Consistent-==Judgments Class,** defined as ~~A~~all individuals and entities that own a building or structure physically located in the United States on which Owens Corning's Oakridge-brand shingles are ==currently== ~~or have been~~ installed, where those shingles were purchased on or before September 26, 2006.
>
> **==A== Rule 23(b)(2) Injunctive Relief Class and Rule 23(b)(3) ~~Monetary Relief~~ Class,** defined as ~~A~~all individuals and entities that own a building or structure physically located in the states of California, Illinois, Pennsylvania, or Texas on which Owens Corning's Oakridge-brand shingles ==were== ~~are or have been~~ installed from 1992 through 2012, ==and where those shingles manifested any cracking, degranulation, fragmentation, or deterioration during the warranty coverage period==.

(ECF No. 178 at 18-19 (¶ 1(a)-(b)).)

**FOF 7:**  The most significant difference between the originally-proposed Rule 23(b)(1)(B) class, and the currently-proposed Rule 23(b)(1)(B) class is that a member of the currently-proposed Rule 23(b)(1)(B) class must own a building or structure on which Oakridge-brand shingles are currently installed. FOF 1, 6.

**FOF 8:**  The purpose of the proposed Rule 23(b)(1)(B) class remains the same: to address the effect of Owens Corning's bankruptcy discharge on owners who hold legal claims relating to Oakridge-brand shingles. FOF 2; (ECF No. 178 at 27-30 (¶¶ 41-51).)

Plaintiffs contend that this class will protect "the rights of class members whose interests are otherwise vulnerable to inconsistent dischargeability rulings." (Id. at 30 (¶ 51).)

**FOF 9:**     The most significant difference between the originally-proposed Rule 23(b)(2) and Rule 23(b)(3) classes, and the currently-proposed Rule 23(b)(2) and Rule 23(b)(3) classes is that a member of both currently-proposed classes must demonstrate that one of the four shingle conditions listed in the class definition manifested during the term of the applicable warranty period. FOF 1, 3, 6.

**FOF 10:**     Membership in the currently-proposed Rule 23(b)(2) class remains coterminous with membership in the currently-proposed Rule 23(b)(3) class. If an owner can demonstrate that the "shingles manifested any cracking, degranulation, fragmentation, or deterioration during the warranty coverage period," then that owner is a member of both the Rule 23(b)(3) monetary damages class, and the Rule 23(b)(2) injunctive relief class. If an owner cannot demonstrate that the "shingles manifested any cracking, degranulation, fragmentation, or deterioration during the warranty coverage period," then that owner is a member of neither the Rule 23(b)(3) monetary relief class, nor the Rule 23(b)(2) injunctive relief class.

**FOF 11:**     Despite the representations made by plaintiffs during the class certification hearing, plaintiffs do not, in their proposed findings of fact and conclusions of law, seek certification of the Rule 23(b)(2) injunctive relief class as an alternative to certification of the Rule 23(b)(3) monetary damages class. FOF 3(a) & 3(b).

**FOF 12:**     Instead, in their proposed findings of fact and conclusions of law, plaintiffs contend that both a Rule 23(b)(3) and a Rule 23(b)(2) class should be certified because the former will provide relief for owners who have already "suffered substantial product

failures" and the latter will "protect class members who have yet to suffer substantial product failures." (ECF No. 178 at 30 (¶ 54)).

**FOF 13:** Plaintiffs seek to pursue the same four categories of legal claims on behalf of the classes proposed under Rule 23(b)(2) and Rule 23(b)(3) that were set forth in their original briefing: (1) breach of express warranty (PA owners only); (2) breach of implied warranty of merchantability (PA, CA, and TX); (3) violation of state-specific consumer protection statutes (CA, TX, and IL); and (4) unjust enrichment (PA, CA, TX, and IL). FOF 4, 21, 46, 70, 88; (ECF No. 178 at 34-43 (¶¶ 72-106).)

**FOF 14:** Even though plaintiffs, upon questioning by the court at the class certification hearing, expressed their belief that the Rule 23(b)(2) and Rule 23(b)(3) classes should have state-by-state subclasses, and stated that they "would be happy to" propose state-specific subclasses in their post-hearing filings, plaintiffs do not propose state-specific subclasses in their proposed findings of fact and conclusions of law. (ECF No. 173 at 17-19.) Plaintiffs, instead, include a proposed conclusion of law that states: "To the extent that trial requires separate consideration of state-law claims, this Court reserves the right to certify separate state subclasses." (ECF No. 178 at 19 (¶ 1(d)); see also ECF No. 178 at 34 (¶ 71); but see ECF No. 178 at 34 (¶ 72) and 36 (¶ 81) (making passing reference in proposed conclusions of law to state-specific subclasses for the express warranty and implied warranty claims even though those classes are never defined in plaintiffs' submission).)

**FOF 15:** At the hearing on plaintiffs' motion for class certification, the court explicitly advised plaintiffs that it was their obligation to propose state-specific subclasses at the class certification stage, and that the matter was not a trial management issue in this case.

(ECF No. 173 at 18.)  Plaintiffs nevertheless elected not to propose state-specific subclasses for the proposed Rule 23(b)(2) and (b)(3) classes.

**FOF 16:**   Plaintiffs do not include a Rule 23(c)(4) class in the list of classes that they ask the court to certify. (ECF No. 178 at 18-19 (¶ 1).)  They do, however, include five paragraphs in their proposed findings of fact and conclusions of law which discuss a Rule 23(c)(4) liability-only class. (ECF No. 178 at 45-46 (¶¶ 115-119).)

    a.   Plaintiffs contend that a liability-only class is appropriate in this case because such proceedings will be efficient, with respect to both time and cost, and will allow for "focused damages proceedings." (ECF No. 178 at 46 (¶¶ 118-19).)

    b.   Plaintiffs assert that a Rule 23(c)(4) class would "proceed to trial on the threshold question of liability for the following claims: breach of express warranty under Pennsylvania law; breach of implied warranty under Illinois, Pennsylvania, and Texas law; violation of consumer protection laws in California, Illinois, and Texas; and unjust enrichment" because, "[n]otwithstanding some minor differences between the legal theories, all these claims rest on a common core of facts: design defects in Oakridge; Owens Corning's knowledge of those defects; and deceptive representations about the reliability and durability of Oakridge." (Id. at 45-46 (¶¶ 117, 119).)

**FOF 17:**   The class definitions for all three currently-proposed Rule 23(b) classes include:

    a.   Buildings and structures that are single-family dwellings, multi-family dwellings, commercial facilities, and government-owned properties. FOF 6.

b. Owners that are individuals, corporations, unincorporated associations, and governmental or municipal entities. FOF 6.

c. Owners who purchased structures on which a previous owner installed Oakridge-brand shingles prior to the date of purchase. FOF 6.

d. Owners who jointly own a structure. FOF 6.

e. Owners for whom another individual or entity, such as a builder or contractor, selected Oakridge-brand shingles for installation on the structure. FOF 6.

f. For the proposed Rule 23(b)(2) and Rule 23(b)(3) classes, owners who purchased structures from which a previous owner removed Oakridge-brand shingles prior to transferring ownership to the current owner. FOF 6.

g. For the proposed Rule 23(b)(2) and Rule 23(b)(3) classes , owners whose Oakridge-brand shingles will not crack, degranulate, fragment, or deteriorate for 30 years, or more. FOF 193(f).

h. For the proposed Rule 23(b)(2) and Rule 23(b)(3) classes, owners whose Oakridge-brand shingles will not require repair or replacement for 30 years, or more. FOF 193(f).

i. For the proposed Rule 23(b)(2) and Rule 23(b)(3) classes, owners whose Oakridge-brand shingles will not cause a roofing leak, or otherwise cause property damage for 30 years, or more. FOF 193(f).

**B. The Named Plaintiffs' Cases, Claims, and Factual Circumstances**

**1. The Wright[(PA)] – West[(IL)] Case**

**FOF 18:**   On November 11, 2009, Patricia Wright ("Wright") and Kevin West ("West")

filed a putative class action complaint in this court. (09-cv-1567, ECF No. 1.)  The

operative complaint in the Wright-West case is the Third Amended Complaint, which

was filed on November 30, 2012. (09-cv-1567, ECF No. 119.)

**FOF 19:**   Wright and West aver that Owens Corning's Oakridge-brand shingles are

"plagued by design flaws that result in cracking, curling and degranulation" and "will

eventually fail, causing property damage, and costing consumers substantial removal and

replacement costs." (09-cv-1567, ECF No. 119 ¶ 2.)

**FOF 20:**   Wright and West propose certification of a nationwide class of individuals who

"owned, own, or acquired" structures on which Owens Corning Oakridge roofing

shingles "are or have been installed since 1986." (09-cv-1567, ECF No. 119 ¶ 55.)  An

alternative class comprised of individuals who own structures located in Pennsylvania or

Illinois is proposed. (Id. ¶¶ 8-9, 56 (Wright is a resident of Pennsylvania, and West is a

resident of Illinois.).)

**FOF 21:**   The Third Amended Complaint consists of ten counts. (09-cv-1567, ECF No. 119

at 21-33.)   The legal claims asserted by Wright and West are:

| Count No. | Cause of Action | Applicability | Seeking Class Certification? |
|---|---|---|---|
| 1 | Pennsylvania's Unfair Trade Practices and Consumer Protection Law | "Pennsylvania Plaintiffs" | No |
| 2 | Breach of Contract | "the Class" | No |
| 3 | Breach of Express Warranty | "the Class" | Yes (PA Only) |
| 4 | Breach of Implied Warranty of Merchantability | "the Class" | Yes (PA Only) |

| 5 | Negligence | "the Class" | No |
|---|---|---|---|
| 6 | Strict Products Liability | "the Class" | No |
| 7 | Unjust Enrichment | "the Class" | Yes |
| 8 | Fraudulent Misrepresentation, Concealment, and Failure to Disclose | "the Class" | No |
| 9 | Negligent Misrepresentation | "the Class" | No |
| 10 | Declaratory and Injunctive Relief | "the Class" | Yes (Rule 23(b)(2)) |

### a. Facts Applicable to Wright

**FOF 22:** Wright had Owens Corning Oakridge-brand shingles installed on her home, which is located in Pennsylvania, no later than 1999. (09-cv-1567, ECF No. 1 ¶¶ 8, 47; ECF No. 162-4 at 20-23.)

**FOF 23:** Wright selected the Oakridge-brand shingles after visiting a commercial retailer, such as Home Depot or Lowe's, where she obtained a brochure for "Oakridge Shadow Premium Architectural Series Shingles." (ECF No. 153-10 at 8 (depo. pgs. 94 and 97); ECF No. 153-12 at 14-18.) She gave or showed the brochure to the contractor that she hired to build an addition onto her home and instructed him to use the shingles she selected for the project. (ECF No. 162-4 at 19-20.)

**FOF 24:** The brochure obtained by Wright describes the six components of a complete Owens Corning Roofing System, of which the shingles are one part. (ECF No. 153-12 at 15-17.) The multi-component system is described as providing "long-lasting protection." (Id. at 15.) With respect to the shingle component of the system, the brochure states that "[p]erformance is at the heart of every Owens Corning shingle," the shingles offer "premium protection and enduring value," and "[a]ll Owens Corning shingles have a tough, Fiberglass mat core that has become an industry standard." (Id. at 16, 17.)

**FOF 25:**   The brochure obtained by Wright includes, on the cover, a graphic representing a "Limited 40 Year Product Warranty." (ECF No. 153-12 at 14.)  The brochure later explains that a purchaser "automatically get[s] limited shingle warranty coverage" and can purchase a warranty with additional benefits if the complete Owens Corning Roofing System is installed. (Id. at 16.)  A chart is included in the brochure that lists the "shingle warranty" for various brands of Owens Corning shingles, and the "System Warranty Non-Prorated Period" applicable to each brand if the additional system warranty is purchased. (Id. (listing shingle and system warranties for Oakridge-, Prominence-, Supreme-, Supreme Shadow-, Glaslock-, and Classic-brand shingles).)  The brochure states that the "40-year warranty* covers the prorated replacement cost of new shingles *and* labor." (Id. at 17 (emphasis in original).)  The asterisk directs the reader to "see actual warranty for details." (Id.)

**FOF 26:**   No one at the retail store told Wright anything about the warranty coverage for the Oakridge-brand shingles that she selected. (ECF No. 153-10 at 8 (depo. pg. 97).)

**FOF 27:**   Wright testified that "when we bought a 40-year shingle roof, we were promised that was supposed to have been a good roof." (ECF No. 153-10 at 5-6 (depo. pg. 43).)

**FOF 28:**   Although Wright has documentation of the total cost of the addition to her home on which the shingles were installed in 1999, that documentation does not reflect, and she does not and never did know, what portion of the $77,500 total cost was attributable to purchasing the Oakridge-brand shingles that she picked out, as opposed to related roofing supplies, or the labor associated with installing the roof, or other aspects of the addition project. (ECF No. 153-10 at 7 (depo. pgs. 83-84); ECF No. 162-4 at 12-13, 20.)

**FOF 29:** No later than 2009, Wright experienced water leaking around the skylights in the addition. (ECF No. 162-4 at 23-24; ECF No. 153-10 at 4 (depo. pgs. 35-36).) Owens Corning's expert witness in the field of roofing, James Johnson ("Johnson"), attributed the leakage to improperly installed flashing around the skylights in the addition. (ECF No. 162-7 at 6.) Plaintiffs' expert witness, Dean Rutila ("Rutila"), agreed with Johnson, testifying during a <u>Daubert</u> hearing that the leaking around Wright's skylights was not caused by problems with the Oakridge-brand shingles installed on the addition. (ECF No. 139 at 34.)

**FOF 30:** Wright contends that a roofer who inspected the roof after she experienced the water leak in 2009 reported to her that all the shingles on her roof were cracked. (ECF No. 153-10 at 9 (depo. pg. 121).) The roofer did not tell Wright that the cracked shingles caused water to leak around the skylights in the addition. (<u>Id.</u>) There is no evidence that the roofer advised Wright to immediately replace, or repair, the shingles on her roof.

**FOF 31:** Wright submitted a warranty claim to Owens Corning, but rejected its $3,400 offer because the roof would cost her $13,000 to replace. (ECF No. 153-10 at 10-12 (depo. pgs. 131, 137, 146)).

 **b. <u>Facts Applicable to West</u>**

**FOF 32:** West had Owens Corning Oakridge Pro 30 shingles installed on his home, which is located in Illinois, in 2005. (ECF No. 162-6 at 8; ECF No. 153-11 at 4-6; ECF No. 153-12 at 22, 24.)

**FOF 33:** West selected the Oakridge-brand shingle after visiting a commercial retailer located in "Galesburg," where he obtained a one-page flyer for "Oakridge Pro 30 Onyx Black" shingles. (ECF No, 153-11 at 4-6; ECF No. 153-12 at 24.) West instructed the

contractor he had hired to replace the roof on his house to use those shingles, and the contractor purchased the Oakridge-brand shingles on West's behalf from the Alexander Lumber Company. (ECF No. 162-6 at 9-10.)

**FOF 34:** West does not know how much his contractor paid for the shingles, and testified that it is not readily apparent to him from the documentation that he has from the project what portion of the total cost is attributable to the cost of the shingles, as opposed to related supplies, and labor. (ECF No. 162-6 at 11; ECF No. 153-12 at 22.)

**FOF 35:** West does not recall anyone at the retail store giving him information about Owens Corning's shingles. (ECF No. 162-6 at 9.) He maintains that the only representations made to him by Owens Corning are found in the one-page flyer that he obtained at the retail store. (ECF No. 162-6 at 28-29; ECF No. 153-12 at 24.)

**FOF 36:** The one-page flyer that West obtained at the retail store includes a graphic representing a "Limited 30 Year Product Warranty" and, in the text, lists a "30-Year Limited Warranty," as well as a "70-MPH Wind Resistance Limited Warranty." (ECF No. 153-12 at 24.) The flyer emphasizes the aesthetic appeal of the shingles and states that the shingles "offer increased curb appeal and low-maintenance durability." (Id.)

**FOF 37:** West testified that the shingles were not durable because they did not last for 30 years. (ECF -No. 153-11 at 13.)

**FOF 38:** In June 2009 water began to leak into West's family room, which is located in the back of his home. (ECF No. 162-6 at 14.) This is referred to as the "back roof" of West's home.

    a. West personally viewed the area from inside his house and outside his house, while on a ladder, and contacted the contractor who installed the roof, who

visited several days later and caulked some cracks in the roof. (ECF No. 162-
6 at 15-16.)

b. An insurance adjuster later inspected the roof and opined that the leak was
being caused by either faulty shingles or airflow problems. (Id. at 16-17.)

c. West also contacted Owens Corning to make a warranty claim, which claim
was denied because the cracks, which were vertical cracks, were deemed to
have been caused by deck movement resulting from inadequate ventilation.
(Id. at 19; ECF No. 153-11 at 9-10.)

d. Johnson confirmed the presence of both deck movement and inadequate
ventilation during his visual inspection of West's roof. (ECF No. 162-7 at 7-
8.) There is no indication that Rutila conducted a visual inspection of West's
home. (ECF Nos. 151-5 to -7 and 154-2.)

**FOF 39:** West was unaware that the middle and main roofs of his house allegedly exhibited
"cracking and degranulation" until shortly before his deposition was taken for purposes
of this litigation in April 2010, when he was told about the condition of his shingles by an
inspector hired by plaintiffs' counsel. (ECF No. 162-6 at 20.)

**FOF 40:** West's insurance company paid him more than the actual cost of the repairs to the
ceiling in his family room, which was damaged by the water leak. (ECF No. 162-6 at 23-
24, 30.)

**FOF 41:** The contractor who replaced the roof on West's house in 2005, reshingled the
back roof, which is above his family room, free-of-charge, in 2009. (ECF No. 162-6 at
21-22, 30.)

**FOF 42:** West is not seeking to recover for any property damage to his home, but does seek to recover the cost to reshingle his roof. (ECF No. 162-6 at 6, 30.) West does not specify whether this includes the middle, main, or back roofs, or some combination of the same. There is no evidence that West, to date, has reshingled any part of his roof, other than the back roof.

## 2. The Gonzalez[(TX)] Case

**FOF 43:** On February 22, 2013, the same attorneys who were representing Wright and West before this court, filed a putative class action complaint in the United States District Court for the Southern District of Texas on behalf of Jaime Gonzalez ("Gonzalez") and a nationwide class of individuals who owned structures on which Owens Corning's Oakridge-brand shingles were installed. (ECF No. 1 ¶ 54.) Alternatively, Gonzalez sought to represent a class of individuals who owned structures located in Texas, where the structure owned by Gonzalez is located. (Id. ¶ 55.)

**FOF 44:** Gonzalez filed a First Amended Class Action Complaint in which he abandoned his pursuit of a nationwide class and asked the court to certify a class of "individuals and entities that have owned, own, or acquired [structures] physically located in Texas on which Owens Corning Oakridge shingles are or have been installed since 1986." (ECF No. 23 ¶ 54 (referred to as the "Gonzalez Texas Class" in the chart that follows).)

**FOF 45:** Gonzalez alleges that Owens Corning's shingles are "defectively designed and manufactured in such a way that they fail prematurely, causing damage to the underlying structures," which defects are manifested by "cracking, curling, degranulation," among other things. (ECF No. 23 ¶¶ 11, 13.)

**FOF 46:** The operative complaint in the Gonzalez case is the First Amended Class Action

Complaint. The First Amended Class Action Complaint consists of eight counts. (ECF

No. 23 at 19-28.) The legal claims asserted by Gonzalez are:

| Count No. | Cause of Action | Applicability | Seeking Class Certification? |
|-----------|-----------------|---------------|------------------------------|
| 1 | Breach of Express Warranty | the Gonzalez Texas Class | No |
| 2 | Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose | the Gonzalez Texas Class | Yes (as to merchantability) |
| 3 | Breach of Contract | the Gonzalez Texas Class | No |
| 4 | Fraudulent Concealment | the Gonzalez Texas Class | No |
| 5 | Negligence | the Gonzalez Texas Class | No |
| 6 | Unjust Enrichment | the Gonzalez Texas Class | Yes |
| 7 | Texas Deceptive Trade Practices Act | the Gonzalez Texas Class | Yes |
| 8 | Declaratory and Injunctive Relief | the Gonzalez Texas Class | Yes (Rule 23(b)(2)) |

**FOF 47:** Gonzalez had Owens Corning Oakridge-brand shingles installed on his home,

which is located in Texas, no later than 2002. (ECF No. 162-10 at 10.)

**FOF 48:** Gonzalez selected the Oakridge Pro 30 shingle after visiting Leyendecker Lumber

with the contractor who was building his home. (ECF No. 162-10 at 12-13; ECF No. 153-

11 at 26.) Gonzalez recalls seeing a promotional display at the retail store, and being given

a brochure or pamphlet by a salesman, all of which he recalls reflected a warranty of a set

number of years. (ECF No. 162-10 at 15-16, 18, 20, 21.)

**FOF 49:** The salesman at Leyendecker Lumber told Gonzalez that the Oakridge-brand shingles were "one of their best sellers" and "had more warranty." (ECF No. 162-10 at 17, 19.) Gonzalez's contractor told him that "it's a good shingle." (Id. at 17.)

**FOF 50:** Gonzalez selected the Oakridge Pro 30 shingles based upon price and length of warranty. (ECF No. 162-10 at 16, 20; ECF No. 153-11 at 20.)

**FOF 51:** Gonzalez testified that a shingle with a 20-year warranty, for example, "should last 20 years." (ECF No. 153-11 at 17.)

**FOF 52:** Although Gonzalez testified that he saw Owens Corning commercials on television, he could not recall the content of any of those advertisements. (ECF No. 162-10 at 23-24.)

**FOF 53:** Gonzalez did not know the price of the shingles he purchased and could only estimate that they cost "[a] couple of thousand" dollars. (ECF No. 162-10 at 22.) He did not know what the labor cost associated with installing the shingles was. (Id. at 24.)

**FOF 54:** Although the documentary evidence for Gonzalez's project includes an invoice that reflects the purchase of roofing supplies from Leyendecker Lumber, the exhibit provided to the court is illegible. (ECF No. 166-2 at 20-21; ECF No. 153-11 at 27.)

**FOF 55:** In 2012, Gonzalez experienced water leaking in his garage, kitchen (which is adjacent to the garage), and master bathroom. (ECF No. 162-10 at 26; ECF No. 166-2 at 5-11.)

**FOF 56:** The roof over Gonzalez's garage is stucco, or cement, and has no shingles on it. (ECF No. 162-10 at 10-11; ECF No. 162-17 at 4; ECF No. 162-21 at 2.)

**FOF 57:** Gonzalez's insurance company estimated the cost to repair the damage to the interior of his house, in all areas, to be approximately $6,500. (ECF No. 162-17 at 2-4; ECF No. 166-2 at 5-11.)

**FOF 58:**   The insurer paid Gonzalez for the cost to repair the interior of his home, less a deductible. (Id.; ECF No. 166-3 at 2.)

**FOF 59:**   Gonzalez testified that the insurance adjuster told him that the insurance company would not pay for the repair or replacement of the roof because "it was bad shingles." (ECF No. 153-11 at 24-25.)

**FOF 60:**   The insurance adjuster's written report, however, states that "the ridge shingles had deteriorated.  The field shingles however are in perfect condition." (ECF No. 162-21 at 2.) Hip and ridge shingles, which fold over the peaks of a roof, are not Oakridge-brand shingles. (ECF No. 162-7 at 8.)  Field shingles are Oakridge-brand shingles.

**FOF 61:**   Gonzalez's insurance carrier further reported that the stucco roof over the garage was cracked, and there were maintenance and insulation issues with the shingled roof over the master bathroom, but there was no storm damage to the roof. (ECF No. 166-2 at 24.)

**FOF 62:**   Johnson opined that cracks in the cement roof above the garage caused the leaking in the garage and kitchen, and that the boot flashing for the soil stack in the master bedroom was improperly installed, causing the leaking in the master bathroom. (ECF No. 162-7 at 8-9.)

**FOF 63:**   When Rutila inspected Gonzalez's roof for purposes of preparing his April 2014 expert report, he noted that "[s]hingle tabs are cracked and the shingles have apparent surfacing granule loss." (ECF No. 151-5 at 12-13.)  Although recognizing the fact that the one-story attached garage has a "fluid applied membrane" roof, without any shingles, Rutila makes no further distinction between the unshingled garage roof and the remainder of the roof in offering his opinions, even though Gonzalez experienced leaking in the garage and adjacent kitchen. (Id.)

**FOF 64:** Gonzalez submitted a warranty claim to Owens Corning, which offered a payment of $162.63, representing the prorated replacement cost for the hip and ridge shingles on Gonzalez's roof. (ECF No. 162-17 at 3.) Gonzalez's warranty claim submissions include only pictures of hip and ridge shingles. (ECF No. 166-2.)

**FOF 65:** Gonzalez rejected Owens Corning's warranty offer, stating that the damage to his roof was quoted to be in excess of $15,000, not including the nearly $7,000 in damage to the interior of his home, which was paid for by his insurance company. (ECF No. 166-3.) There is no evidence that Gonzalez actually replaced the shingles on his roof.

**FOF 66:** Owens Corning directed Gonzalez to submit additional samples and photographs if shingles other than the "hip and ridge" shingles were "bad/affected." (ECF No. 166-03 at 2.) There is no evidence that Gonzalez ever supplemented his warranty claim submission to Owens Corning.

### 3. The Boehm[(CA)] Case

**FOF 67:** Several days after the Gonzalez case was filed in Texas, on February 28, 2013, a subset of the same attorneys who were representing Wright and West before this court and Gonzalez before the Texas district court filed a putative class action complaint in the United States District Court for the Central District of California on behalf of Gerald Boehm ("Boehm") and a nationwide class of individuals who owned structures on which Owens Corning's Oakridge-brand shingles were installed. (13-cv-936, ECF No. 35-1.) Alternatively, Boehm sought to represent a class of individuals who owned structures located in California. (Id.)

**FOF 68:**   On April 16, 2013, Boehm filed a First Amended Class Action Complaint in the California district court, in which he abandoned his pursuit of a nationwide class and asked the court to certify a class of "individuals and entities that have owned, own, or acquired [structures] physically located in the state of California on which Owens Corning Oakridge shingles are or have been installed since 1986." (13-cv-936, ECF No. 35-1; <u>Boehm, et al. v. Owens Corning, et al.</u>, No. 13-0355 (C.D. Cal.), ECF No. 13 ¶ 53 (referred to as the "Boehm California Class" in the chart that follows).)

**FOF 69:**   Boehm makes the same allegations in his complaint as did Wright, West and Gonzalez about Owens Corning's Oakridge-brand shingles being "plagued by design flaws that result in cracking, curling and degranulation" and "causing property damage, and costing consumers substantial removal and replacement costs." (13-cv-936, ECF No. 35-1; <u>Boehm, et al. v. Owens Corning, et al.</u>, No. 13-0355 (C.D. Cal.), ECF No. 13 ¶ 2.)

**FOF 70:**   The operative complaint in the Boehm case is the First Amended Class Action Complaint. (13-cv-936, ECF No. 35-1; <u>Boehm, et al. v. Owens Corning, et al.</u>, No. 13-0355 (C.D. Cal.), ECF No. 13 ¶ 2.)  The First Amended Class Action Complaint consists of twelve counts. (13-cv-936, ECF No. 35-1; <u>Boehm, et al. v. Owens Corning, et al.</u>, No. 13-0355 (C.D. Cal.), ECF No. 13 at 17-29.)   The legal claims asserted by Gonzalez are:

| Count No. | Cause of Action | Applicability | Seeking Class Certification? |
|---|---|---|---|
| 1 | California Business and Professional Code; Unfair Business Practices | The Boehm California Class | Yes |
| 2 | California Business and Professional Code; False Advertising | The Boehm California Class | Yes |
| 3 | California Consumer Legal Remedies Act | The Boehm California Class | Yes |
| 4 | Breach of Contract | The Boehm California Class | No |
| 5 | Breach of Express Warranty | The Boehm California Class | No |

| 6 | Breach of Implied Warranty of Merchantability | The Boehm California Class | Yes |
|---|---|---|---|
| 7 | Negligence | The Boehm California Class | No |
| 8 | Strict Products Liability | The Boehm California Class | No |
| 9 | Unjust Enrichment | The Boehm California Class | Yes |
| 10 | Fraudulent Misrepresentation, Concealment, and Failure to Disclose | The Boehm California Class | No |
| 11 | Negligent Misrepresentation | The Boehm California Class | No |
| 12 | Declaratory and Injunctive Relief | The Boehm California Class | Yes (Rule 23(b)(2)) |

**FOF 71:**   In 1997, Boehm had Oakridge Shadow-brand shingles installed on the roof of his home, which is located in California. (ECF No. 154-25; ECF No. 162-8 at 3.)

**FOF 72:**   Boehm visited Ford Wholesale where he viewed samples of different brands of shingles, as well as different Owens Corning shingles with varying warranty lengths. (ECF No. 162-9 at 10, 12-13.)

**FOF 73:**   Boehm obtained a brochure from Ford Wholesale for Oakridge Shadow-brand shingles, and drove past a house that he was told had the color shingle that he was interested in using installed on it. (Id. at 10-11, 13.)

**FOF 74:**   The brochure includes a "Limited 40 Year Product Warranty" graphic and states, in the text of the brochure, that a "40-year warranty* covers the prorated replacement cost of new shingles *and* labor." (ECF No. 162-8 at 6 (emphasis in original).)  The asterisk directs the customer to "see actual warranty for details." (Id.)

**FOF 75:**   Boehm's contractor also gave him a copy of the "Limited Warranty on Roofing Shingles," issued by Owens Corning in November 1997. (ECF No, 162-8 at 5.)

**FOF 76:**   Boehm testified that he understood the warranty would be "deducted for the time [the shingles were] used." (ECF No. 162-9 at 15.)

**FOF 77:** Although Boehm generally recalled Owens Corning commercials that included the "pink panther," he did not remember the content of any such advertisement, and never saw any marketing materials, other than the brochure he obtained at Ford Wholesale, before purchasing the shingles for his roof in 1997. (ECF No. 162-9 at 10, 17.)

**FOF 78:** Boehm selected the Oakridge Shadow-brand shingles based upon "the warranty, the name [Owens Corning], and the color," and the architectural styles (ECF No. 162-9 at 13; ECF No. 153-11 at 33.)

**FOF 79:** Boehm decided to purchase the Oakridge-brand shingles that were accompanied by the warranty with the longest duration because each upgrade in the number of years for which the warranty applied only cost a few hundred dollars more, and he considered "it well worth the extra 4- or $500, whatever it was, to get the higher warranty." (ECF No. 162-9 at 12.)

**FOF 80:** Boehm stated "my 40-year roof that I think should probably last 40 years" and that all he wants is for his "roof to last 40 years." (ECF No. 162-9 at 3.)

**FOF 81:** In 2010, a roofer who was recoating a drain system and replacing flashing around several solar lights on Boehm's roof informed Boehm that the shingles on his roof "looked like they were starting to crack." (ECF No. 162-9 at 7-8.)

**FOF 82:** In February 2011, Boehm submitted a warranty claim to Owens Corning, stating that there were top surface cracks mainly on south-facing slopes, but with evidence of cracks in most other areas. (ECF No. 162-9 at 18-19; ECF No. 162-8 at 3.)

**FOF 83:** Owens Corning offered a payment of approximately $2,300, which Boehm rejected because he estimated that it would cost more than double that amount to replace

his roof. (ECF No. 153-11 at 34-35; ECF No. 162-8 at 2.)  Boehm never obtained an estimate from a contractor for the cost to replace his roof. (ECF No. 162-9 at 22.)

**FOF 84:**  The total cost to replace the roof on Boehm's residence in 1997 was approximately $10,000, but there is no evidence in the record about what portion of that cost was attributable to the shingles purchased from Ford Wholesale for the project. (ECF No. 153-11 at 39; ECF No. 162-8 at 4.)  Even though the invoice indicates a $4,150 payment to Ford Wholesale, the invoice reflects that the payment included materials and supplies other than shingles. (ECF No. 153-11 at 39.)

**FOF 85:**  Boehm's house has not suffered any property damage as a result of the allegedly faulty Oakridge-brand shingles, and Boehm submits no evidence that he, to date, has replaced the shingles on the roof of his house. (ECF No. 153-11 at 35; ECF No. 162-9 at 22-23.)

## 4.  The Maag[(IL)] Case

**FOF 86:**  The last of the four cases was filed in the United States District Court for the Southern District of Illinois on March 25, 2014, on behalf of Edward and Diane Maag (the "Maags" or the "Maag Case") and a nationwide class of individuals "that have owned, own, or acquired" structures "on which Owens Corning Oakridge shingles are or have been installed since 1986." (14-cv-826, ECF No. 2 ¶ 68.)  Alternatively, the Maags proposed certification of a class of individuals "that have owned, own, or acquired [structures] physically located in the state of Illinois on which Owens Corning Oakridge shingles are or have been installed since 1986." (Id. ¶ 69.)

**FOF 87:**  The Maags make the same allegations in their complaint as do the other named plaintiffs about Owens Corning's Oakridge-brand shingles being "plagued by design

flaws that result in cracking, curling and degranulation" and "causing property damage, and costing consumers substantial removal and replacement costs." (14-cv-826, ECF No. 2 ¶ 2.)

**FOF 88:** The operative pleading in the Maag case is the originally-filed Complaint. The Complaint consists of ten counts. (14-cv-826, ECF No. 2 at 21-33.) The legal claims asserted by the Maags are:

| Count No. | Cause of Action | Applicability | Seeking Class Certification? |
|-----------|-----------------|---------------|------------------------------|
| 1 | Illinois Consumer Fraud and Deceptive Business Practices Act | "the Class" | Yes |
| 2 | Breach of Contract | "the Class" | No |
| 3 | Breach of Express Warranty | "the Class" | No |
| 4 | Breach of Implied Warranty of Merchantability | "the Class" | No |
| 5 | Negligence | "the Class" | No |
| 6 | Strict Products Liability | "the Class" | No |
| 7 | Unjust Enrichment | "the Class" | Yes |
| 8 | Fraudulent Misrepresentation, Concealment, and Failure to Disclose | "the Class" | No |
| 9 | Negligent Misrepresentation | "the Class" | No |
| 10 | Declaratory and Injunctive Relief | "the Class" | Yes (Rule 23(b)(2)) |

**FOF 89:** In 1999, the Maags had Oakridge-brand shingles installed on their home, which is located in Illinois. (ECF No. 162-14 at 14.)

**FOF 90:** The Maags selected the Oakridge Shadow-brand shingle during a visit to Leo Brown Lumber because of the color availability, architectural style, and length of warranty. (ECF No. 162-16 at 7-8; ECF No. 162-14 at 14.)

**FOF 91:** The Maags did not obtain any brochures or speak to any salespeople during the selection process. (ECF No. 162-16 at 8-10.) They did view a display board with

samples of the shingles, which indicated that certain Owens Corning shingles were "40-year warranty shingles." (ECF No. 162-19 at 9-10.)

**FOF 92:**    The cost of the Oakridge-brand shingles in 1999 was $3,719.40. (ECF No. 162-14 at 20.)

**FOF 93:**    Mr. Maag stated that "a 40-year warranty seemed to me to be a warranty which would compensate for defects for 40 years." (ECF No. 162-14 at 27.)  Mrs. Maag stated that shingles with a 40-year warranty "were going to be the longest-life shingles" and "would last 40 years, like they said it would." (ECF No. 153-12 at (44, 102).)

**FOF 94:**    Following a tornado in 2011, the Maags hired a contractor to replace a shingle that had blown off their roof. (ECF No. 162-16 at 5-6, 11-12.)  The contractor informed the Maags that the shingles on their roof were cracked and that the roof would need to be replaced in the next year or so. (Id.)

**FOF 95:**    In December 2012, a different contractor who the Maags hired to repair shingles that had blown off the roof informed the Maags that pieces of shingles were coming off the roof because the shingles were disintegrating. (ECF No. 153-12 at 43.)

**FOF 96:**    The Maags' home never suffered property damage as a result of shingle failure. (ECF No. 162-16 at 18; ECF No. 162-14 at 24, 25.)

**FOF 97:**    The Maags accepted a settlement payment from Owens Corning in 2013 of $6,696.63. (ECF No. 162-15 at 2-3.)  The Maags used the payment to purchase new Owens Corning shingles to replace their roof, at a total cost of approximately $16,000. (ECF No. 162-16 at 3, 14; ECF No. 162-14 at 25.)

**FOF 98:** By accepting the settlement payment, the Maags released Owens Corning from any and all liability related to the complaint they made to Owens Corning's Customer Response Center about their shingles. (ECF No. 162-15 at 2-3.)

**5. <u>Summary of Named Plaintiffs' Claims</u>**

**FOF 99:** Each named plaintiff contends that Owens Corning's defective Oakridge-brand shingles cause two kinds of harm: a) property damage, and b) removal and replacement costs. FOF 19, 45, 69, 87.

**FOF 100:** Of the named plaintiffs, only the structures owned by Wright, West, and Gonzalez suffered property damage. FOF 29, 38-40, 55, 58, 81-82, 85, 96.

    a. Plaintiffs concur that the damage caused to Wright's roof was not caused by faulty Oakridge-brand shingles. FOF 29.

    b. There is evidence that the damages caused to West's and Gonzalez's structures were not caused by faulty Oakridge-brand shingles. FOF 38-40, 60-62.

    c. West's and Gonzalez's insurance carriers paid to repair the property damage to their structures. FOF 40, 58.

**FOF 101:** Of the named plaintiffs, the record reflects that only West and the Maags replaced the Oakridge-brand shingles on the roof of their structures. FOF 30-31, 41, 65, 85. 97.

    a. West's contractor replaced the back roof on his structure free-of-charge. FOF 41.

    b. The Maags used a nearly $7,000 settlement payment that Owens Corning made in connection with their warranty claim to purchase new Owens Corning shingles to replace the shingles on their structure. FOF 97.

**C.**     **Owens Corning's Oakridge-Brand Shingles and Warranty Data**

**FOF 102:** Oakridge-brand shingles are fiberglass mat shingles, which means that the mat component of the shingle is made primarily of fiberglass. When the mat is made primarily of paper or cloth, the shingle is referred to as an organic shingle. (ECF No. 165 ¶ 11.)

**FOF 103:** The fiberglass mat is coated with an asphalt and limestone filler mix and then colored ceramic granules are applied on top. (Id. ¶¶ 10-24.)

**FOF 104:** Each of the shingle components is supplied to Owens Corning by different manufacturers from plants located throughout the country. (Id.) The characteristics of each component will vary from plant to plant to account for climate differences, and raw materials have changed in content and performance over the last two decades. (Id.)

**FOF 105:** At least 23 kinds of Oakridge-brand shingles were manufactured at 13 different plants in the United States during the proposed 20-year class period. (ECF No. 151-5 at 8-9; ECF No. 165 ¶ 6.)

**FOF 106:** Each Owens Corning plant designs shingles to perform in the climate of the location in which that plant is located, and correspondingly, where those shingles will likely be installed. (ECF No. 165 ¶¶ 7-8).)

**FOF 107:** Owens Corning typically distributes shingles from particular manufacturing plants to particular states. (ECF No. 165 ¶ 7.) For instance, the Owens Corning manufacturing plant in Portland, Oregon, supplies shingles to customers located in "geo-zones" in the Pacific Northwest, while the plant in Jacksonville, Florida, supplies shingles to customers located in Florida and Latin America. (ECF No. 153-12 at 8-9; ECF No 165 ¶¶ 6-7.)

**FOF 108:** During the proposed 20-year class period, Owens Corning used more than 500 design specifications to manufacture Oakridge-brand shingles. (ECF No. 162-61 ¶ 34; ECF No. 165 ¶ 43; ECF No. 165-1.)

    a.   Each specification provides a minimum, maximum, and target measurement for square weight, a target and minimum measurement for asphalt weight and tear strength, and a target measurement for mat weight. (ECF No. 162-61 ¶ 35; ECF No. 165-1 at 2-15.)

    b.   An Owens Corning design specification for an Oakridge-brand shingle is, therefore, not a list of exact measurements to which a shingle must be manufactured, but, instead, is a collection of minimums, maximums, and target measurements for various features of the shingle which frame the acceptable, and preferable, parameters within which to manufacture a shingle at that particular plant, at that particular time, using those raw materials that are available at that location and time. (ECF No. 162-61 ¶ 35; ECF No. 165 ¶ 35; ECF No. 165-1 at 2-15.)

    c.   How the various features of a shingle, such as its square weight, asphalt weight, tear strength, and mat weight are coordinated with and related to each other affects the quality of a shingle. (ECF No. 159 at 4, 5-6, 7, 21.)  One measurement, viewed in isolation, will not define the quality of a shingle. (Id.)

**FOF 109:** There is no dispute that all design specifications for Oakridge-brand shingles at issue in this case meet the applicable industry standard, ASTM D3462.  That standard is "designed for the evaluation of products as manufactured." (ECF No. 139 at 23; ECF No. 151-3 at 14-18.)  The ASTM standard sets minimums for such measurements as tear

32

strength, net mass, mat mass, asphalt mass, and mineral matter mass for newly-manufactured shingles. (ECF No. 151-3 at 15-16.)  Plaintiffs' expert concedes that the standard does not establish performance requirements for installed fiberglass shingles and does not prescribe an expected service life for a shingle. (ECF No. 151-4 at 3 (¶ 11).)

**FOF 110:**  Although other warranties could have been offered, and purchased, in connection with Oakridge-brand shingles, a limited shingle warranty was automatically provided with the installation of all Oakridge-brand shingles. (ECF No. 162-51 ¶¶ 4-5, 10-12 and Table A.)  During the proposed 20-year class period, the term of the limited shingle warranty varied from 25 years, to a lifetime warranty, and provided for the replacement, at a prorated cost, of shingles that contain manufacturing defects that would reduce the usable life of the shingle or affect shingle performance. (Id.)

**FOF 111:**  Owens Corning Oakridge-brand shingles were installed on more than six million structures between 2000 and 2012. (ECF No. 166-7 at 30.)

**FOF 112:**  Less than one half of one percent of Oakridge-brand shingle installations produced a warranty claim between 2000 and 2012. (ECF No. 166-7 at 30; ECF No. 139 at 73.)  Put another way, for every 1,000 structures on which Oakridge-brand shingles were installed, fewer than 5 owners submitted a warranty claim to Owens Corning.

**FOF 113:**  Data produced by Owens Corning in this litigation indicates that, between 1992 and 2012, nearly 30,000 warranty claims were made in connection with Oakridge-brand shingles that were produced at manufacturing plants that typically distribute shingles for installation in Pennsylvania, Illinois, California, and Texas. FOF 103-04; (ECF No. 154-24 at 5; ECF No. 153-12 at 8-9; ECF No. 154-1 ¶ 44(c).)

**FOF 114:** Warranty claims are occasionally denied on the basis that the shingle submitted with the claim was not manufactured by Owens Corning. (ECF No. 154-1 ¶ 44(d).)

**FOF 115:** Owens Corning administers warranty claims on a case-by-case basis. A product quality specialist is assigned to each warranty claim that Owens Corning receives. (ECF No. 162-51 ¶ 25.) The warranty claim review process may include reviewing documentation and photographs, gathering information from the owner or third parties, sending an inspector to the property, or testing the returned shingles. (Id. ¶ 26.) Claims are sometimes paid solely to preserve customer goodwill. (Id. ¶ 29.)

**FOF 116:** Owens Corning does not maintain records that identify all owners who had Oakridge-brand shingles installed on their structures from 1992 to 2012. (ECF No. 162-51 ¶ 22.)

**FOF 117:** Owens Corning does not maintain records that indicate all owners who hold a limited shingle warranty. (ECF No. 162-51 ¶ 22.)

**D.** **Owens Corning's Representations about Oakridge-brand Shingles**

**FOF 118:** The record reflects that purchasers receive information about Oakridge-brand shingles while at retail locations, such as home improvement stores and lumber yards. Specifically, purchasers obtain brochures, pamphlets, and data sheets, and view sample boards and signage at retail outlets prior to selecting Oakridge-brand shingles. FOF 23-25, 33, 35-36, 48, 72-75, 77, 90-91. Purchasers may also speak with the contractor who will be installing the new shingles and sales associates at the retail location. FOF 49.

    a.   Plaintiffs submit no examples of product displays or sample boards made available at the retail point of sale, which several named plaintiffs indicate they relied upon in selecting Oakridge-brand shingles. FOF 48, 91.

b. Plaintiffs submit no examples of product packaging or inserts that accompany Oakridge-brand shingles at the retail point of sale, or when the product is delivered to the owner, or the owner's contractor.

**FOF 119:** The named plaintiffs rely upon several different categories of evidence to support their contention that Owens Corning, during the entire proposed 20-year class period, "represented that Oakridge would last the duration of the warranty," "encouraged consumers to associate Oakridge's warranty durations with Oakridge's durability," or otherwise promised that Oakridge-brand shingles would have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty. (ECF No. 178 at 10 (¶¶ 39, 41); ECF No. 162-51 at 6; ECF No. 152-1 to -12; ECF No. 153-2 to -8; ECF No. 154-21 at 2.) These categories of evidence are: (1) product literature; (2) internal Owens Corning documents and communications; (3) testimony of the named plaintiffs; and (4) Owens Corning's limited shingle warranty. The court will separately consider the content and significance of each category of evidence in the findings of fact that follow. The court will indicate when, instead of making findings about the evidence, inferences are being drawn from the evidence, or conclusions are being reached about the sufficiency of the record. None of the evidence relied upon by the named plaintiffs supports a finding that Owens Corning promised that all Oakridge-brand shingles would not experience cracking, degranulation, fragmentation, or deterioration for, or would have a useful life of, at least 25 years.

1. **Product Literature**

   a. **The Group Exhibit of Brochures, Pamphlets, and Flyers**

      i. **Findings of Historical Fact**

**FOF 120:** The named plaintiffs submitted a group exhibit comprised of six Owens Corning brochures, pamphlets, and flyers to support their assertion that Owens Corning promised that all Oakridge-brand shingles would not experience cracking, degranulation, fragmentation, or deterioration for, or would have a useful life of, the same number of years as the length of the limited warranty. (ECF Nos. 152-1 to -12, 153-1 to -8.)

**FOF 121:** Although the record reflects the dates of these brochures, ECF No. 151-1 ¶ 27 (1995, 1999, 2002, 2004, 2007, and 2009), there is no other information about where the brochures were distributed, in terms of both geographic market and kind of retail outlet, how they were distributed, or for what period of time they were distributed.

**FOF 122:** None of the brochures include a statement that Oakridge-brand shingles will experience no cracking, degranulation, fragmentation, or deterioration for the same number of years as the length of the limited warranty.

**FOF 123:** None of the brochures include a statement that Oakridge-brand shingles will not require repair or replacement for the same number of years as the length of the limited warranty.

**FOF 124:** Although the materials refer to Oakridge-brand shingles using words such as durable, worry-free, quality, premier, and exceptional, those words are not always used in the same context, or to convey the same meaning. (ECF Nos. 152-1 at 3 ("enduring quality"), 152-1 at 5 ("quality protection"), 151-2 at 2 ("top-quality construction"), 152-2 at 4 ("premium protection" and "premier shingle"), 152-4 at 3 ("outstanding

performance"), 152-4 at 5 ("worry-free performance"), 152-5 at 3 ("exceptional performance"), 152-6 at 2 ("25 years of performance"), 152-7 at 4 and 153-6 at 2-3 ("lasting performance and protection"), 152-12 at 3 ("low-maintenance durability"), 153-8 at 3 ("durable beauty").)

**FOF 125:** The same materials equally tout, and in some examples emphasize, the aesthetic appeal of Oakridge-brand shingles. (ECF Nos. 152-1 at 3 ("rugged appearance of added dimension")], 152-1 at 5 ("subtle look of dimension"), 152-2 at 2 ("dimension-like, random look of wood"), 152-2 at 4 ("rugged wood-look beauty" "the greatest degree of added dimension"), 152-4 at 3 ("add depth and dimension to your roof" "rich dimensional look" "exceptional beauty"), 152-4 at 5 ("special double shadows add drama and depth to your home"), 152-5 at 2 ("nature's richest colors and deepest shadows") ("rich dimension"), 152-5 at 3 ("softly textured look"), 152-6 at 2, 4 ("subtle shadows create interest" and "add[] depth and dimension"), 152-7 at 4 ("shadow lines create a dramatic, three-dimensional effect"), 152-12 at 3 ("subtle shadows… offer increased curb appeal"), 153-1 at 4 ("a more dimensional look"), 153-2 at 2 ("a dramatic, three-dimensional look"), 153-8 at 2 ("a warm inviting look").

**FOF 126:** Some brochures discuss the benefits of purchasing a multi-component Owens Corning Roofing System, ECF Nos. 152-4 to -6, 152-7 to -11, 152-12, 153-1 to -6, 153-7 to -8, while others do not, ECF Nos. 152-1 to -3, see also ECF No. 162-5 at 9; ECF No. 162-5 at 12; ECF No. 162-8 at 6. Of the brochures that discuss the roofing system, some explain that increased warranty coverage can be purchased if the roofing system is installed, ECF Nos. 152-4, see also ECF Nos. 162-5 at 9, 162-8 at 6, while others do not, ECF Nos. 152-7 to -11, 152-12, 153-1 to -6, 153-7 to -8.

**FOF 127:** In some materials the length of the limited shingle warranty is included in the name of the Oakridge-brand product, e.g., Oakridge Pro 30, ECF No. 152-4 to -6, 152-7 to -11, 152-12, 153-1 to -6, <u>see</u> <u>also</u> ECF No. 162-5 at 12, while in other brochures the name of the shingle includes no reference to the length of the limited shingle warranty, e.g., Oakridge Shadow, ECF No. 152-1 to -3, 153-7 to -8, <u>see</u> <u>also</u> ECF No.162-5 at 9, 26-30; ECF No. 162-8 at 6.)  Notably, while the majority of the brochures offered into evidence by the named plaintiffs include the length of the limited shingle warranty in the name of the product, e.g., ECF No. 152-1 to -12, 153-1 to -8, the majority of marketing materials produced by Owens Corning do not include the length of the limited warranty in the name of the product, e.g., ECF Nos. 162-5 at 9, 26-30, 162-8 at 6.

**FOF 128:** Each brochure includes a graphic referencing the limited shingle warranty of a set number of years and includes information about the scope of coverage or directs the reader to see the warranty for complete details. (ECF Nos. 152-1 at 5, 152-2 at 2 & 4, 152-4 at 4 & 6, 152-5 at 3 & 7, 152-6 at 2 & 4, 152-7 at 4, 152-12 at 3, 153-2 at 2, 153-3 at 3, 153-4 at 4, 153-5 at 5, 153-6 at 2 & 3.)

**FOF 129:** Phrases such as "worry-free" and "low-maintenance" are used in some, but not all the brochures submitted into evidence by the named plaintiffs. <u>See</u> <u>e.g.</u>, ECF Nos. 152-7 to -11, 153-7 to -8.

**FOF 130:** "Worry-free" appears in the materials as part of phrases such as "worry-free coverage with a full 25-year warranty" and "40 years of beautiful, worry-free performance." (ECF Nos. 152-1 at 5, 152-4 at 5.)

**FOF 131:** The named plaintiffs identify two instances in the materials in which the phrase "low-maintenance durability" is used. (ECF No. 152-12 at 3 and 153-5 at 5; ECF No. 178 at 10 (¶ 38).)

**FOF 132:** Some, but not all, of the materials include references to the amount and kind of asphalt used. (ECF Nos. 155-1 to -3, 152-7 to -12.)  None of the brochures, however, include a statement that Oakridge-brand shingles will not require repair or replacement or will last for the same number of years as the limited warranty because of the amount or kind of asphalt used.

**FOF 133:** Plaintiffs identify only one brochure, which is dated 1999, that purportedly links asphalt to the useful life of Oakridge-brand shingles. ECF No. 154-4 to -6.  Three times in the brochure Oakridge-brand shingles are referred to as having "[____] weathering-grade asphalt for [__] years of [____] performance." (Id.)  For the shingles sold with a 25-year limited warranty, weathering-grade is modified by the word "quality" and the word performance is not modified. (ECF No. 152-6 at 2.).  For the shingles sold with a 30-year limited warranty, weathering-grade is modified by the word "extra" and the word performance is modified by the word "exceptional." (ECF No. 152-5 at 3.).  For the shingles sold with a 40-year limited warranty, weathering-grade is modified by "the most" and the word performance is modified by the phrase "beautiful, worry-free." (ECF No. 152-4 at 5.)

## ii.  **Inferences Drawn From, and Sufficiency of, the Evidence**

**FOF 134:**  The group exhibit of brochures, pamphlets, and flyers, in which certain words or phrases are used in only some specimens, cannot be the basis for any reasonable inference about the content and consistency of Owens Corning's marketing activities, between 1992 and 2012, in Pennsylvania, Illinois, California, and Texas.

**FOF 135:**  The group exhibit of brochures, pamphlets, and flyers does not support any reasonable inference that Owens Corning represented that Oakridge-brand shingles will last for at least 25 years, or for the same number of years as the length of the limited warranty.

**FOF 136:**  Owens Corning does not use words such as "quality," "premier," "worry-free" or "low-maintenance" consistently in the group exhibit of brochures, pamphlets, and flyers.

**FOF 137:**  When words such as "worry-free," "low-maintenance," appear in the group exhibit of brochures, pamphlets, and flyers they do not equate to a representation that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, as plaintiffs contend. (ECF No. 178 at 10 (¶ 38).)

    a.  In both examples identified by plaintiffs in which the phrase "worry-free" is used, a connection is made between the absence of worry and Owens Corning's limited shingle warranty.  A limited warranty, which according to Owens Corning's literature, provides for payment of replacement costs, and sometimes labor, for faulty shingles, is something that would ease an owner's worry or concern.  Such statements assure the owner that if the shingles need repair or replacement during the warranty period, Owens Corning, and not the owner, will bear the cost.

Statements about the security provided by a warranty are not a promise that the shingles will not need repair or replacement for the length of the warranty. That interpretation is actually counterintuitive.

b. Regardless, even if statements about shingles being "worry-free" could arguably be characterized as representations that the shingles will not crack, degranulate, fragment, or deteriorate or will not need repair or replacement for the length of the warranty, the record includes only these two isolated statements, made in brochures dated prior to 2000, and distributed in unknown geographical locations and through unspecified distribution methods. Plaintiffs identify no other use of such phrases in the record, ECF No. 178 at 10 (¶ 38), and the court could locate none in the exhibits filed in support of plaintiff's motion for class certification.

c. Plaintiffs proffer no evidence about what the phrase "low-maintenance" means to a purchaser of roofing shingles and provide no basis for this court to infer that "low-maintenance durability" equates to a representation that an Oakridge-brand shingle will last for at least 25 years, or for the same number of years as the limited shingle warranty.

d. Like the "worry-free" statements identified by plaintiffs, these "low-maintenance" statements are also isolated when viewed in the context of the breadth of the proposed class definitions.

**FOF 138:** References in the group exhibit of brochures, pamphlets, and flyers to the amount or quality of asphalt do not equate to a representation that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, as plaintiffs contend. (ECF No. 178 at 10 (¶ 40).)

41

a. In the single brochure relied upon by plaintiffs, Owens Corning does not make any uniform or consistent representation about the effect that asphalt has on the useful life of a shingle. Although the shingles sold with the 30- and 40-year limited warranties reflect an increase in the amount of asphalt being used (from "extra" to "the most"), the performance is described as going from "exceptional" to "beautiful, worry-free," not from exceptional to the best, or superior, performance. As such, the brochure does not suggest a direct correlation between the amount of asphalt used, and the level of performance.

b. Some brochures indicate that although different amounts of asphalt are used, the performance stays the same. (ECF Nos. 153-5 at 5 ("*durable* weathering-grade asphalt shingles bonded together with tough Fiberglas mat core *for lasting performance and protection*," ECF No. 153-6 at 2 ("*extra* weathering-grade asphalt shingles bonded together with tough Fiberglas mat core *for lasting performance and protection,*" 153-6 at 3 ("*premium* weathering-grade asphalt shingles bonded together with tough Fiberglas mat core *for lasting performance and protection*") (emphasis added in each).)

c. As with other words and phrases identified by plaintiffs in Owens Corning's marketing materials, the discussion of asphalt on which plaintiffs rely appears in one brochure, dated prior to 2000, which is an isolated example.

**FOF 139:** Plaintiffs offer no legal authority to support their crucial contention that phrases such as "exceptional," "worry-free," "low-maintenance,: and "lasting" qualify as actionable representations even though this legal contention is not without dispute. See Cheatham v. ADT Corp., No. 15-2137, 2016 WL 540832, at *9 (D. Ariz. Feb. 11, 2016)

(claim that a security system provides "worry-free living" is puffery); Gold v. Lumber Liquidators, Inc., No. 14-5373, 2015 WL 7888906, at *6-7 (N.D. Cal. Nov. 30, 2015) (statements about "high quality" or "high performance" are non-actionable puffery under California consumer protection statutes); Peruto v. TimberTech Ltd., No. 15-2166, 2015 WL 5089484, at *2, 7 & n.10 (D.N.J. Aug. 26, 2015) (finding phrase "designed to provide years of low-maintenance use and enjoyment" to be "puffery as a matter of law"); Elias v. Hewlett-Packard Co., 950 F.Supp.2d 1123, 1131-34 (N.D. Cal. 2013) (statements about computer being "ultra-reliable" or "higher performance" were non-actionable puffery under California consumer protection statutes); Rochester Laborers Pension Fund v. Monsanto Co., 883 F.Supp.2d 835, 882 (E.D. Mo. 2012) (statement about "exceptional performance" constituted inactionable puffery under federal securities laws); ConsulNet Computing, Inc. v. Moore, No. 04-3485, 2007 WL 2702446, at *10 (E.D. Pa. Sept. 12, 2007) (promise that a website will "alleviate 'worry'" is "mere puffery"); Hercules Machinery Corp. v. McElwee Bros., Inc., No. 01-3651, 2002 WL 31015598, at *5 (E.D. La. Sept. 9, 2002) ("top quality" is a "classic example of puffery").

**b. The Named Plaintiff's Exhibits**

**i. Findings of Historical Facts**

**FOF 140:** Three of the named plaintiffs produced copies of brochures or flyers that they saw before deciding to purchase Oakridge-brand shingles in support of their claims. Plaintiffs attached two of these items to their motion papers. (ECF Nos. 153-12 at 14-18 (Wright), 24 (West).) The court could only locate the last item in the papers filed by Owens Corning. (ECF No. 162-8 at 6-7 (Boehm).) The three specimens are dated 1997, 1998, and 2005.

**FOF 141:** Boehm's brochure, which is from approximately 1997, stresses the architectural style of the shingles, and states that they "feature the rugged look of wood, premium protection and enduring value," and offer maximum protection from the elements due to "the most weathering-grade asphalt available and our tough Fiberglass mat construction." (ECF No. 162-8 at 6.) The brochure includes a graphic depicting a "40 year limited product warranty." (Id.) The text of the brochure states that the "40-year warranty* covers the prorated replacement cost of new shingles and labor" and instructs the reader to "see actual warranty for details." (Id.)

**FOF 142:** Wright's brochure, which is dated 1998, differs from Boehm's brochure in that it emphasizes the benefits of purchasing an entire Owens Corning Roofing System, which is comprised of six parts, only one of which is the shingles. (ECF No. 153-12 at 14-18.) With respect to the shingle component of the roofing system, the brochure includes statements about premium protection, enduring value, the most weathering-grade asphalt, and a tough fiberglass mat. (Id. at 17.) The brochure includes a graphic depicting a "40 year limited product warranty." (Id.) The brochure states that the "40-year warranty* covers the prorated replacement cost of new shingles and labor" and instructs the reader to "see actual warranty for details." (Id.) Wright's brochure, however, unlike Boehm's brochure, offers a detailed comparison of the warranty periods, both prorated and non-prorated, for the limited shingle warranty as compared to the enhanced roofing system warranty, and explains that the latter warranty must be separately purchased. (Id. at 16.)

**FOF 143:** West's 2005 flyer, unlike Boehm's and Wright's brochures, is only one page. It states that Oakridge-brand shingles offer increased curb appeal, low-maintenance durability, and a 30-year limited warranty*. (ECF No. 153-12 at 24.) There are no

statements about asphalt, the fiberglass mat, premium protection, or enduring value.  The

focus of the flyer is almost entirely on the aesthetic appeal of the shingles.

**FOF 144:**  The promotional displays viewed by Gonzalez and the Maags at the retail outlet,

and the brochure given to Gonzalez are not available for the court's review. FOF 48, 91.

### ii.  Inferences Drawn from, and Sufficiency of, the Evidence

**FOF 145:**   Rather than being probative of Owens Corning's allegedly uniform

representations that all Oakridge-brand shingles will have a useful life of at least 25

years, or for the same number of years as the length of the limited warranty, the named

plaintiffs' materials include no such statements and demonstrate a general lack of

consistency in Owens Corning's product literature.

**FOF 146:**  There is no basis, based upon the record before the court, to infer that the

materials seen by Gonzalez and the Maags would have included any uniform

representations about the useful life of Oakridge-brand shingles.  As will be discussed in

the findings of fact that follow, the only reasonable inference supported by the record is

that these items likely included references to a limited shingle warranty of a set number

of years. FOF 128.

### 2.  Owens Corning's Internal Documents and Communications

### a.  Findings of Historical Fact

**FOF 147:**  The named plaintiffs submit various internal Owens Corning documents and

communications to support their assertion that Owens Corning promised that all

Oakridge-brand shingles would have a useful life of at least 25 years, or for the same

number of years as the length of the limited warranty. (ECF Nos. 153-9 at 3, 154-20, 154-

21 at 2, 154-22 at 2, 154-23 at 2, 165-2 at 5; ECF No. 178 at 9 (¶ 35) and 10 (¶¶ 39, 41-43).)

**FOF 148:** The "Residential Roofing Technical Training Manual," is more than 200-pages long, is dated 1995, ECF No. 165-2 at 5, and was used in 1998, ECF No. 165 at 11.

    a. Plaintiffs cite to a single page of this 200-page document. (ECF No. 178 at 10 (¶ 41) (citing ECF No. 154-4 at 5); ECF No. 165-2 to -4.)

    b. The page provides information about shingle warranties in general, including that they always cover manufacturing defects only and that even without manufacturing defects shingles eventually "wear out by losing granules to the point of looking bad," but is not specific to Oakridge-brand shingles. (ECF No. 165-2 at 60.)

**FOF 149:** The presumed television commercial script is undated and proffered without any explanation about when it was drafted and when, if ever, it was created and broadcast. (ECF No. 178 at 10 (¶ 39)); (ECF No. 154-21 at 2.)

    a. It appears that the script submitted into evidence is not a complete copy as the dialogue seems to end abruptly, which discounts its evidentiary significance. (ECF No. 154-21 at 2.)

    b. Plaintiffs truncate the passage they quote from the script. The actual statement in the script is that "[e]qually important [as aesthetics], with a 30-year Limited Warranty <u>and a 70-miles-per-hour Wind Resistance Limited Warranty</u>, I know they're durable." (ECF No. 154-21 at 2.) Plaintiffs delete the reference to the wind resistance warranty in their proposed findings. (ECF No. 178 at 10 (¶ 39).)

**FOF 150:** "The Architect's Roofing Answer Book" is dated 1996. Plaintiffs proffer no

evidence that the book was used at any other time during the proposed 20-year class

period. (ECF No. 178 at 10 (¶ 39)); (ECF No. 153-9 at 3-5.)

    a. The answer book discusses Owens Corning's "full complement of roofing

       products" and nowhere refers specifically to Oakridge-brand shingles.

    b. The book does not appear on its face to have been created for, or distributed to,

       the end purchaser of roofing shingles. It instead is directed at architects and

       builders, seemingly to encourage them to recommend, or use, Owens Corning's

       shingles on their projects. Plaintiffs offer no evidence to show the contrary.

    c. The statement that plaintiffs excise from the book, and rely upon in their proposed

       findings of fact and conclusions of law, is taken out of context. Plaintiffs assert

       that the book states: "[T]he longer the warranty, the better the shingle." (ECF No.

       178 at 10 (¶ 39).) In the book, that statement is preceded by the word "Generally"

       and followed by an explanation that the warranty is prorated for both replacement

       costs and labor.

**FOF 151:** The 2006 Owens Corning Consumer Roofing Market Structure/Segmentation

Study - upon which plaintiffs rely - reflects that warranties are not synonymous with

durability and does not prove that purchasers equate durability with warranties when

selecting shingles. (ECF No. 178 at 9 (¶ 35); ECF No. 154-20.) The study lists durability

and warranty as the top two concerns when selecting roofing materials. (ECF No. 154-20

at 4.)

**FOF 152:** The August 23 and 24, 2006 email chain indicates that "Rob" [Daenen] and Bert

Elliott "put together a first pass" at answering certain questions raised during two

presentations about residential roofing products. (ECF No. 154-22 at 2.)

    a. Plaintiffs provide no information about who attended those presentations and

       asked the identified questions, or under what circumstances "an Owens Corning

       employee" suggested these answers. (ECF No. 178 at 10 (¶ 42).) There is no

       indication that the suggested answers are Owens Corning's "final" answers, or

       that the suggestions are made with any authority to speak on behalf of Owens

       Corning.

    b. In any event, the suggested answers merely explain that some purchasers select an

       Oakridge-brand shingle with a 50-year warranty because it is a higher number

       than the 30-year warranty and that some contractors push a 50-year warranty in

       higher-end neighborhoods. (ECF No. 154-22 at 3.)

    c. The suggested answers also discuss the terms and benefits of Owens Corning's

       new lifetime warranty product. (Id.)

**FOF 153:** In a second email chain, which is dated January 26, 2011, plaintiffs contend that

Owens Corning's "quality director" agrees with another employee's statement that

"warranty enhancements are always due to following our competition." (ECF No. 178 at

10 (¶ 43).)

    a. As an initial matter, the employee makes various statements to which the alleged

       director responds, "You got it." (ECF No. 154-23 at 2.) It is impossible, without

       further explanation, to determine with which statement, or statements, the director

       is agreeing.

b. In any event, even accepting plaintiffs' characterization of the email as correct, a statement that Owens Corning changes its warranty terms in order to match what competitors offer is innocuous and is not probative that Owens Corning promised that all Oakridge-brand shingles would have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty.

**b. <u>Inferences Drawn from, and Sufficiency of, the Evidence</u>**

**FOF 154:** The single page from the training manual cannot support a reasonable inference that Owens Corning represented that all Oakridge-brand shingles would have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, because it is not specific to Oakridge-brand shingles and only discusses shingle warranties generally. FOF 148.

**FOF 155:** The television commercial script cannot support a reasonable inference that Owens Corning represented that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, because it is undated and incomplete and submitted without any information about where, if ever, it was broadcast, which are significant evidentiary deficiencies given that the proposed class definition includes owners located in four states over a period of twenty years. FOF 149.

**FOF 156:** The television commercial script cannot support a reasonable inference that Owens Corning represented that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, because the script does not, as plaintiffs imply, associate the limited shingle warranty, standing alone, with the durability of Oakridge-brand shingles. FOF 149.

**FOF 157:**  The architect's answer book cannot support a reasonable inference that Owens Corning represented that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, because it is not addressed specifically to Oakridge-brand shingles and is not directed to the ultimate purchaser of shingles. FOF 150.

**FOF 158:**  The market study cannot support a reasonable inference that Owens Corning represented that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, because the study identifies durability and warranty as two separate features.  In other words, the study demonstrates that consumers want materials to last long (durability), and, if for some reason they do not, they want to be compensated for any repairs or replacement (warranties).  Instead of proving that the length of a warranty and the useful life of a product are equivalent, as plaintiffs contend, the study is evidence that the two characteristics were separate, albeit related, features. FOF 151.

**FOF 159:**  The two email chains cannot support a reasonable inference that Owens Corning represented that all Oakridge-brand shingles will have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty, because they are proffered without further explanation and contain no statements that are probative of promises that Owens Corning made to purchasers about the useful life of Oakridge-brand shingles. FOF 152-53.

### 3. __The Named Plaintiffs' Testimony__

#### a. __Findings of Historical Fact__

**FOF 160:**  Plaintiffs cite to the deposition testimony of the named plaintiffs in support of their contention that "consumers consistently believed that Oakridge shingles would last the duration of the warranty." (ECF No. 178 at 11 (¶ 44).)

**FOF 161:**  Only four of the six named plaintiffs, however, testified that they believed that Oakridge-brand shingles should last for the same number of years as the length of the limited shingle warranty. (ECF No. 153-11 at 13 (West – shingles should last 30 years "if that's what they're warranted"); ECF No. 153-11 at 17 (Gonzalez – shingle "should last 20 years" because "[i]t says it's a 20-year warranty"); ECF No. 153-11 at 31-33 (Boehm – "my 40-year roof that I think should probably last 40 years")); ECF No. 153-12 at 36 (Mrs. Maag - shingles with a 40-year warranty would "last 40 years, like they said it would").)

**FOF 162:**  Wright testified that she thought that a "40-year shingle roof... was supposed to have been a good roof." (ECF No. 153-10 at 5.)

**FOF 163:**  Mr. Maag testified that the 40-year warranty on the Oakridge-brand shingles "seemed to me to be a warranty which would compensate for defects for 40 years." (ECF No. 153-12 at 50-51.)  Although plaintiffs do not cite to this testimony, Mrs. Maag testified that shingles with a 40-year warranty would "last 40 years, like they said it would." (ECF No. 153-12 at 36; <u>see</u> ECF No. 178 at 11 (¶ 45).)

### b.  Inferences Drawn from, and Sufficiency of, the Evidence

**FOF 164:** Even the testimony of the six named plaintiffs does not reflect that purchasers consistently equated the length of the limited shingle warranty with the useful life of Oakridge-brand shingles. FOF 161-63.

**FOF 165:** Mrs. Maag's testimony demonstrates that two individuals who own the same structure on which Oakridge-brand shingles are installed can have different understandings of what Owens Corning's limited shingle warranty provides or promises. FOF 163.

## 4.  The Limited Warranty on Oakridge-brand Shingles

### a.  Findings of Historical Fact

**FOF 166:** A limited warranty is automatically provided with the installation of Oakridge-brand shingles. FOF 25, 110.

**FOF 167:** The record reflects that the shingle warranty is always modified by the word "limited," and is almost always followed by either an explanation of the scope of coverage or an asterisk that directs the reader to see the actual warranty for complete details and limitations. FOF 25, 36, 74, 128, 141-43.

**FOF 168:** Contrary to plaintiffs' assertion, Owens Corning did not always incorporate the length of the limited warranty into the name of the product throughout the proposed 20-year class period. FOF 127.

**FOF 169:** The record reflects that although a limited shingle warranty was always provided in connection with Oakridge-brand shingles, the same warranty does not apply to every Oakridge-brand shingle manufactured during the proposed 20-year class period.

a. Owens Corning offered at least nine different warranties between 1992 and 2012. (ECF No. 162-51 ¶ 4.)

b. The limited shingle warranty is only one kind of warranty that Owens Corning offered. (<u>Id.</u>)

c. Other warranties include the Platinum Promise Limited Warranty, the TruProtection Preferred Limited Warranty, and the System Advantage Roofing Limited Warranty. (<u>Id.</u>)

    i. The prerequisites to coverage, and scope of coverage, differ with respect to each of these warranties. (<u>Id.</u> ¶¶ 4-9.)

    ii. Some enhanced warranties require payment of an additional fee to obtain coverage. (<u>Id.</u> ¶¶ 4-17; ECF No. 162-39 at 4-5.)

d. The limited shingle warranties offered by Owens Corning between 1992 and 2012 differ in terms of, for example, length of coverage, transferability, coverage for labor and tear-off, coverage for installation defects, proration, and coverage for conditions such as algae and wind. (ECF No. 162-39, 162-51 to -60; ECF No. 162-51 ¶¶ 11-19.)

    i. By way of example, during the first seven years of the class period, warranties on Oakridge-brand shingles were nontransferrable. (ECF No. 162-51 ¶ 19.)

    ii. After 1999, however, warranties on Oakridge-brand shingles could be transferred one time, but only if a small payment was made and a warranty transfer card was submitted to Owens Corning. (<u>Id.</u> ¶¶ 19-22.)

iii. During the proposed 20-year class period, the length of the limited shingle warranties varied from 25, 30, 40, and 50 years. (ECF No. 162-51 at 5-6 (¶ 10 and Table A).)

iv. In 2011, Owens Corning instituted a lifetime warranty on all Oakridge-brand shingles. (Id. at 6 (Table A); ECF No. 154-22 at 3.)

e. The limited shingle warranties offered between 1992 and 2012 contain explicit limitations on the availability of alternative legal remedies, implied warranties, and consequential damages. These provisions are not identical: for example, some limited warranties purport to entirely exclude implied warranties, ECF No. 162-53 at 37, 40, while others purport to only limit the duration of any implied warranties, ECF No. 162-53 at 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29. Some limited shingle warranties indicate that their terms can be changed without notice, ECF No. 162-53 at 31. All limited shingle warranties acknowledge that limitations may be prohibited by law in some states, e.g., ECF No. 162-53 at 3, 19, 29, 31, 40.

**b. Inferences Drawn From, and Sufficiency of, the Evidence**

**FOF 170:** Plaintiffs' fundamental proposition that the limited shingle warranties qualify as a representation that all Oakridge-brand shingles will have a useful life of at least 25 years, or will last for the same number of years as the length of the limited warranty is contradicted by the record because the warranties are explicitly described as being limited, which denotes restrictiveness, not comprehensiveness. FOF 167.

**FOF 171:** Plaintiffs' fundamental proposition that the limited shingle warranties qualify as a representation that all Oakridge-brand shingles will have a useful life of at least 25 years,

or will last for the same number of years as the length of the limited warranty is contradicted by the record because the length of the warranty is not always incorporated into the name of the Oakridge product. FOF 168.

**FOF 172:** Plaintiffs' fundamental proposition that the limited shingle warranties qualify as a representation that all Oakridge-brand shingles will have a useful life of at least 25 years, or will last for the same number of years as the length of the limited warranty is contradicted by the record because the terms, conditions, and limitations of the limited warranties were not the same throughout the proposed class period. FOF 169.

**FOF 173:** Plaintiffs offer no legal authority to support their crucial contention that Owens Corning's limited shingle warranty qualifies as a representation that all Oakridge-brand shingles will have a useful life of the same number of years as the length of the limited warranty, even though this legal contention is not without dispute. In re IKO Roofing Shingles Prod. Liab. Litig., No. 2:09–md–2104 (C.D. Ill. Jan. 28, 2014) (ECF No. 338 at 35-36 (citing 1/28/2014, 4/12/2013, and 4/15/2013 decisions)); see Brooks v. GAF Materials Corp., 301 F.R.D. 229, 233 (D.S.C. 2014) (recognizing, but finding inapplicable, the IKO MDL court's findings); In re HardiePlank Fiber Cement Siding Litig., 12-md-2359, 2014 WL 2987657, at *3 (D. Minn. June 30, 2014) ("An advertisement's reference to a formal limited warranty does not, on its own, create a new informal promise that the product will last for a certain amount of time."); Rasmussen v. Apple Inc., 27 F. Supp. 3d 1027, 1035 (N.D. Cal. 2014) (the purpose of a warranty is to contractually mark the point in time when the risk of paying for repairs shifts from the manufacturer to the consumer); Keegan v. Am. Honda Motor Co. Inc., 838 F. Supp. 929, 940-41 (C.D. Cal. 2012) (same); Sears, Roebuck and Co. v. Tyco Fire Products LP,

833 F. Supp. 2d 892, 899 (N.D. Ill. 2011) (stating that under Texas law, an explicit

statement must be made about the useful life of a product in order to assert warranty

coverage on that basis).

**FOF 174:**  Under all the circumstances and based upon this record, the limited warranties

referenced in Owens Corning's product literature cannot be reasonably characterized as

affirmative representations that Oakridge-brand shingles will have a useful life of at least

25 years, or for the same number of years as the length of the limited shingle warranty.

**5.  Ultimate Factual Findings: Representations about Oakridge-brand Shingles**

**FOF 175:**   The record does not support a factual finding that Owens Corning "represented

that Oakridge would last the duration of the warranty," "encouraged consumers to

associate Oakridge's warranty durations with Oakridge's durability," or otherwise

promised that Oakridge-brand shingles would have a useful life of at least 25 years, or for

the same number of years as the length of the limited warranty, as plaintiffs contend.

**FOF 176:**  The record does not support a factual finding that Owens Corning represented that

Oakridge-brand shingles would not need to be repaired or replaced for at least 25 years,

or for the same number of years as the length of the limited warranty.

**FOF 177:**  The record does not support a factual finding that Owens Corning represented that

Oakridge-brand shingles would not experience any cracking, degranulation,

fragmentation, or deterioration for at least 25 years, or for the same number of years as

the length of the limited warranty.

**FOF 178:**  The record does not support a factual finding that Owens Corning represented that

Oakridge-brand shingles would not experience excessive cracking, degranulation,

fragmentation, or deterioration, beyond ordinary wear and tear, for at least 25 years, or for the same number of years as the length of the limited warranty.

**FOF 179:** The record does not support a factual finding that Owens Corning represented that a roof on which Oakridge-brand shingles are installed would not leak for at least 25 years, or for the same number of years as the length of the limited warranty.

**FOF 180:** The record does not support a factual finding that Owens Corning represented that a roof on which Oakridge-brand shingles are installed would not cause property damage for at least 25 years, or for the same number of years as the length of the limited warranty.

## E. **Design Defect**

### 1. **Findings of Historical Fact**

**FOF 181:** According to plaintiffs, all Oakridge-brand shingles manufactured "from 1992 to 2012 (except those manufactured in Atlanta and Memphis) are defectively designed because Owens Corning's specifications allow Oakridge to be manufactured at or near minimums for asphalt mass and tear strength" making them "susceptible" and "vulnerable" to cracking, premature deterioration, and failure. (ECF No. 178 at 3 (¶¶ 6, 8-9).)

#### a. **The Expert Opinion of Dean Rutila**

**FOF 182:** Plaintiffs retained Simpson Gumpertz & Heger, an engineering firm, to investigate alleged problems with Owens Corning's Oakridge-brand shingles and to provide expert opinions about the causes of the alleged failures of those shingles. (ECF No. 151-5 at 5.)

**FOF 183:** Mr. Dean Rutila ("Rutila"), a Senior Principal with Simpson Gumpertz & Heger and a civil engineer, was the individual responsible for the investigation. (ECF No. 151-5 at 4.)

**FOF 184:** Rutila "performed detailed laboratory documentation and testing on 298 shingle samples" that were returned to Owens Corning with a warranty claim. (ECF No. 151-5 at 6, 12, 19; ECF No. 139 at 38.) These shingle samples have been referred to as the "warranty shingles" in these proceedings.

**FOF 185:** It appears that Rutila also visually inspected approximately 700 shingle samples that were returned to Owens Corning with a warranty claim, but did not conduct laboratory testing on them. (ECF No. 151-5 at 6, 12; ECF No. 139 at 100.)

**FOF 186:** The warranty shingles were removed from structures after installation and weathering and sent to Owens Corning in connection with a claim being made pursuant to one of Owens Corning's warranty programs. FOF 184. After processing and administration, the warranty shingles were stored by Owens Corning in a warehouse in Toledo, Ohio, for some time before Rutila studied them. (ECF No. 151-5 at 6.)

**FOF 187:** Rutila tested the warranty shingles to determine whether they met the standards set forth in ASTM D3462, using the ASTM test methods listed in D3462, all of which are designed to evaluate newly-manufactured products. (ECF No. 151-5 at 19-20; ECF No. 151-3 at 15-17 (referring to ASTM Test Methods D1922 and D228).)

**FOF 188:** Although Rutila claimed that he also tested a limited number of unused shingles obtained from some of the named plaintiffs, ECF No. 151-5 at 19, that data was not included in Rutila's expert report, ECF No. 126 at 49.

**FOF 189:** Rutila reviewed Owens Corning's warranties and warranty claim documents, industry standards and literature, and tested the warranty shingles in order to determine the causes of the alleged problems with Oakridge-brand shingles. (ECF No. 151-5 at 5, 9.) Rutila opined that: (1) the shingles have excessive granule loss because they are designed to meet the minimum mass of asphalt, which is inadequate to retain the mass of granules applied; and (2) the shingles are designed at minimum tear strengths, with fiberglass mats designed to meet the minimum standard for mat mass, which results in cracking. (Id. at 6-7.)

### i. Owens Corning's *Daubert* Motion

**FOF 190:** Owens Corning filed a motion challenging the admissibility of Rutila's opinions. (ECF No. 92.) This court has a duty to evaluate and weigh expert testimony at the class certification stage. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 602 (3d Cir. 2012).

**FOF 191:** At the Daubert hearing held on Owens Corning's motion, the court expressed various general concerns with the admissibility of Rutila's testimony, including that his testing appeared to suffer from an inherent selection bias, in that all the shingles Rutila tested were returned to Owens Corning in connection with a warranty claim, which indicates some level of dissatisfaction with the product, and appeared to be statistically insignificant, in that Rutila tested fewer than 300 shingles out of the millions of shingles manufactured during the proposed class period. (ECF No. 126 at 42-43.) The court continued the Daubert hearing, and ordered the parties to submit additional briefing about these, and other, issues. (Id. at 48-49; 1/21/15 Minute Entry.) Plaintiffs were instructed to produce Rutila to be questioned at the continued Daubert hearing.

**FOF 192:** At the continued <u>Daubert</u> hearing, plaintiffs conceded that Rutila's testing would become irrelevant if Owens Corning stipulated that it manufactured all Oakridge-brand shingles within the parameters of the written design specifications it produced during discovery in this litigation. (ECF No. 139 at 6, 12-27.) Owens Corning agreed to this stipulation. (<u>Id.</u>) The court later clarified that Owens Corning did not stipulate, and the record would not support a finding, that all Oakridge-brand shingles were manufactured at the minimum measurements set forth in Owens Corning's design specifications, but only that all shingles were manufactured somewhere within the parameters established by the various minimum, maximum, and target measurements set forth in Owens Corning's design specifications. FOF 108; (ECF No. 139 at 63.)

**FOF 193:** After Owens Corning stipulated that it manufactured all Oakridge-brand shingles during the proposed 20-year class period within the parameters established by the various minimum, maximum, and target measurements set forth in its design specifications, the court ruled that Rutila could not rely upon the testing he conducted on the warranty shingles for any reason. (ECF No. 139 at 6, 25-27; ECF No. 159 at 3.) This ruling dispensed with the need for Rutila to demonstrate that his testing of the warranty shingles was statistically significant, unbiased, or otherwise reliable.

    a. The court did not hear testimony or argument, and made no rulings, regarding the statistical significance or reliability of Rutila's testing of the warranty shingles. The court described Rutila's testing of the warranty as irrelevant and inadmissible. (ECF No. 139 at 26, 27; ECF No. 159 at 3.) For this reason, the Supreme Court's recent decision in <u>Tyson Foods, Inc. v. Bouaphakeo</u>, No. 14-

1146, 2016 WL 1092414 (S.Ct. Mar. 22, 2016), discussing the admissibility of representative evidence in class and collective actions cases is inapposite.

b. Rutila admitted at the continued <u>Daubert</u> hearing that his testing of the warranty shingles suffered from selection bias. (ECF No. 139 at 104.)

c. The court specifically explained that Rutila's testing of the warranty shingles could only become relevant if Owens Corning were to attack his credibility on the ground that he had never seen an Oakridge-brand shingle, in which case he could refer to his testing to prove otherwise. (ECF No. 139 at 24-27; ECF No. 159 at 3.)

d. Even in the rebuttal situation described above, however, the court explained that the validity and statistical significance of Rutila's testing would not be relevant. (ECF No. 139 at 24-25, 95.) The testing would only demonstrate Rutila's general familiarity with Oakridge-brand shingles.

e. Under these circumstances, the court finds plaintiffs' suggestion in their proposed findings of fact and conclusions of law, ECF No. 178 at 4 n.1, that Owens Corning has opened the door to the admission of Rutila's testing by arguing that Rutila cannot prove that all Oakridge-brand shingles suffer from a common design defect to be wholly inappropriate.

   i. The court unambiguously explained that Rutila's testing of the warranty shingles was inadmissible for this exact purpose. (ECF No. 139 at 24-27, 76-78, 80, 109.)

   ii. The court explicitly held that Rutila would not be permitted to testify, based upon his testing of the warranty shingles, that all (or even most or many) Oakridge-brand shingles were manufactured at the allegedly-

defective minimum design specification measurements. (ECF No. 139 at 110.)

    iii.  Following the court's <u>Daubert</u> ruling, plaintiffs were tasked with proving their design defect claim by way of evidence other than Rutila's testing of the warranty shingles. Owens Corning's contention that plaintiffs failed to meet that burden does not "open the door" to the admission of Rutila's testing to prove plaintiffs' design defect claim. Plaintiffs' argument is both circular and specifically prohibited by this court's <u>Daubert</u> ruling.

### ii. **Rutila's Post-*Daubert* Opinion**

**FOF 194:** Rutila now contends that because Owens Corning's design specifications allow or permit shingles to be manufactured "at or near" industry minimums for asphalt mass, mat mass, and tear strength, all Oakridge-brand shingles are "susceptible" and "vulnerable" to premature failure. (<u>Id.</u> (¶¶ 6, 7, 9).) According to Rutila, a design specification that allows some Oakridge-brand shingles to be manufactured at higher measurements that will admittedly produce a longer-lasting shingle ("high-end shingles"), and some to be manufactured at lower measurements that will produce a shingle that will not last more than 20 years ("low-end shingles") is a defective design specification. (ECF No. 139 at 31, 82; <u>see</u> ECF No. 173 at 57-58 (describing an owner's possession of "high-end shingles" as winning the "shingle lottery").)

    a.  Rutila testified that not all Oakridge-brand shingles will be manufactured at the low-end of Owens Corning's design specifications. (ECF No. 139 at 81.)

    b.  Rutila testified that he cannot determine whether a particular shingle was manufactured at the "high-end" or the "low-end" of a design specification

without examining the roof, or a shingle removed from the roof. (ECF No. 139 at 32-33.)

c.  Rutila offers no opinion about where, between the lower and the higher measurements set forth in Owens Corning's allegedly defective design specifications, a shingle crosses the line and becomes defective.

   i.  Although Rutila testified at the continued <u>Daubert</u> hearing that a nondefectively designed shingle would have an asphalt mass of 20 to 23 pounds per shingle square, a net weight of 215 to 230 pounds per shingle square, and a mat mass right around 1.5 pounds per 100 square foot, ECF No. 139 at 41-42, the only measurement that Rutila could substantiate was the 1.5 pounds per 100 square foot mat mass, ECF No. 139 at 46-47, ECF No. 159 at 4, 21.  The court ruled that Rutila could testify only about that measurement. (ECF No. 159 at 21-22.)

   ii.  The court ruled that Rutila would be permitted to testify, as a general proposition, but without reference to specific measurements (other than mat mass), that the inter-relationship and coordination between asphalt mass, net weight, and mat mass affects the performance and reliability of a shingle. (ECF No. 159 at 4, 5-6, 7, 21.)

d.  Rutila testified that even if a shingle is manufactured in accordance with what he considered to be a defective design specification, he cannot testify about how long any particular shingle will last or whether any particular shingle will

experience excessive granule loss or cracking during the term of a warranty. (ECF No. 139 at 33.)

e.   Rutila testified that some shingles manufactured within the parameters of Owens Corning's design specifications will last more than 20 years. (ECF No. 139 at 33, 93.)

f.   Rutila testified that a shingle manufactured at the higher measurements set forth in Owens Corning's design specifications will last 30 years. (ECF No. 139 at 33-34; 162-3 at 14.)

g.   Rutila testified that an Oakridge-brand shingle manufactured at the low-end of Owens Corning's design specifications will not last more than 20 years. (ECF No. 139 at 76-77, 81, 91; ECF No. 159 at 3.)

**FOF 195:** Although the court ruled that Rutila would be permitted to testify that low-end Oakridge-brand shingles would not last more than 20 years, plaintiffs offer no evidence to establish what proportion of Oakridge-brand shingles were manufactured as low-end shingles during the proposed 20-year class period. (ECF No. 139 at 76-77, 81, 91; ECF No. 159 at 3.)

a.   Rutila offers no admissible opinion about what proportion of Owens Corning Oakridge-brand shingles were manufactured at or near the minimum design specifications for tear strength, mat mass, or asphalt weight.

i.   This court ruled that any opinion based upon Rutila's testing of the warranty shingles was not admissible. FOF 192-93. Although the court did not need to address the myriad defects in Rutila's testing in reaching that ruling, some flaws include that:

a. Rutila's sample size was only 300 shingles out of the millions of shingles manufactured during the proposed class period. FOF 111, 184, 191.

b. All shingles that were tested were sent to Owens Corning with a warranty claim, which is indicative of some level of dissatisfaction and product failure. FOF 184.

c. Rutila's testing does not readily account for the differing conditions in which the shingles were in use prior to being sent to Owens Corning with a warranty claim.

d. Rutila tested the warranty shingles pursuant to an industry standard "designed for the evaluation of products as manufactured" which explicitly states that "[p]hysical and performance requirements after application and during in-service use of the products described herein are beyond the scope of this material specification." FOF187; (ECF No. 151-3 at 14.)

ii. Even if Rutila's testing of the warranty claim shingles was admissible, Rutila, in his expert report, states that the "testing demonstrates that the mass of asphalt, mass of fiberglass felt and mass of surfacing are near is [sic] at or below minimum for approximately half of the 286 shingles with this data." (ECF No. 151-5 at 21 (§ 6.1).)

b.  Plaintiffs proffer no other evidence that is probative of the quantity of Owens
Corning Oakridge-brand shingles that were manufactured as low-end shingles
between 1992 and 2012.  FOF 205-16.

**FOF 196:**  Rutila testified that granule loss and cracking on a shingle can be caused by
conditions other than a defective design specification, such as, for example, improper
installation, poor ventilation, foot traffic, poor maintenance, and ordinary wear and tear.
(ECF No. 139 at 33, 36-39; ECF No. 162-3 at 5, 8, 10, 12, 13, 15.)

a.  Rutila testified that these conditions could cause a shingle to fail regardless of
the design specification to which it was manufactured. (Id.)

b.  Rutila testified that all shingles experience ordinary wear and tear, which will
include granule loss, but that "excessive" granule loss is indicative of a defect.
(ECF No. 139 at 33.)

c.  In the context of this testimony, plaintiffs' reliance in their proposed findings of
fact and conclusions of law to Rutila's conclusory statement ruling out any
other causes for degranulation or cracking of Oakridge-brand shingles for the
entire proposed class period, and an industry article about the effects of
ventilation on roofs, are not persuasive evidence to the contrary. (ECF No. 178
at 7 (¶¶ 26-27 (citing ECF No. 151-5 at 25 and ECF No. 151-9 at 2)).)

**FOF 197:**  Rutila testified that he could not determine the cause of a roofing leak without
seeing the roof. (ECF No. 139 at 33-34.)

**FOF 198:**  Owens Corning's expert witness James S. Johnson ("Johnson") testified that
different kinds of shingle cracks are caused by different factors.  For example, a spider-

web-like crack is distinguishable from a vertical crack, the latter of which is typically caused by deck movement or improper ventilation. (ECF No. 162-7 at 10.)

**FOF 199:** Johnson testified that not all shingle cracks are an indicator of imminent shingle failure. In this circumstance, a surface crack is distinguishable from a crack that is deep enough to compromise the shingle's ability to adequately shed water. (<u>Id.</u>)

**FOF 200:** In addition to the insufficient asphalt mass and insufficient mat mass/tear strength design defect theories proffered by Rutila in his original expert reports and testimony, Rutila advances a new design defect theory in plaintiffs' proposed findings of fact and conclusions of law, i.e., that Owens Corning's design specifications are defective because they allow an excessive amount of filler to be added to the asphalt. FOF 203. Before proceeding to analyze the record evidence in support of each of these three design defect theories, however, the court makes the following general findings.

    a. The reference in plaintiffs' proposed findings of fact and conclusions of law to the Atlanta and Memphis plants, ECF No. 178 at 3 (¶ 6), indicates that plaintiffs persist in their attempts to rely upon Rutila's testing of the warranty shingles, despite the court's <u>Daubert</u> rulings precluding that reliance.

        i. Rutila excluded these two plants from his written expert opinions because warranty shingles from those two manufacturing plants were not available to him for testing. (ECF No. 151-4 at 6 (¶ 21(d)); ECF No. 151-5 at 11 (chart), 15 (§ 5.3.1.).)

        ii. This court ruled during <u>Daubert</u> proceedings that Rutila cannot base his opinions on his testing of the warranty shingles. FOF 192-93.

b. Rutila offers his design defect opinions, which purport to apply to all Oakridge-brand shingles produced for the proposed 20-year class period, even though he "only [saw] Owens Corning specification 'targets' for 2000 through 2012." (ECF No. 178 at 2 (¶ 5); ECF No. 151-4 at 5 (¶ 21(b)); ECF No. 165-1 (design specifications from 1993 to 2012).)

c. Rutila never defines the point at which the measurements in Owens Corning's design specifications go from being nondefective to defective for any of his three design defect theories. FOF 194(c).

d. Rutila never quantifies what proportion of Oakridge-brand shingles were manufactured as low-end shingles, under any of his three design defect theories, during the proposed 20-year class period, and, in fact, his testing of the warranty shingles, although inadmissible, indicates that allegedly defective shingles were produced only about half of the time. FOF 195(a).

**FOF 201:** Despite pointed and extended questions from the court at oral argument, ECF No. 173 at 91-99, plaintiffs offer no legal authority to support their theory that admittedly nondefective products can, nevertheless, be considered defectively designed if a design specification establishes a range of measurements, some of which will produce defective products and some of which will produce nondefective products, especially where, as here, plaintiffs failed to identify where within the range of measurements the design crosses the line from producing nondefective products to producing defective products or to quantify how often defective products, versus nondefective products, were produced, even though this legal contention is seemingly novel, illogical, and contrary to the weight

of authority. <u>Reyes v. Netdeposit, LLC</u>, 802 F.3d 469, 485 (3d Cir. 2015) (the standard is not whether it is mathematically or scientifically possible that one of the telemarketing firms used by defendants did not engage in the allegedly wrongful conduct, but whether plaintiff established that it is more likely than not that the telemarketing firms used by defendants engaged in the allegedly wrongful conduct); <u>In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.</u>, 722 F.3d 838, 847 (6th Cir. 2013) (plaintiffs established that all Duet-brand washing machines were built to designs with "nearly identical engineering" that differed only in the machines' size and aesthetics and expert witness opined that a common defect, failure to self-clean the tub, was present in all machines regardless of slight design differences); <u>Marcus</u>, 687 F.3d at 602-03 (expert witness testified, after reviewing "thousands of pages of specifications" that all tires, regardless of model or size, are substantially similar in construction and all tires manifest the same defective characteristic, i.e., extra stiffness); <u>Wolin v. Jaguar Land Rover N. Am., LLC</u>, 617 F.3d 1168, 1172 (9th Cir. 2010) (same design defect, i.e., a geometry defect in vehicle's alignment, was present in each class member's car); <u>Pella Corp. v. Saltzman</u>, 606 F.3d 391, 391 (7th Cir. 2010) (all ProLine casement windows were designed to allow water to seep behind aluminum casing, which accelerated wood rot); <u>Martin v. Ford Motor Co.</u>, 292 F.R.D. 252, 256-59, 267 (E.D. Pa. 2013) (class action involved only "second generation" "rear twist beam axle," which was manufactured by one company for fewer than five years); <u>Brunson v. Louisiana-Pacific Corp.</u>, 266 F.R.D. 112, 114, 119 (D.S.C. 2010) (all trimboard suffered from same manufacturing defects that made it rot, warp, and crack prematurely); <u>Payne v. Goodyear Tire & Rubber Co.</u>, 216 F.R.D. 21, 23, 28 (D. Mass. 2003) (hosing used in radiant floor heating system was

defectively designed causing oxidation, hardening, cracks, and eventually, leaks; testing and other evidence confirmed presence of defect in all hosing).

**(a)** **Design Defect #1 – Insufficient *Quantity* of Asphalt**

**FOF 202:** The first design defect identified by plaintiffs is that Owens Corning used insufficient quantities of asphalt for the amount of granules being applied to the shingles, causing the excessive granules to fall off, which degrades shingle performance. (ECF No. 151-4 ¶ 22(d); ECF No. 151-5 at 6, 21; ECF No. 151-6 at 4-5, 7-8; ECF No. 178 at 3 (¶ 6) and 5 (¶ 12).)

    a. Granules, which are usually ceramic, are applied to the surface of a shingle after the fiberglass mat has been coated with an asphalt/filler mixture. (ECF No. 165 at 7 (¶19).) The granules are what provide color to the shingle. (Id. at (¶ 20).)

    b. Rutila's original expert report and supplemental declaration both identify this "insufficient *quantity* of asphalt" design defect as the cause of degranulation of Oakridge shingles. (ECF No. 151-5 at 6; ECF No. 151-4 at 6 (¶ 22).)

    c. Plaintiffs specifically contend that "Owens Corning's design specifications for Oakridge are defective because they allowed asphalt mass to be at or close to the 15 pounds-per-square foot minimum, but that [such an] asphalt mass is not sufficient to adhere mineral mass [granules] to the shingle." (ECF No. 178 at 5 (¶ 12 (citing Rutila's report, deposition, and Daubert hearing testimony)).)

        i. Although testifying that the asphalt mass can only be deemed insufficient in relationship to the granule mass and other measurements, FOF 194(c)(ii), Rutila does not identify what amount of granule mass is appropriate if asphalt mass is at or close

to 15 pounds-per-square foot. (ECF No. 139 at 30-31; ECF No. 151-8 at 5-6.)

    ii.  Although the court prohibited Rutila from relying upon the specific measurements to which he testified at the continued <u>Daubert</u> hearing because he produced no documentation or support for them, FOF 194(c)(i), plaintiffs, nevertheless, cite to Rutila's testimony about these numbers to support this design defect theory. (ECF No. 178 at 5 (¶ 12) (citing ECF No. 139 at 29-33).)  This is improper and such evidence will not be considered.

    iii.  The record includes no evidence establishing how much granule mass is appropriate if asphalt mass is at or close to 15 pounds-per-square foot.

    iv.  The record includes no evidence establishing what shingle mass and mat mass is appropriate if asphalt mass is at, or close to, 15 pounds-per-square foot, so that granule mass can be calculated by subtracting asphalt mass and mat mass from shingle mass to arrive at granule mass.

  **(b)  <u>Design Defect #2 – Insufficient *Quality* of Asphalt</u>**

**FOF 203:**  At oral argument and in plaintiffs' proposed findings of fact and conclusions of law, plaintiffs advanced a new asphalt-based design defect theory: degranulation occurs because Owens Corning uses design specifications that allow the filler content of the asphalt to be at or above 66%. (ECF No. 173 at 62-63; ECF No. 178 at  5-7 (¶¶ 13-24).)

In other words, plaintiffs now identify "insufficient _quality_ of asphalt" as a design defect that causes Oakridge-brand shingles to degranulate. (ECF No. 178 at 9 (¶ 34).)

a. Filler is a stabilizer that is mixed with the asphalt before being applied to the fiberglass mat. (ECF No. 165 at 6-7 (¶¶ 16-17, 19).)

b. Under ASTM D3462 the maximum filler permitted is 70% of the asphalt mixture. (ECF No. 151-3 at 16.) Under ASTM D3462, a shingle manufactured with a filler content of 66% falls within acceptable industry standards.

  i. The Owens Corning design specification data offered into evidence reflects that the maximum filler percentage is always below 70%, the industry standard. (ECF No. 170-2 at 2-17.)

  ii. The Owens Corning design specification data offered into evidence reflects that target filler percentage is typically at 67% or less. (Id.) The historic averages for all Owens Corning design specifications offered into evidence reflect target filler of 65.9% and a maximum filler of 67.1%. (Id. at 17.)

  iii. None of the evidence propounded by plaintiffs contradicts these facts. (ECF No. 178 at 5 (¶¶ 14-16).)

c. There is no evidence in the record, expert or otherwise, that a design specification that sets filler content at 66% or higher is a defective design.

  i. Rutila never proffered an opinion in a written expert report, during his deposition, or at the Daubert hearing that a specification that sets filler content above any particular percentage, including 66%, is a design defect.

a. The only reference to “filler percents [sic]” in Rutila’s submissions is a single paragraph in the declaration he filed in opposition to Owens Corning’s Daubert motion. (ECF No. 154-2 at 7 (¶ 23) (citing ECF No. 154-3).) The declaration refers to an internal Owens Corning report, dated January 5, 1995, that summarizes testing conducted “at the Houston roofing plant” in 1994 “primarily aimed at the Oakridge II product line.” (ECF No. 154-2 at 7 (¶ 23) (citing ECF No. 154-3 (“the Houston Report”)).)

(i) According to Rutila, the Houston Report concluded that filler percentages were too high and asphalt content too low for the Oakridge II product to last 25 years. (ECF No. 154-2 at 7 (¶ 23); see ECF No. 139 at 55 (testifying, at continued Daubert hearing, about this report).)

(ii) Rutila does not opine in any written report, based upon the Houston Report, or any other evidence, that a design specification with filler content set at 66%, or any particular percentage, is a defective design.

(iii) The court never ruled that Rutila could proffer an expert opinion that a design specification

with filler content set at or above 66% was
defective. FOF 182-200.

ii. The Houston Report, to which Rutila cites, does not state that a
design specification that allows filler content to be 66% is
defective. (ECF No. 178 at 6-7 (¶¶ 19-20, 24).)

    a. The Houston Report recognizes, generally, that a
correlation can exist between filler percentage and
shingle performance. (ECF No. 154-2 at 4.)

    b. The Houston Report recommends a specific reduction in
filler percentage for one line of lightweight Oakridge-
brand shingles, but explains that filler percentages could
not be reduced on "heavy weight" Oakridge-brand
shingles because face-to-face sticking increased as a
result. (ECF No. 154-3 at 7.)

    c. Owens Corning's Materials Engineer Leader for the
Roofing and Asphalt Division explains that "technology
and raw materials for the manufacture of Oakridge
shingles have changed significantly since this report was
written in 1995." (ECF No. 165 ¶ 38.)

    d. The Houston Report evidences an isolated issue,
experienced at one point in time more than twenty years
ago and in one manufacturing plant in connection with
one kind of Oakridge-brand shingle.

iii. The internal and industry documents to which plaintiffs cite in their proposed findings of fact and conclusions of law do not state that a design specification setting filler content at or above any particular percentage, including 66%, is defective.

    a. As stated above, the Houston Report does not state that a filler percentage at, or in excess of, 66% constitutes a design defect. FOF 203(c)(i) – (iii)(a); (ECF No. 178 at 5-7 (¶¶ 17, 19-20, 24).)

    b. The 1993 article from the 10th Conference on Roofing Technology, states that "increasing filler percentages does not materially improve shingle performance," but does not state that a filler percentage at any specific level is a design defect. (ECF No. 178 at 5 (¶ 13).) The article does not identify any particular filler percentage as being acceptable or unacceptable. The article does not discuss Owens Corning or Oakridge-brand shingles specifically. In addition, the article is outdated given the advances in material composition and technology in the shingle industry. (ECF No. 165 at 12 (¶ 38).)

    c. The internal Owens Corning communications and presentations about the cost of asphalt do not indicate that a filler percentage at, or in excess of, 66% constitutes a design defect. (ECF No. 178 at 5-6 (¶¶ 17-18).)

(i) The internal discussions are sporadic.

(ii) The internal discussions reject certain production options on the basis of cost, but do not indicate that the selected, less-expensive, options constitute design defects.

b) The internal emails from 2006 and 2009, which consider adjustments to filler percentages at particular plants to address specific quality control issues, do not state that a filler percentage at, or in excess of, 66% constitutes a design defect. (ECF No. 178 at 6 (¶¶ 21, 23).)

(i) The emails are sporadic.

(ii) The emails are directed to specifically-identified production concerns. They are not comprehensive discussions about proper filler percentages for all Oakridge-brand shingles produced over the proposed 20-year class period.

(iii) For at least one quality control issue the "root cause" of the problem was not filler percentage, but "coater scrapers." (ECF No. 151-8 at 22-23.)

(iv) The emails never state that filler percentages at 66%, or higher, constitute a design defect.

c) A single, general reference in a 1998 Owens Corning training manual, in an introductory section entitled "Shingle Raw Materials," to the negative effects of "adding too much filler" does not indicate that a filler percentage at, or in excess of, 66% constitutes a design defect. (ECF No. 178 at 6 (¶ 22) (citing ECF No. 154-4 at 4 (bates ending '637 [incorrectly cited as ECF No. 154-4 at 3 (bates ending '614)]).)

iv. The record reflects that the kind of filler being used, the product being made, the location of the manufacturing plant, and the kind of asphalt being used all affect the appropriate filler percentage. (ECF No. 165 at 6 (¶¶ 16-18); ECF No. 154-7 at 16.)

**(c) <u>Design Defect #3 – Insufficient Mat Mass and Tear Strength</u>**

**FOF 204:** The last design defect identified by plaintiffs is that the mat mass set forth in Owens Corning's design specifications marginally satisfies the ASTM D3462 standard while the tear strength is at or close to the 1700-gram minimum. (ECF No. 151-5 at 17-18; ECF No. 178 at 3-4 (¶ 6-9).)

a. ASTM D3462 sets the minimum mat mass at 1.35 pounds-per-100-square feet and the minimum tear strength at 1,700 grams. (ECF No. 151-3 at 15-16; ECF No. 139 at 101-02.)

b. The court permitted Rutila to testify that a mat mass of 1.5 pounds, or more, is appropriate in order to produce a "longer-lasting shingle." (ECF No. 139 at 42-43; ECF No. 159 at 21.)

c. There is no evidence in the record establishing the appropriate tear strength for any particular corresponding mat mass measurement, even though Rutila acknowledges that the appropriateness of design specification measurements can only be judged in relationship to each other. FOF 194(c)(ii).

d. The record reflects that Owens Corning's design specification measurements met or exceeded industry standards at all pertinent times.

    i. Owens Corning's design specifications almost always set the minimum tear strength at or above the 1,700-gram industry standard. (ECF No. 165-1 at 1-15.)  The target tear strength is always 1,800 grams or higher, with the target at or exceeding 2,000 grams the vast majority of the time. (Id.)  In those four instances, out of hundreds, where the minimum tear strength is below 1,700 grams, the mat mass is 1.69 pounds, or more, which Rutila admits is an increase in mat mass that would materially improve shingle performance and would produce a "longer-lasting shingle." (Id. at 2, 4; ECF No. 139 at 42-43, 101-02; ECF No. 159 at 21.)

    ii. Owens Corning's design specifications include only a target measurement for mat mass. (ECF No. 165-1 at 1-15.)  That target is always at least .27 pounds above the industry minimum of 1.35 pounds-per-100-square foot. (Id.)  Rutila admits that such an increase in mat mass would materially improve shingle performance. (ECF No. 139 at 101-02.)

e. The record does not reflect, as plaintiffs contend, that Oakridge-brand shingles "often missed" or "narrowly met" tear-strength targets. (ECF No. 178 at 4 (¶ 10).)

    i. One category of evidence on which plaintiffs rely for this assertion relates to failures of Oakridge-brand shingles to pass Underwriters Laboratories ("UL") testing for minimum tear strengths. (ECF No. 178 at 4 (¶ 10) (citing ECF No. 154-13 to -15).) This category consists of a total of two UL incidents, one in 2010 and one in 2012. The Summit, Illinois plant was issued a variation notice in 2010 because tear strengths were 24 grams below the 1,700-gram tear strength minimum when tested. (ECF No. 154-13 to -15.) A second sample had to be tested by the UL representative at the Memphis, Tennessee plant in 2012, because the first sample tested below the 1,700-gram tear strength minimum. (Id.) The record reflects that both incidents were promptly resolved to the satisfaction of UL, without the need for further corrective action.

    ii. The other category of evidence on which plaintiffs rely for this assertion is email communications between Owens Corning employees. (ECF No. 178 at 4 (¶ 10) (citing ECF No. 154-6 and -12).) This category consists of a total of two emails, one in 2005 and one in 2009. (ECF No. 154-6 and -12.) The emails reflect isolated incidents, limited in time and location, in which certain products tested at low tear strength. (ECF No. 154-6 and -12.)

iii. Plaintiffs proffer no other admissible evidence that Oakridge-brand

shingles often missed or narrowly met tear-strength targets.

**b.  <u>Alleged Prevalence of Defects: Systematic Flaws and Suppression of Information</u>**

**FOF 205:**  Plaintiffs endeavor to establish that the design defects identified by Rutila are

prevalent in Oakridge-brand shingles through evidence that the shingles suffered from

"systematic flaws" and Owens Corning suppressed negative information about those

flaws. (ECF No. 178 at 8-9 (¶¶ 28-34).)

**FOF 206:**  As set forth previously in these findings of fact, plaintiffs' expert witness, Rutila,

can offer no opinion about how often Oakridge-brand shingles are manufactured at

design specification measurements that he claims are defective. FOF 195(a).

**FOF 207:**  The named plaintiffs contend that Owens Corning's warranty program and

internal quality control practices and communications are proof that Oakridge-brand

shingles suffer from systematic flaws that cause granule loss, regardless of the particular

design defect theory at issue. (ECF No. 178 at 8-9 (¶¶ 28-33).)

a. The evidence establishes that fewer than half of one percent of Oakridge-brand

shingles result in a warranty claim. FOF 195(a)(ii).  This level of warranty

activity is not indicative of systematic problems with a product.

b. Plaintiffs contend that Owens Corning's formation of "granule loss" teams is

evidence of "systematic flaws."

i. The record reflects, however, that it was routine practice for Owens

Corning to form "focused quality teams," such as granule loss teams, to

address myriad issues, including color, brittleness, and deformation,

among other issues. (ECF No. 154-18 at 4; ECF No. 154-8 at 10-12; ECF No. 154-18 at 5.)

    ii. The record reflects that a second granule loss team was formed in 2012 not because the first granule loss team failed to adequately address the issue, resulting in a recurrence, but because the focus shifted to different manufacturing plants. (ECF No. 154-17 at 4-5 (first team (2009-2011) in Jacksonville, Houston, and Denver and second team (2012) in Irving, Portland, Savannah, and Compton); ECF No. 154-18 at 5 (same).)

c. The UL letter to which plaintiffs cite is dated 2012 and reflects that a single consumer complaint about granule loss was received by UL. (ECF No. 154-16.) A single consumer complaint is not indicative of systematic problems with a product.

d. The R&A Quality Overview cited by plaintiffs, which is dated 2011, addresses claims for all Owens Corning shingles, not only Oakridge-brand shingles. (ECF No. 154-18; ECF No. 165 at 12 (¶ 39).)

e. The email from Mark Zeorlin, dated 2009, in which filler percentages are discussed is a) an isolated communication, that b) discusses products other than Oakridge, and c) involves a situation in which it was later determined that "coater scrapers" were the root cause of granule loss. (ECF No. 154-10; ECF No. 151-8 at 23.)

**FOF 208:** The named plaintiffs contend that two emails are proof that Owens Corning suppressed negative information about Oakridge-brand shingles, and support an inference that design defects were prevalent in Oakridge-brand shingles. (ECF No. 178 at 9 (¶ 34).)

a. In the 2008 email, an Owens Corning employee states that he "cannot believe some of the data." (ECF No. 170-4.)   The email attaches various data.  Without explanation or context, the reader does not know what the author "cannot believe" and why he "cannot believe" it.  (ECF No. 170-4.)

b. The 2009 email concerns test results that involve an ongoing lawsuit filed by a homeowner against Owens Corning, which likely explains why the author did not want to "state what is highlighted below." (ECF No. 170-3.)

## 2.  Inferences Drawn from, and Sufficiency of, the Evidence

**FOF 209:**  The record contains no evidence of any set of specific design specification measurements that will produce defective shingles, or identify how "near" to the minimums of Owens Corning's design specifications a shingle must be manufactured in order to be defective. FOF 194(c).

**FOF 210:**  Not all Oakridge-brand shingles will be manufactured at allegedly defective design specification measurements. FOF 194(c).

**FOF 211:**  Some Oakridge-brand shingles will last for 30 years, or more. FOF 194(f).

**FOF 212:**  Some Oakridge-brand shingles will fail for reasons unrelated to the design specifications to which they were manufactured. FOF 196.

**FOF 213:**  The record contains no evidence, expert or otherwise, to support a finding that Oakridge-brand shingles were often, usually, or typically manufactured at or near the minimums of Owens Corning's design specifications. FOF 195.

**FOF 214:**  The record contains no evidence, expert or otherwise, to support a finding that Oakridge-brand shingles were often, usually, or typically manufactured below target specifications. FOF 195.

**FOF 215:** The record does not support an inference that Oakridge-brand shingles often missed, or narrowly met, tear-strength targets. FOF 204.

**FOF 216:** The evidence relied upon by plaintiffs to establish systematic flaws and suppression of negative information is innocuous and sporadic and not probative that any defects were prevalent in Oakridge-brand shingles. FOF 205-08.

### 3. Ultimate Factual Findings: Design Defects

**FOF 217:** The record does not support a finding that Owens Corning's design specifications are defective because they call for an insufficient *quantity* of asphalt mass for the amount of granules being affixed to the shingle.

**FOF 218:** The record does not support a finding that setting filler percentage at or above 66% constitutes a design defect.

**FOF 219:** The record reflects that the design specifications to which Oakridge-brand shingles were manufactured between 1992 and 2012 do not contain the purported insufficient mat mass and tear-strength defect identified by plaintiffs.

**FOF 220:** Even if the record established the existence of any of the three design defects identified by plaintiffs, there is no evidence that the defects were prevalent in Oakridge-brand shingles.

### F. Identification of Owens Corning Shingles

**FOF 221:** All Oakridge-brand shingles have release tape on the back, to keep the shingles from sticking together during shipping. (ECF No. 165 at 10 (¶ 31).)

**FOF 222:** Before 1995, the release tape did not include any identifying information. (Id.)

**FOF 223:** After 1995, the release tape identifies only the plant at which a shingle was produced, but does not indicate the brand of Owens Corning shingle. (ECF No. 173 at 68-

69.) Owens Corning's plants will produce more than one brand of shingle at the facility.

(Id.) Identification of the manufacturing plant, therefore, is not dispositive of whether the shingle is an Oakridge-brand shingle.

**FOF 224:** Oakridge-brand shingles that do not meet Owens Corning specifications may be sold on the seconds market, without any warranty. (ECF No. 165 at 10 (¶ 32).) Although a mark is to be applied to such product, it may not be readily apparent to a consumer that the shingle was sold on the seconds market. (Id.)

**FOF 225:** There are two or three experts at Owens Corning who can determine whether a shingle is an Oakridge-brand shingle by looking at it. (ECF No. 173 at 70.)

**FOF 226:** During Owens Corning's administration of warranty claims, it sometimes, but not often, denies a claim on the basis that the product is not an Owens Corning product. FOF 114.

## G. Owens Corning's Bankruptcy Proceedings and the Court of Appeals' Decision

**FOF 227:** In 2000, Owens Corning and several related entities filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Wright, 450 B.R. at 545.

**FOF 228:** On September 26, 2006, the bankruptcy court confirmed Owens Corning's reorganization plan (the "Bankruptcy Order"). (ECF No. 162-49.) Under the terms of the Bankruptcy Order and pursuant to 11 U.S.C. § 1141 all claims that existed against Owens Corning as of September 26, 2006 were discharged.

**FOF 229:** Owens Corning moved for summary judgment in this case on July 19, 2010, arguing that because the claims of named plaintiffs Wright and West existed before September 26, 2006, they were discharged when its reorganization plan was approved.

This court granted summary judgment in favor of Owens Corning based upon the Court of Appeals for the Third Circuit's en banc decision in Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.), 607 F.3d 114 (3d Cir. 2010) ("Grossman's").

**FOF 230:** In Grossman's, the court of appeals ruled that a claim arises for purposes of determining its dischargeability in bankruptcy when the claimant is exposed to the debtor's product or conduct, even if the injury does not manifest itself, and is not discovered, until after the reorganization. Grossman's, 607 F.3d at 121. In other words, a claim arises on the date that a product is purchased, not on the date that it fails, or the purchaser discovers that it failed. In reaching this holding, the court overruled Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.), 744 F.2d 332 (3d Cir.1984). Id. at 117.

**FOF 231:** On appeal, this court's summary judgment decision was affirmed, in part, and reversed, in part. Wright, 679 F.3d at 105-06. The appellate court recognized that, under Grossman's, the claims of Wright and West were discharged by virtue of the Bankruptcy Order because they purchased their Oakridge shingles prior to September 26, 2006. Id. at 106. The court of appeals, however, declined to apply the rule established in Grossman's retroactively and held that the "Frenville test" applies to "bankruptcy cases in which reorganization plans are proposed and confirmed prior to June 2, 2010, when Grossman's was decided." Id. at 109. Because Owens Corning's reorganization plan was confirmed before June 2, 2010, the court of appeals held that the Frenville test, and not the Grossman's test, applied.

**FOF 232:** After deciding the proper test to apply to Wright's and West's claims, the court of appeals engaged in the case-specific, and fact-based assessment required by Frenville to

determine when their claims arose, and whether the notice that they received about

Owens Corning's bankruptcy satisfied the requirements of due process. Wright, 679 F.3d

at 107-09.

**FOF 233:** Owens Corning does not dispute that the Frenville test must be applied to

determine whether claims were discharged by the Bankruptcy Order. (ECF No. 173 at

14-15, 28-33.)

**FOF 234:** The Bankruptcy Order vests jurisdiction over any and all matters arising out of

Owens Corning's bankruptcy case in the bankruptcy and federal courts located in

Delaware, which is located within the jurisdiction of the Court of Appeals for the Third

Circuit. (ECF No. 162-49 at 64-65.)

**FOF 235:** The Court of Appeals for the Third Circuit, in Wright applied third-circuit law to

the claims of not only Wright, who is a Pennsylvania owner, but also West, who is an

Illinois owner, to determine the effect of Owens Corning's Bankruptcy Order. Wright,

679 F.3d at 105-09.

**FOF 236:** The proposed class period begins fourteen years before the Bankruptcy Order was

entered. FOF 6, 227.


## CONCLUSIONS OF LAW

**A.  General Legal Principles**

**COL 1:**     To be certified, a class must satisfy the four prerequisites of Federal Rule of Civil

Procedure 23(a):  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of

representation. FED. R. CIV. P. 23(a).

**COL 2:**   Additional requirements must be satisfied depending on whether a plaintiff seeks certification of a class under Rule 23(b)(1), (2), or (3). Reyes, 802 F.3d at 482 (citing Marcus, 687 F.3d at 590).

**COL 3:**   To determine whether to certify a class, the court must be "satisfied after a rigorous analysis, that the prerequisites of Rule 23 are met." Reyes, 802 F.3d at 484 (citing In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008)).  The rigorous analysis requires the court to make explicit findings that the requirements of Rule 23 are met, not that they are supported by some evidence or could be met later in the case. In re Hydrogen Peroxide, 552 F.3d at 321.

**COL 4:**   Plaintiffs have the obligation, at the class certification stage, to establish how the evidence and the law support classwide treatment of their claims, including through the production of expert testimony and opinions. In the Matter of IKO Roofing Shingle Products Liability Litig., 757 F.3d 599, 603-04 (7th Cir. 2014) (noting that "it may require sophisticated analysis" to determine what failure data and testing in accordance with manufacturing standards reveal about the defectiveness of shingles.)

**COL 5:**   The proponent of class certification has the burden of proving each of the prerequisites under Rule 23(a) and that the class fits within the desired categories of class actions set forth in Rule 23(b) by a preponderance of the evidence. In re Hydrogen Peroxide, 552 F.3d at 307, 316 n.14, 317 (citation omitted); see Hayes v. Wal–Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit").

**COL 6:**   In assessing whether a plaintiff has satisfied its burden, the district court "cannot be bashful" and must resolve all factual and legal disputes relevant to class certification,

including disputes touching on the elements of the causes of action, and the merits of a claim. <u>Reyes</u>, 802 F.3d at 484.

**COL 7:**    The Court of Appeals for the Third Circuit recently set forth the district court's duty in ruling on a motion to certify a class by stating that "it is now clear that the District Court must: (1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits), (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23 requirements." <u>Reyes</u>, 802 F.3d at 485. Plaintiffs, however, need not establish the validity of their claims at the class certification stage. <u>Id.</u>

### B. <u>Rule 23(a) Requirements</u>

**COL 8:**    In order to be certified, a class must first satisfy the four prerequisites of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. F<small>ED</small>. R. C<small>IV</small>. P. 23(a); <u>Reyes</u>, 802 F.3d at 482.

**COL 9:**    For purposes of the Rule 23(a) analysis, plaintiffs propose two different classes: a class whose members own structures in any state (under Rule 23(b)(1)(B)) and a class whose members own structures in Pennsylvania, Illinois, California, or Texas (under Rule 23(b)(2) and (b)(3)). (ECF No. 154 at 23.) Where relevant, the court will differentiate between these two categories of classes in the following discussion of the Rule 23(a) requirements. If no distinction is made, the analysis is the same. For ease of reference, the first class will be referred to as the "nationwide class" and the second class will be referred to as the "four-state class."

**COL 10:** Even where Owens Corning does not challenge plaintiffs' ability to meet their burden of proving each of the Rule 23(a) requirements, this court has an independent duty to ensure that plaintiffs prove, by a preponderance of the evidence, that each of the Rule 23(a) requirements is met.

**1. <u>Numerosity</u>**

**COL 11:** Under Rule 23(a), a plaintiff bears the burden of establishing numerosity by a preponderance of the evidence. <u>Marcus</u>, 687 F.3d at 594-95. Plaintiff must prove that the putative class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

**COL 12:** The Court of Appeals for the Third Circuit has said that, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., <u>Moore's Federal Practice</u> § 23.22[3][a] (Matthew Bender 3d ed. 1999)).

**COL 13:** A court cannot "assume," "speculate," or defer to "common sense" with respect to how many class members exist. <u>Marcus</u>, 687 F.3d at 595-97. Instead, a plaintiff must produce evidence, direct or circumstantial, specific to the products, problems, parties, and geographic areas actually covered by the proposed class definitions to allow a district court to make a factual finding on this requirement. <u>Id.</u> at 596.

**COL 14:** Owens Corning does not dispute that plaintiffs can satisfy the numerosity requirement for both the nationwide class and the four-state class. (ECF No. 176 ¶ 90; ECF No. 173 at 9.)

**COL 15:**   The Nationwide Class: Data produced by Owens Corning in this litigation reflects

that it manufactured millions of square feet of Oakridge-brand shingles between 2000 and

2006. FOF 111; (ECF No. 154-24.)  The court can reasonably infer from this

manufacturing data, which covers only a portion of the proposed class period, that there

are significantly more than 40 people throughout the country who purchased Oakridge-

brand shingles before September 26, 2006 and have those shingles currently installed on

structures that they own.  The numerosity requirement of Rule 23(a) is met with respect

to the proposed nationwide class.

**COL 16:**   The Four-State Class:  Data produced by Owens Corning in this litigation

indicates that, between 1992 and 2012, nearly 30,000 warranty claims were made in

connection with Oakridge-brand shingles that were produced at manufacturing plants that

typically distribute shingles for use in Pennsylvania, Illinois, California, and Texas. FOF

106-07, 113.   The court can reasonably infer from this volume of warranty claims that

substantially more than 40 claims were made by owners located in Pennsylvania, Illinois,

California, and Texas whose shingles manifested any cracking, degranulation,

fragmentation, or deterioration during the warranty period. FOF 6.   The numerosity

requirement of Rule 23(a) is met with respect to the proposed four-state class.

**COL 17:**   Plaintiffs satisfied their burden of proving numerosity by a preponderance of the

evidence for the proposed nationwide class and the proposed four-state class.

**2.   Commonality**

**COL 18:**    "A putative class satisfies Rule 23(a)'s commonality requirement if 'the named

plaintiffs share at least one question of fact or law with the grievances of the prospective

class.'" Reyes, 802 F.3d at 486 (citing Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382

(3d Cir. 2013)).  "Commonality does not require perfect identity of questions of law or fact among all class members.  Rather, even a single common question will do." <u>Reyes</u>, 802 F.3d at 486 (citing <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338 (2011)).

**COL 19:**  A district court must ask whether determining the truth or falsity of a common contention will resolve an issue that is central to the validity of each one of the claims in one stroke. <u>Id.</u> at 487.  "What matters to class certification ... is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" <u>Dukes</u>, 564 U.S. 338, 131 S.Ct. 2541, 2551 (emphasis and ellipsis in the original).

**COL 20:**  The bar for establishing commonality is "not high" and is "easily met." <u>In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig.</u>, 795 F.3d 380, 397 (3d Cir. 2015) (<u>Community Bank III</u>); <u>Reyes</u>, 802 F.3d at 486 (citing <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994)).

**COL 21:**  Where an action is to proceed under Rule 23(b)(3), district courts typically analyze Rule 23(a)'s commonality requirement together with the more stringent predominance requirement of Rule 23(b)(3). <u>Reyes</u>, 802 F.3d at 486; <u>see</u> <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 297 (3d Cir. 2011).  The Court of Appeals for the Third Circuit, however, recently cautioned that commonality must be established *before* predominance can be considered. <u>Reyes</u>, 802 F.3d at 486 (emphasis in original).  While not faulting the district court in <u>Reyes</u> for considering the two requirements together, the court of appeals, "in the interest of clarity," separately addressed each requirement. <u>Id.</u> Especially where, as here, plaintiffs propose classes under Rules 23(b)(1)(B) and (b)(2), which do not include a predominance requirement, as well Rule 23(b)(3), which does

include a predominance requirement, the court will not collapse the commonality requirement of Rule 23(a) into the predominance requirement of Rule 23(b)(3) and will, as the court of appeals suggests in <u>Reyes</u>, separately consider them.

**COL 22:** <u>The Nationwide Class</u>: Plaintiffs contend that commonality is satisfied for the proposed nationwide class because there is "a common question on whether Owens Corning's bankruptcy discharged claims of homeowners who purchased Oakridge on or before September 26, 2006." (ECF No. 178 at 22 (¶ 17).) Plaintiffs state that "resolution of this question is central to whether class members can proceed with claims against Owens Corning." (<u>Id.</u>)

    a. At the hearing on plaintiffs' motion for class certification, plaintiffs claimed that the purpose of the proposed nationwide class was to obtain a ruling with respect to whether the <u>Frenville</u> test or the <u>Grossman's</u> test would apply to any challenge made by Owens Corning to a class member's claim on the ground that the claim was discharged by the Bankruptcy Order. (ECF No. 173 at 10.) This question is not justiciable and cannot satisfy the commonality requirement. <u>Neale v. Volvo Cars of N. Am., LLC</u>, 794 F.3d 353, 366 (3d Cir. 2015) ("[b]efore even getting to the point of class certification, however, class representatives need to present a justiciable claim").

        i. The Court of Appeals for the Third Circuit has already ruled that the <u>Frenville</u> test applies to any dischargeability defense asserted by Owens Corning. FOF 230-31.

        ii. Owens Corning concedes that it cannot relitigate this issue. FOF 233; (ECF No. 176 at 48 (¶ 232).)

iii. This question is not justiciable as it presents no live case or controversy between the proposed nationwide class and Owens Corning sufficient to support this court's exercise of jurisdiction. <u>Valley Forge Christian Coll. v. Americans United for Separation of Church and State</u>, 454 U.S. 464, 471 (1982) (the "judicial power" of the federal courts is limited to the resolution of certain "cases" and "controversies"). A case can become moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969); <u>Toll Bros., Inc. v. Twp. of Readington</u>, 555 F.3d 131, 137 (3d Cir. 2009).

iv. The commonality requirement is not met with respect to the proposed nationwide class to the extent that plaintiffs seek a ruling about whether the <u>Frenville</u> test or the <u>Grossman's</u> test applies to Owens Corning's Bankruptcy Order because the question that the named plaintiffs ask this court to answer has already been answered by the Court of Appeals for the Third Circuit. There is no present dispute for this court to resolve.

v. Because this question was actually litigated and determined by the appellate court, and was essential to its ruling, Owens Corning would be barred from relitigating it in any court by principles of collateral estoppel. <u>In re Docteroff</u>, 133 F.3d 210, 214 (3d Cir. 1997); <u>Arlington Indus., Inc. v. Bridgeport Fittings, Inc.</u>, 106 F.

Supp. 3d 506, 513-14 (M.D. Pa. 2015) (citing <u>Peloro v. United States</u>, 488 F.3d 163, 175 (3d Cir. 2007), and <u>Burlington N. R.R. v. Hyundai Merch. Marine Co.</u>, 63 F.3d 1227, 1231–32 (3d Cir. 1995)).

b. To the extent that what plaintiffs actually seek on behalf of the proposed nationwide class is a ruling from this court that the claims of any owner who purchased Oakridge-brand shingles before September 26, 2006, are not discharged by Owens Corning's Bankruptcy Order, the court of appeals' decision in <u>Wright</u> specifically precludes this relief.

   i. In <u>Wright</u>, the Court of Appeals for the Third Circuit held that the <u>Frenville</u> test must be applied to determine the effect of Owens Corning's Bankruptcy Order on an owner's claim.

      a) Under the <u>Frenville</u> test, a court must look to the underlying substantive state limitations law to determine when a cause of action arises. <u>Wright</u>, 679 F.3d at 105-06. For example, if the discovery rule applies under the pertinent state law, then the claim does not arise until the claimant discovered the injury.

      b) The <u>Frenville</u> test is, by its nature, a case-specific, fact-based assessment that cannot be applied on a classwide basis to the claims of all owners throughout the country who are asserting different legal claims under different state laws and based upon different pertinent facts,

including, for example, when ownership of the structure

began, when the shingles exhibited failure, when a

warranty claim was submitted to Owens Corning, when

property damage was suffered, and when roofing repairs

were made.

c) Although classwide relief based upon the purchase date

of the shingles could be available under the bright-line

Grossman's test, the court of appeals specifically rejected

application of that test to Owens Corning's Bankruptcy

Order, even for those owners who are located in

jurisdictions outside the boundaries of the Court of

Appeals for the Third Circuit. FOF 230-31, 235.

ii. It does not follow from the court of appeals' holding in Wright that

Wright's and West's claims were not discharged that all potential class

members' claims are also not discharged by the Bankruptcy Order.  In

Wright, the bankruptcy court applied the fact-specific Frenville test to the

circumstances surrounding Wright's and West's ownership of Oakridge-

brand shingles and knowledge about Owens Corning's bankruptcy

proceedings, and held that, under those facts, the Bankruptcy Order did

not operate to discharge their claims.

iii. Plaintiffs did not propose any method by which the court could

determine, on a classwide basis, when class members' claims arose under

the laws of all fifty states, for the variety of substantive legal claims being

asserted by the named plaintiffs, and what circumstances surround each

class members' ownership of Oakridge-brand shingles and knowledge

about Owens Corning's bankruptcy proceedings.

    iv. The commonality requirement is not met with respect to the

proposed nationwide class to the extent that plaintiffs seek a ruling

that the claims of any owner who purchased Oakridge-brand

shingles before September 26, 2006, are not discharged by Owens

Corning's Bankruptcy Order because the <u>Frenville</u> test does not

permit this court to answer that question on a classwide basis.

**COL 23:** <u>The Four-State Class</u>: Plaintiffs contend that commonality is satisfied for the

proposed four-state class because in class actions relating to products liability, if there is

a classwide question about whether a product is intrinsically faulty, or whether a

manufacturer knew about or concealed such faults, commonality is satisfied. (ECF No.

178 at 22 (¶ 15) (citing <u>Wolin</u>, 617 F.3d at 1173, and <u>Zeno v. Ford Motor Co., Inc.</u>, 238

F.R.D. 173, 185 (W.D. Pa. 2006))). Plaintiffs further explain that the common questions

in this case include whether Oakridge has intrinsic design defects, whether Owens

Corning knew about those design defects, whether Owens Corning misled consumers

about Oakridge's usable life, and whether Oakridge's defects caused it to fail before the

warranty period lapsed, which allow for classwide liability to be resolved in a single

stroke. (ECF No. 178 at 22 (¶ 16).)

**COL 24:** Plaintiffs satisfy the commonality requirement with respect to those legal claims

that are based upon allegedly false representations about Oakridge-brand shingles, but

only to the extent that those claims are grounded in the theory that a limited warranty of a

set number of years qualifies as an affirmative representation about the useful life of a shingle.

  a.  There is no dispute that Owens Corning consistently offered limited warranties of a set number of years in connection with the sale of Oakridge-brand shingles. FOF 128, 141-42, 145, 166-69.

  b.  Whether a limited warranty of a set number of years can, as a matter of law, constitute a representation about the useful life of a product is a common question with a common answer. But see COL 74(b), 173 (discussing plaintiffs' failure to establish that Owens Corning's limited shingle warranties qualify as affirmative representations about the useful life of Oakridge-brand shingles).  Although the length of the limited warranties varies from 25 to 50 years, and now includes a lifetime term, this distinction does not destroy commonality with respect to this legal theory.

**COL 25:**  A classwide proceeding cannot generate common answers with respect to any legal claims based upon the theory that Owens Corning made specific misrepresentations in its product literature about Oakridge-brand shingles.

  a.  The record reflects that Owens Corning made no consistent or uniform representations about the useful life of Oakridge-brand shingles in its product literature. FOF 134, 146, 175-80.

  b.  The record reflects that Owens Corning made no consistent or uniform representations about the qualities or characteristics of Oakridge-brand shingles in its product literature. FOF 134, 146, 175-80.

c.   The record reflects that even the named plaintiffs relied upon different

marketing materials and product literature, and that some also considered

oral representations made by third parties. FOF 140-46.

**COL 26:**   Plaintiffs cannot satisfy the commonality requirement with respect to any legal

claims that are based upon an alleged design defect.

a.   The record reflects that there is not a single design specification that applies

to all Oakridge-brand shingles manufactured in Pennsylvania, Illinois,

California, and Texas between 1992 and 2012, and there is no evidence that

all (or even most or many) Oakridge-brand shingles contain a particular

design specification measurement that renders the shingle defective. FOF

108, 195, 200(c).  This fact alone distinguishes the instant case from the

decisions relied upon by plaintiffs, and other design defect precedent. Neale,

794 F.3d at 357 (all legal claims would be based upon whether Volvo's

sunroof drainage systems were defectively designed); In re Whirlpool, 722

F.3d at 847 (plaintiffs established that all Duet-brand washing machines

were built to designs with "nearly identical engineering" that differed only

in the machines' size and aesthetics and expert witness opined that a

common defect, failure to self-clean the tub, was present in all machines

regardless of slight design differences); Marcus, 687 F.3d at 602-03 (expert

witness testified, after reviewing "thousands of pages of specifications" that

all tires, regardless of model or size, are substantially similar in construction

and all tires manifest the same defective characteristic, i.e., extra stiffness);

Wolin, 617 F.3d at 1172 (same design defect, i.e., a geometry defect in

vehicle's alignment, was present in each class member's car); <u>Pella</u>, 606 F.3d at 391 (all ProLine casement windows were designed to allow water to seep behind aluminum casing, which accelerated wood rot); <u>Martin</u>, 292 F.R.D. at 256-59, 267 (class action involved only "second generation" "rear twist beam axle," which was manufactured by one company for fewer than five years); <u>Brunson</u>, 266 F.R.D. at 114, 119 (all trimboard suffered from same manufacturing defects that made it rot, warp, and crack prematurely); <u>Payne</u>, 216 F.R.D. at 23, 28 (hosing used in radiant floor heating system was defectively designed causing oxidation, hardening, cracks, and eventually, leaks; testing and other evidence confirmed presence of defect in all hosing).

b. There is no evidence identifying, for purposes of comparison, what design specification measurements are defective. FOF 108, 194(c), 200(c).

c. The record reflects that Owens Corning's allegedly defective design specifications will produce both shingles that will last less than 20 years, and shingles that will last more than 30 years, with no way to determine, without inspecting a sample shingle, which shingles a particular owner has. FOF 194(b), (f) & (g).

d. The record includes no evidence establishing the frequency at which Oakridge-brand shingles were manufactured at the low-end of Owens Corning's design specifications, such that inferences could be drawn about the prevalence of the alleged design defect. FOF 195; <u>Reyes</u>, 802 F.3d at 485 (the standard is not whether it is mathematically or scientifically possible that one of the telemarketing firms used by defendants did not

engage in the allegedly wrongful conduct, but whether plaintiff established that it is more likely than not that the telemarketing firms used by defendants engaged in the allegedly wrongful conduct). Instead, the statistical evidence in the record reflects that only around half of the warranty shingles measured at, near, or below industry minimums. FOF 195(a)(ii). This sample, which was small and inherently biased, could not support any inference that all (or even most or many) Oakridge-brand shingles were manufactured at the low-end of Owens Corning's design specifications, even if the sample was admissible. FOF 193(b).

e. Plaintiffs submit no legal authority to support their proposition that a design specification that sets a range of measurements, some of which will produce defective products and some of which will not, can establish a design defect claim. FOF 201; COL 73(b).

**COL 27:** Plaintiffs satisfied their burden of proving commonality by a preponderance of the evidence only for the proposed four-state class, and only with respect to those legal claims based upon the theory that a limited warranty qualifies as a representation about the useful life of a shingle.

**3. Typicality**

**COL 28:** In Marcus, the Court of Appeals for the Third Circuit explained that the typicality requirement aids a court in determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Marcus, 687 F.3d at 597-98 (citing General Telephone Co. of the Sw. v.

Falcon, 457 U.S. 147, 158 n.13 (1982)).  Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." Id. at 598.

**COL 29:**   To determine whether a plaintiff's position is markedly different from the class as a whole, a court compares three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class. Marcus, 687 F.3d at 599.

**COL 30:**   The Nationwide Class:  Plaintiffs contend that the typicality requirement is met for the nationwide class because the bankruptcy discharge defense that Owens Corning asserted against Wright and West "has ramifications for all other homeowners who purchased Oakridge before Owens Corning's bankruptcy was finalized," and "supplies a common course of conduct that has equal ramifications for Plaintiffs and the class." (ECF No. 178 at 24 (¶ 25).)

> a.   To the extent that the purpose of the proposed nationwide class is to obtain a ruling with respect to whether the Frenville test or the Grossman's test would apply to any bankruptcy discharge defense mounted by Owens Corning to a class member's claim, the court finds that the typicality requirement of Rule 23(a) is readily met.  In doing so, the court puts aside the conclusions reached

with respect to the ability of this court to issue any rulings on this question in light of the court of appeals' decision in <u>Wright</u>. COL 22(b).

b. To the extent that what plaintiffs actually seek on behalf of the proposed nationwide class is a ruling from this court that the claims of any owner who purchased Oakridge-brand shingles before September 26, 2006, are not discharged by Owens Corning's Bankruptcy Order, the court concludes that plaintiffs cannot satisfy their burden to prove typicality by a preponderance of the evidence.

   i. The claims of the named plaintiffs are generally the same as those of the class in terms of the legal theory advanced. Both groups would be seeking an adjudication with respect to whether Owens Corning's Bankruptcy Order discharges their claims.

   ii. The claims of the named plaintiffs are not generally the same as those of the class in terms of the factual circumstances underlying that legal theory.

      a) As explained in previous findings and conclusions, <u>Wright</u> directs a court to assess the factual circumstances surrounding each individual claim in light of the legal cause of action being asserted to determine when that claim arose under state law and whether notice of the bankruptcy proceedings was sufficient. FOF 229-32; COL 22(b); <u>Wright</u>, 679 F.3d at 103-08. Because the <u>Frenville</u> test is, by its nature, fact-specific the factual

circumstances pertinent to how Owens Corning's bankruptcy discharge defense applies to the claims held by the named plaintiffs and the class members cannot be "generally the same."

(i) By way of example, the record reflects that none of the named plaintiffs suffered property damage or otherwise knew that the Oakridge-brand shingles on their roofs failed prior to September 26, 2006, the date on which Owens Corning's Bankruptcy Order was signed. FOF 29, 38, 55, 81, 94. This fact was critical to determining whether or not Owens Corning's Bankruptcy Order discharged Wright's and West's claims. <u>Wright</u>, 679 F.3d at 107-09. The proposed nationwide class, however, includes owners who purchased structures on which Oakridge-brand shingles were installed at any time prior to September 26, 2006. It is therefore entirely plausible, and in fact likely, that class members who own structures on which Oakridge-brand shingles were installed in the early 1990s would have experienced property damage or had other actual notice of

the alleged failure of their roofing shingles before September 2006. See FOF 22, 29, 32, 38, 47, 55, 71, 81, 89, 94 (evidencing that the named plaintiffs obtained actual knowledge about the alleged failure of their Oakridge-brand shingles no more than 13 years after installation). Such factual circumstances affect the accrual of an owner's claim under state law, and, in turn, the sufficiency of the notice provided about Owens Corning's bankruptcy case, both of which are critical issues under Wright. Wright, 679 F.3d at 107-09.

(ii) The factual circumstances of the named plaintiffs and the members of the proposed nationwide class will also differ due to the breadth of the proposed class definition, which focuses on current ownership of a structure. Although the named plaintiffs all directed that Oakridge-brand shingles be installed on the roof of their structures, it is likely that some members of the proposed nationwide class will have purchased a structure with

Oakridge-brand shingles already installed on it.  The date of that purchase, the information and inspections exchanged in connection with the transfer of ownership, and related facts will affect how the <u>Frenville</u> test applies.

(iii) Lastly, the named plaintiffs are all individuals who own single-family dwellings, whereas the proposed nationwide class will include entities, associations, and governmental bodies, as well as owners of multi-family dwellings and commercial properties.  These circumstances will inevitably cause divergent facts to emerge between the named plaintiffs and the class members with respect to how the <u>Frenville</u> test applies.

b)  Under these circumstances, the named plaintiffs cannot satisfy their burden of showing that their claims are generally the same as those of the class in terms of the factual circumstances underlying the legal theories.

iii.  Wright and West would be subject to a unique defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation with respect to the proposed nationwide class, and they would have differing interests and

incentives than the other named plaintiffs and class members. The court of appeals issued a final ruling in <u>Wright</u> that Wright's and West's claims were not discharged by Owens Corning's Bankruptcy Order. FOF 232; COL 22(b). These two named plaintiffs have no interest or incentive in relitigating that issue, and would be prohibited from doing so if they tried. Wright's and West's claims cannot be typical of the claims held by members of the proposed nationwide class for this additional reason.

iv. Gonzalez, Boehm, and the Maags will not be subject to any unique defenses and will have the same interests and incentives as those members of the proposed nationwide class, and in this respect, their claims are typical of the claims held by members of the proposed nationwide class.

a) Although the court of appeals' holding about the applicability of the <u>Frenville</u> test will apply to these four named plaintiffs, as well as to all members of the proposed nationwide class, the court of appeals did not apply the <u>Frenville</u> test to their claims in <u>Wright</u>. That ultimate issue is still an open question for Gonzalez, Boehm, and the Maags, just as it will be an open question for all (or even most or many) members of the proposed nationwide class.

b) Gonzalez, Boehm, and the Maags will have the same interest and incentive to ensure that their claims, like the claims of the proposed nationwide class, are not deemed discharged by Owens Corning's Bankruptcy Order.

c. In summary, although the interests and incentives of Gonzalez, Boehm, and the Maags are sufficiently aligned, and they are not subject to any unique defenses, plaintiffs nevertheless failed to satisfy the typicality requirement because their factual circumstances cannot be generally the same as those of the other members of the proposed nationwide class because the <u>Frenville</u> test, by its nature, is fact- and case-specific.

**COL 31:** <u>The Four-State Class</u>: Plaintiffs contend that the typicality requirement is met with respect to the proposed four-state class because this litigation arises out of a common course of wrongdoing by Owens Corning with respect to defective design, knowledge of defect, and misrepresentations about Oakridge-brand shingles. (ECF No. 178 at 24 (¶ 24).) For the reasons set forth in the following conclusions of law, the court finds that plaintiffs failed to demonstrate typicality by a preponderance of the evidence for the proposed four-state class.

a. The legal theories advanced by the named plaintiffs are not generally the same as those of the class.

i. The named plaintiffs are from different states, and propose to pursue different combinations of legal claims against Owens Corning on a classwide basis. FOF 13.

a) For example, Wright, who is from Pennsylvania, is the only named plaintiff who seeks class certification for an express warranty claim. She also pursues claims for breach of the implied warranty of merchantability and unjust enrichment on behalf of the class, but does not pursue any consumer protection claims on behalf of the class, even though such claims are pled in her complaint. FOF 4(b), 13.

b) In contrast, West and the Maags, who are Illinois owners, are not pursuing any kind of warranty claim, but are seeking class certification of consumer protection and unjust enrichment claims. FOF 4(b), 13.

c) These examples demonstrate that the named plaintiffs, who purport to represent owners located in all four states, do not assert "generally the same" legal theories as all members of the proposed four-state class.

ii. State-specific subclasses could possibly remedy this concern.

a) "[I]t is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the [plaintiff] who is required to submit proposals to the court." Reyes, 802 F.3d at 494 (citing U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 408 (1980)).

b) Despite being specifically informed of the need to propose state-specific subclasses at the class certification phase, and

despite stating their intention to propose state-specific subclasses in the post-hearing briefing, plaintiffs nevertheless failed to propose state-specific subclasses in any filing made in support of their motion for class certification. FOF 14-15; COL 31(a)(ii). Plaintiffs, instead, continue to assert that the court should be responsible for constructing state-specific subclasses as a matter of trial management, if necessary. FOF 14.

c) Under the circumstances, plaintiffs' failure to propose state-specific subclasses cannot be characterized as an inadvertent oversight.

d) In any event, due to other deficiencies in the named plaintiffs' satisfaction of the Rule 23(a) and Rule 23(b) requirements, the crafting of state-specific subclasses would not ultimately alter the court's decision with respect to the propriety of certifying the class.

b. The factual circumstances underlying the legal theories of the named plaintiffs are generally the same as those of the members of the proposed four-state class, but only with respect to any legal claims that are based exclusively on a design defect and not with respect to any legal claims that are based upon Owens Corning's alleged misrepresentations.

i. Plaintiffs argue that typicality is met because Owens Corning promised all class members that Oakridge-brand shingles would last

for 25 years or more, but due to a common and intrinsic design defect, no Oakridge-brand shingle will last that long.

ii. The named plaintiffs' factual circumstances with respect to Owens Corning's alleged misrepresentations about the useful life of Oakridge-brand shingles are not generally the same as those of the members of the proposed four-state class, but are generally the same as those of the members of the proposed four-state class with respect to the alleged design defect for the following reasons:

a) Factual Circumstances – Specific Misrepresentations: The record before the court establishes that Owens Corning did not engage in any uniform marketing scheme with respect to Oakridge-brand shingles such that this court could find that the named plaintiffs' factual circumstances are generally the same as those of members of the proposed four-state class. FOF 134-39, 145-46, 154-59, 164-65, 175-80; COL 25.   In fact, the record reflects that even the named plaintiffs were exposed to different marketing materials with different statements and representations about Oakridge-brand shingles. FOF 140-46.  It would defy logic for this court to find that the factual circumstances of the named plaintiffs and the proposed four-state class are generally the same when the factual circumstances among the named plaintiffs are not even generally the same.

b) Factual Circumstances – Limited Warranties as

Misrepresentations: The only factual circumstance that is

generally the same among the named plaintiffs and between

the named plaintiffs and the members of the proposed four-

state class is that all owners will hold, at least, the limited

shingle warranty of at least 25 years that is automatically

provided with all Oakridge-brand shingles. FOF 128, 167-

74.  The record reflects, however, that there are significant

factual differences among the named plaintiffs and there

will be significant factual differences between the named

plaintiffs and the members of the proposed four-state class

with respect to the terms of those warranties.

(i) The limited shingle warranties include differing

limitations, disclaimers, terms, and scope of

coverage. FOF 169.  For example, some warranties

disclaim implied warranties, while others do not.

FOF 169(e).  Although all owners will hold a

limited shingle warranty, the record reflects that the

terms of those warranties will not be the same.

(ii) In addition, the limited shingle warranties are only

one kind of warranty held by purchasers of

Oakridge-brand shingles. FOF 169(c).  Some class

members will have purchase enhanced warranties,

which include still different terms and limitations.
<u>Id.</u>  There is no evidence that any named plaintiff
purchased such enhanced warranty protection.

c)  In summary, the named plaintiffs failed to prove, by a
preponderance of the evidence, that the named
plaintiffs' factual circumstances with respect to Owens
Corning's alleged representations about the useful life
of Oakridge-brand shingles are generally the same as
those of the members of the proposed four-state class.
Although the named plaintiffs and all class members
will hold a limited shingle warranty of at least 25
years, that common factual circumstance is dwarfed by
the diverse terms, limitations, and kinds of warranties
held by the class members, which can be critical to the
validity of their legal claims.

d)  <u>Factual Circumstances - Design Defect</u>:  In contrast, the
named plaintiffs' factual circumstances with respect to
the alleged design defect are generally the same as those
of the members of the proposed four-state class.

(i)  Regardless of the particular design defect
theory that the named plaintiffs pursue, the
factual circumstances of the named plaintiffs
and the members of the proposed four-state

class are generally the same. FOF 200, 202-04 (identifying three possible design defects: insufficient quantity of asphalt, insufficient quality of asphalt, and low mat mass/tear strength). Whether or not Oakridge-brand shingles suffer from any of these purported design defects will be proven by the same evidence. There are no facts unique to any named plaintiff or class member that will affect how Owens Corning designed its shingles.

(ii) For purposes of analyzing the typicality factor, the court uncritically accepts the named plaintiffs' theory that all Oakridge-brand shingles are defectively designed because Owens Corning's design specifications "allow" both the manufacture of shingles that will last only 20 years (low-end shingles) and shingles that will last more than 30 years (high-end shingles). But see COL 73 (discussing plaintiffs' failure to establish that a common design defect exists where a portion of manufactured products will admittedly not be defective and no evidence with respect to the

frequency at which the manufactured product includes the defect is proffered).

(iii) Under plaintiffs' theory of the case, this court concludes that the named plaintiffs' factual circumstances with respect to the design defects allegedly affecting Oakridge-brand shingles are generally the same as those of the members of the proposed four-state class.

iii. Two of the named plaintiffs, however, are subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation, regardless of the legal theory being advanced. <u>Marcus</u>, 687 F.3d at 599.

a. The Maags accepted a substantial payment, by way of credit, from Owens Corning, agreeing in the process to release their claims against Owens Corning. FOF 97-98. The Maags are subject to a defense based upon this release that will be inapplicable to many members of the proposed four-state class, and that will likely become a major focus of the litigation. It follows that the Maags' claims cannot be typical of class members' claims under these circumstances.

b. There is no indication that the other named plaintiffs are subject to a unique defense that is likely to become a

major focus of the litigation. Although West and
Gonzalez received payment from their insurers for the
property damage that they suffered, and West's
contractor replaced his back roof free-of-charge, such
circumstances and set-offs will likely be common to the
class and would have to be administered in arriving at a
final claim value for each class member.

iv.   The interests and incentives of the named plaintiffs are not sufficiently
aligned with those of the members of the proposed four-state class.

a.   Some named plaintiffs experienced property damage (Wright,
West, and Gonzalez), while others suffered no property
damage (Boehm and Maags). FOF 100.  Of the three named
plaintiffs who suffered property damage, two were fully
compensated for the damage by an insurance company. FOF
100(c).  There is no dispute that the property damage suffered
by the other named plaintiff was not caused by a failure of her
Oakridge-brand shingles. FOF 100(a).  All these
circumstances will affect what relief the named plaintiffs seek
to obtain in order to resolve their claims.  Yet, the named
plaintiffs propose to represent a class comprised of members
who have suffered out-of-pocket costs associated with
property damage, and members who have not.  There is a lack
of alignment in this respect.

b. The named plaintiffs also purport to represent a class that will undoubtedly include owners who replaced the shingles on their structure as a precaution to prevent property damage. Although two named plaintiffs replaced the shingles on their roofs, one incurred no cost to do so, and the other received partial reimbursement from Owens Corning under the terms of the limited shingle warranty and pursuant to a waiver of future claims. FOF 101. There is a lack of alignment in this regard with respect to obtaining remuneration for costs incurred by class members who preventatively replaced their shingles.

c. The interests and incentives of the named plaintiffs will also be dissimilar because the named plaintiffs and the members of the proposed four-state class obtained warranties of differing numbers of years and purchased shingles at different times. By way of demonstration, Gonzalez, who holds a 20-year limited warranty on shingles purchased in 2002, has a different interest than Boehm, who holds a 40-year limited warranty on shingles purchased in 1997. Both named plaintiffs hold different interests from an owner who purchased a structure in 2010 on which Oakridge-brand shingles with a 50-year limited warranty were already installed, or an owner who installed Oakridge-brand shingles with a lifetime limited

warranty on a structure in 2012.  Although it may be conceivable that a method could be created to standardize such disparate values, interests, and incentives, plaintiffs offer no method for doing so in support of their motion for class certification, and, in fact, fail to even recognize that this situation exists.  Therefore, there is a lack of alignment in this regard.

**COL 32:**  Plaintiffs failed to establish typicality by a preponderance of the evidence for either the proposed nationwide class or the proposed four-state class.  Upon consideration of whether the claims of the named plaintiffs and the class members are generally the same, whether the named plaintiffs are subject to a defense that is inapplicable to the class and central to the litigation, and the alignment of interests and incentives, the court finds that the named plaintiffs' position is markedly different from that of the class as a whole.  This conclusion means that the court need not proceed further with the class certification analysis for either proposed class under any subsection of Rule 23(b).  In the interest of completeness and to facilitate review by an appellate court, the court will, nevertheless, proceed with the analysis of plaintiffs' motion for class certification as though plaintiffs met their burden to prove typicality by a preponderance of the evidence for all proposed classes.

### 4.  **Adequacy**

**COL 33:**  Rule 23(a)'s fourth requirement is that the representative plaintiffs must "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  The adequacy requirement concerns both "the experience and performance of class counsel" and "the

interests and incentives of the representative plaintiffs." Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012) (citing In re Cmty. Bank of N. Va., 418 F.3d 277, 303 (3d Cir. 2005) (Community Bank I)).

**COL 34:** "'The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class.'" Community Bank III, 795 F.3d at 393 (quoting In re Community Bank of Northern Virginia, 622 F.3d 275, 291 (3d Cir. 2010) (Community Bank II)). In fact, "'the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.'" Community Bank III, 795 F.3d at 393 (quoting Dewey, 681 F.3d at 183).

**COL 35:** This inquiry is closely tethered to the typicality inquiry. Danvers Motor Co., Inc. v. FordMotor Co., 543 F.3d 141, 149 (3d Cir. 2008). The goal is to ensure that the named plaintiff's claims "are not antagonistic to the class." Id. at 150 (citing Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006)).

**COL 36:** Owens Corning makes one challenge to the adequacy of both the named plaintiffs and class counsel, i.e., they improperly engaged in claim splitting by inconsistently choosing to seek class certification for only certain legal claims in each state. (ECF No. 176 ¶¶ 109-19.) Although not explicitly stated, Owens Corning's argument applies only to the proposed four-state class, and not to the proposed nationwide class. Plaintiffs, in response, contend that the doctrine of claim splitting only applies when class representatives prosecute claims for economic losses, but not claims for personal injuries arising out of the same facts. (ECF No. 178 ¶¶ 38-40.)

a. The court rejects Owens Corning's contention that plaintiffs and class counsel are inadequate representatives of the proposed four-state class under the claim-splitting doctrine.

   i. The Court of Appeals for the Third Circuit has not decided how the issue of claim splitting applies in the context of class action proceedings. In re Paulsboro Derailment Cases, No. 13-784, 2014 WL 4162790, at *15 (D.N.J. Aug. 20, 2014). The appellate court's only statement on the issue concerned a class representative's pursuit of separate claims for economic harm, while abandoning claims for harm resulting from physical injuries. Nafar v. Hollywood Tanning Sys., Inc., 339 F.App'x 216, 224 (3d Cir. 2009).

   ii. The decisions relied upon by Owens Corning apply the doctrine of claim splitting to class action proceedings in precisely this same context of pursuing claims for economic harm, while abandoning claims for harm resulting from physical injuries. (ECF No. 164 at 60-61 & n.61 (citing Pearl v. Allied Corp., 102 F.R.D. 921, 923 (E.D. Pa. 1984); Thompson v. Am. Tobacco Co. Inc., 189 F.R.D. 544, 551 (D. Minn. 1999); Martin v. Home Depot U.S.A., Inc., 225 F.R.D. 198, 203-04 (W.D. Tex. 2004) (splitting property damage claims as well as personal injury claims); and In re MTBE Products Liab. Litig., 209 F.R.D. 323, 339 (S.D.N.Y. 2002).)

iii. Owens Corning does not accuse the named plaintiffs or class counsel of engaging in claim splitting by abandoning relief for physical injury or property damage.

iv. There is no evidence in the record that the named plaintiffs or class counsel are engaging in claim splitting by abandoning relief for physical injury or property damage.

**COL 37:** Class counsel is qualified consistent with the requirements of Rules 23(a)(4), (g)(1), and (g)(4). Class counsel have sufficient experience and have adequately performed in these proceedings to date. In reaching this conclusion, the court considers (i) the work counsel has done in identifying or investigating potential claims; (ii) counsel's experience in handling class actions, other complex litigation, and the kinds of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

a. This matter has been litigated before this court for more than five years and the court is familiar with class counsel's performance and experience.

b. Class counsel demonstrated experience in handling complex litigation, knowledge of relevant legal principles, and the ability and willingness to commit sufficient resources to this class litigation.

c. Class counsel will fairly and adequately represent the interests of the class.

**COL 38:** Gonzalez, Boehm, and the Maags are adequate representatives of the proposed nationwide class, but no named plaintiff is an adequate representative of the proposed four-state class.

a. <u>The Proposed Nationwide Class</u>: As discussed in the context of the typicality requirement of Rule 23(a), the interests and incentives of Wright and West with respect to the effect of Owens Corning's Bankruptcy Order on their claims differ from those of the proposed class. COL 30(b)(3). The remaining named plaintiffs, however, share common interests and incentives with the members of the proposed nationwide class with respect to ensuring that Owens Corning is not able to assert a bankruptcy discharge defense against their claims.

b. <u>The Proposed Four-State Class</u>: Plaintiffs failed to establish the adequacy of the named plaintiffs to represent the proposed four-state class by a preponderance of the evidence for several reasons:

   i. Even though the election and pursuit of differing legal causes of action does not constitute claim splitting, as Owens Corning asserts, the court finds that for this reason the named plaintiffs cannot be deemed adequate representatives of all members of the proposed four-state class.

      a) Each named plaintiff is advancing a different bundle of legal claims under a different body of state law. FOF 13. The only legal cause of action being pursued by all six named plaintiffs is unjust enrichment. <u>Id.</u> There are any number of conflicts between the interests and incentives of the named plaintiffs and class members in each of the four states being represented by the proposed four-state class.

(i)  West, an Illinois owner, cannot be deemed an adequate representative of owners whose structures are located in Pennsylvania, who, unlike him, are pursuing breach of express and implied warranty claims. FOF 13.  In turn, West, who is pursuing consumer protection claims on a class wide basis, is not an adequate representative of Pennsylvania owners who are not pursuing such claims. FOF 13.

(ii) Gonzalez will have no incentive to pursue breach of express warranty claims, which are only being pursued by Wright on behalf of Pennsylvania residents. FOF 13.  In fact, Gonzalez may be disincentivized to pursue such claims in favor of the equitable unjust enrichment claim and the implied warranty claim that he is pursuing under Texas law.

(iii) The Maags and West have no interest in pursuing any warranty claims, as they are pressing only consumer protection and unjust enrichment claims on behalf of the Illinois owners. FOF 13.  They, in fact, might be

incentivized to renounce any warranty claims

so that they can obtain equitable relief instead.

(iv) Courts have deemed this lack of alignment to

prevent the adequacy requirement from being

satisfied. <u>Martin</u>, 292 F.R.D. at 270.

(v) Although state-specific subclasses could

possibly remedy this lack of alignment, due to

the named plaintiffs' failure to satisfy other

Rule 23(a) and Rule 23(b) requirements, the

crafting of state-specific subclasses would not

ultimately alter the court's decision with

respect to the propriety of certifying the class.

ii. The court additionally concludes that the Maags cannot be adequate

representatives of any member of the proposed four-state class

because they accepted an offer of settlement from Owens Corning

with respect to their claims. FOF 97-98; COL 31(b)(3). This

circumstance creates inherent conflicts, instead of alignment,

between the Maags and the members of the proposed four-state

class who did not accept an offer of settlement and, in the course of

doing so, agree to release his or her claims against Owens Corning.

**COL 39:** Even though class counsel are adequate, the named plaintiffs failed to establish

that they are adequate representatives of the proposed four-state class. Gonzalez, Boehm,

and the Maags are, however, adequate representatives of the proposed nationwide class.

In the interest of completeness and to facilitate review by an appellate court, the court will, nevertheless, proceed with the analysis of plaintiffs' motion for class certification as though plaintiffs met their burden to prove adequacy by a preponderance of the evidence for all proposed classes.

## C. **Rule 23(b) Requirements**

### 1. **Ascertainability**

**COL 40:** "It is the Plaintiffs' burden to show by a preponderance of the evidence that the class is currently and readily ascertainable." Community Bank III, 795 F.3d at 392 (citing Carrera v. Bayer Corp., 727 F.3d 300, 305 (3d Cir. 2013)).

**COL 41:** The ascertainability requirement does not apply to a Rule 23(b)(2) class, but does apply to a Rule 23(b)(1)(B) class and a Rule 23(b)(3) class. Shelton v. Bledsoe, 775 F.3d 554, 559-62 (3d Cir. 2015).

**COL 42:** The four requirements of Rule 23(a) are separate and distinct from the ascertainability inquiry. Byrd v. Aaron's, Inc., 784 F.3d 154, 172 (3d Cir. 2015).

**COL 43:** Ascertainability ensures that a proposed class will function as a class, and focuses on whether individuals fitting the class definition may be identified without resort to mini-trials. Byrd, 784 F.3d at 162, 164-65. "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Marcus, 687 F.3d at 593; see also William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed. 2011) (class members should be ascertainable through a manageable process that does not require much, if any, individual factual inquiry).

**COL 44:** In order to demonstrate ascertainability, a plaintiff is required to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and

administratively feasible mechanism for determining whether putative class members fall within the class definition. Byrd, 784 F.3d at 163 (citing Carrera, 727 F.3d at 355); see also Hayes, 725 F.3d at 355; Marcus, 687 F.3d at 598.

**COL 45:**  Ascertainability is an essential requirement for class certification because it "allow[s] potential class members to identify themselves for purposes of opting out of a class," and "ensures that a defendant's rights are protected by the class action mechanism." Carrera, 727 F.3d at 307; Marcus, 687 F.3d at 591-92 ("Clearly delineating the contours of the class . . . serves several important purposes, such as providing the parties with clarity and assisting class members in understanding their rights and making informed opt-out decisions.").

**COL 46:**  Before proceeding with the analysis, the court notes that plaintiffs offer no briefing and submit no proposed findings of fact or conclusions of law directed to the ascertainability requirement for the proposed nationwide class. (ECF No. 154 at 24-25; ECF No. 178 at 19-21 (¶¶ 5-8); ECF No. 170 at 4-5.)  Given that it is plaintiffs' burden to establish that the nationwide class is ascertainable, the court could find on this basis alone that the proposed nationwide class cannot be certified.  The court will, nevertheless, proceed with the analysis, applying the arguments that plaintiffs make in connection with the proposed four-state class where possible, and otherwise extrapolating from the record the pertinent information.

### a. **Objective Criteria**

**COL 47:**  The Proposed Nationwide Class:  The proposed nationwide class is defined by the following criteria: (a) ownership of a structure located in the United States (b) on which

Oakridge-brand shingles are currently installed, (c) that were purchased before September 26, 2006. FOF 6.   These are all objective criteria.

**COL 48:**   <u>The Proposed Four-State Class</u>: The proposed four-state class is defined by the following criteria: (a) ownership of a structure in Pennsylvania, Illinois, California, or Texas (b) on which Oakridge-brand shingles were installed between 1992 and 2012 (c) where those shingles manifested any cracking, degranulation, fragmentation, or deterioration (d) during the warranty coverage period. FOF 6.  The court finds, for the following reasons, that the degranulation and deterioration elements of the class definition are not objective criteria.  With those elements excised, the court would find that the proposed four-state class definition is based upon objective criteria.

 a. Ownership of a structure located in one of four states, the date of installation, and the length of the warranty period are all objective criteria.

 b. Degranulation and deterioration, which are included in the proposed class definition "manifestation of any cracking, degranulation, fragmentation, or deterioration," are not based upon objective criteria.  Neither party addresses this issue in its papers.

  i. A crack is an objective criteria; either the shingle has a crack in it, or it does not.  Although the record reflects that there are different kinds of cracks - surface cracks, deep cracks, vertical cracks, spider-web-like cracks - and that not all cracks indicate imminent shingle failure and not all cracks can be attributed to faulty shingles, the proposed four-state class definition requires only that "any crack"

be manifest. FOF 198-99. A crack is an observable, objective criteria.

ii. To the extent that fragmentation is understood to mean that a piece of a shingle has been torn away or otherwise separated from the remainder of the shingle, fragmentation is an objective criteria; either the entire shingle is intact, or part of it is gone.

iii. Degranulation and deterioration, on the other hand, are subjective terms of degree which, by virtue of the prefix de-, indicate a change in condition and require a comparison to some other specimen. This subjectiveness is not a matter of semantics.

    a) Consider an owner, who after receiving notice of this class action, climbs on his roof (or engages another person to do so for him) to view his shingles in an effort to decide whether he falls within the class definition. No shingles are cracked. All the shingles are intact. How is the owner to determine if his shingles are "degranulated" or "deteriorated?"

        (i) To what are the shingles on the roof to be compared? A new shingle? Other shingles of the same age that have been in use in the same geographic area? Photographs of shingles manufactured in the same year and from the same plant as the owner's shingles? The

record reflects that shingles manufactured in 1992 will have different qualities and use different materials than shingles manufactured in 2012. FOF 104, 106, 108(b), 203(c)(ii)(c). The record reflects that a shingle manufactured for use in California will have different qualities and use different materials than shingles manufactured for use in Chicago, Illinois. FOF 104, 106, 108(b), 203(c)(ii)(c). Assessing whether a shingle manifests "degranulation" or "deterioration" is not a one-size-fits-all exercise.

(ii) How is the owner to determine what amount of "degranulation" and "deterioration" qualifies him to become a member of the proposed four-state class? Even plaintiffs' expert acknowledges that all shingles experience ordinary and acceptable wear and tear. FOF 196. How much degranulation and deterioration represents acceptable wear and tear and how much represents excessive wear and tear? This determination will depend on various factors such as the age of the shingle,

the exact product installed on the roof, and the environment in which the shingle has been weathering. Acceptable wear and tear for a shingle sold with a 25-year limited warranty that was installed on a roof 23 years ago will undoubtedly be different than acceptable wear and tear for a shingle sold with a lifetime limited warranty that was installed on a roof 5 years ago. None of these are objective criteria and plaintiffs propose no way for class members to make those assessments in order to evaluate their qualifications for class membership.

(iii) Must the owner remove samples from the roof and submit them for testing to determine whether the shingles have suffered sufficiently excessive degranulation and deterioration to qualify as a member of the proposed four-state class? Apart from this approach raising serious concerns with respect to administrative feasibility, the record does not contain a single set of measurements, for all shingles of all ages installed in all four states over a period of

twenty years that will indicate excessive

degranulation or deterioration. FOF 209; COL

26(b).

b) For all these reasons, the degranulation and deterioration
criteria are not objective.  Unless those two criteria are
excised from the class definition, the proposed four-state
class is not ascertainable.   In the interest of completeness
and to facilitate review by an appellate court, the court will,
nevertheless, proceed with the analysis of plaintiffs' motion
for class certification as though the degranulation and
deterioration elements were excised from the proposed
four-state class definition and the class was defined entirely
by reference to objective criteria.

**b.  <u>Administrative Feasibility</u>**

**COL 49:**  The proposed nationwide and four-state classes share several criteria, such as
ownership of a structure with Oakridge-brand shingles installed on it, and either the
purchase or installation date of those shingles.  The court will assess whether there is a
reliable and administratively feasible mechanism for determining whether putative class
members fall within the proposed nationwide class and the four-state class definitions
together, where possible, in the conclusions of law that follow.  Where necessary, the
administrative feasibility of determining whether members fall within the two kinds of
proposed classes will be separately addressed.

**COL 50:** Ownership of a Structure (both classes):  There is a reliable and administratively feasible mechanism for determining whether a putative class member owns a structure. Tax records, property records, deeds, and mortgages are just a few examples of the kinds of documentation that class members could produce, if deemed necessary, to prove ownership of a structure.

**COL 51:** Identifying Oakridge-brand Shingles (both classes):  Plaintiffs contend that Oakridge-brand shingles can be identified by (1) their mass, color, and dimensions; (2) release tape; and (3) receipts or invoices. (ECF No. 178 at 20 (¶ 8).)  According to plaintiffs, Owens Corning's administration of a warranty program is evidence that identification of Oakridge-brand shingles is administratively feasible. (Id.)  Identification of Oakridge-brand shingles is not administratively feasible on a classwide basis for either the proposed nationwide class or the proposed four-state class for the following reasons:

    a.  Class members whose structures have Oakridge-brand shingles installed on them cannot be determined from Owens Corning's corporate records.  FOF 117.

    b.  Class members whose structures have Oakridge-brand shingles installed on them cannot be determined by visual inspection, except by only a few Owens Corning employees. FOF 225.

    c.  Class members whose structures have Oakridge-brand shingles installed on them cannot be determined by release tape. FOF 221-23.  At most, the release tape will indicate that the shingle was manufactured at a plant that produces Oakridge-brand shingles.   It does not necessarily follow that the shingle is an Oakridge-brand shingle.

d.  Class members whose structures have Oakridge-brand shingles installed on them cannot be determined by reference to receipts or invoices.

   i.  The record reflects that even the named plaintiffs could not produce receipts or invoices establishing their purchase of Oakridge-brand shingles. FOF 28, 54, 84, 92.

   ii.  Given that the proposed nationwide class spans nearly fifteen years and the proposed four-state class spans twenty years, it is likely that ownership of the structure will have changed, making documentation for roofing projects completed prior to transfer less likely to be available.

e.  Owens Corning's maintenance and management of a warranty program do not establish that structures on which Oakridge-brand shingles are installed can be identified in an administratively feasible way for either the proposed nationwide class or the proposed four-state class.

   i.  Owens Corning adjudicates warranty claims on a fact-specific, case-by-case basis. FOF 115.  The warranty claims process includes an exchange of information between the owner and Owens Corning, and could include submission of sample shingles and on-site inspections. Id.

   ii.  The warranty program accounts for a miniscule percentage of Owens Corning's production of Oakridge-brand shingles. FOF 112.   Owens Corning's administration of 5 claims does not mean

that 1,000 claims can be feasibly administered on a classwide

basis. Id.

    iii.  Owens Corning occasionally denies warranty claims because the

claimant does not own Owens Corning shingles. FOF 114.

**COL 52:**  <u>Establishing Purchase or Installation Date</u> (both classes):  The ability to establish

the purchase date, for the proposed nationwide class, and the installation date, for the

proposed four-state class, is not administratively feasible for the same reasons set forth

immediately above with respect to "identifying Oakridge-brand shingles." COL 51(d).  If

an owner cannot identify the shingles as Oakridge-brand shingles, it follows that it is

unlikely that the owner can establish the purchase or installation date with documentation

or other evidence. Again, transfer in the ownership of the structure further complicates

administration of this criterion.  Plaintiffs proffer no reliable or administratively feasible

mechanism for determining a putative class member's purchase or installation date of

Oakridge-brand shingles.

**COL 53:**  <u>Establishing Manifestation of Shingle Conditions</u> (the four-state class):  Plaintiffs

contend that it is administratively feasible to determine the manifestation of any cracking,

degranulation, fragmentation, or deterioration because "[i]f an objective inspection

indicates even a minimal manifestation of any of these defects" the owner will qualify as

a member of the class. (ECF N. 178 at 20 (¶ 8(c)).)  Establishing manifestation of one of

the four enumerated shingle conditions, however, is not administratively feasible on a

classwide basis for the proposed four-state class for the following reasons:

a. Plaintiffs, in their argument, recognize that every roof of every potential class member will have to be visually examined in order to determine whether "any cracking, degranulation, fragmentation, or deterioration" has occurred.

    i. Putting aside for the moment the issues raised earlier about how an owner is to assess whether a shingle is sufficiently "degranulated" or "deteriorated" to qualify for class membership, COL 48, the need for an individual examination and subjective assessment of each potential class member's shingles signifies a lack of administrative feasibility for the proposed four-state class.

    ii. Plaintiffs propose no standard procedure pursuant to which an owner can determine whether one of the enumerated shingle conditions exist without personally inspecting, or engaging someone else to inspect, the shingles.

b. Individual factual inquiries will be required to determine whether each potential class member's Oakridge-brand shingles manifest any cracking, degranulation, fragmentation, or deterioration. In fact, if this factual inquiry is not made, the class definition would be effectively reduced to include any owner of a structure on which Oakridge-brand shingles were installed during the proposed 20-year class period, regardless of the physical condition of the shingles. That kind of class definition although eliminating the present concerns about administrative feasibility would be impermissibly over-inclusive and would not align with plaintiffs' legal theories and record evidence. There is no evidence to support certification of a class comprised of

all owners who own a structure on which Oakridge-brand shingles were installed between 1992 and 2012; plaintiffs do not seek certification of such a class.

**COL 54:**  In summary, both the proposed nationwide class and the proposed four-state class are defined by reference to objective criteria, if degranulation and deterioration are removed from the four-state class definition.  Plaintiffs fail to demonstrate, however, that membership in either proposed class can be determined by a reliable and administratively feasible mechanism.

### 2.  Rule 23(b)(1)(B) – The Nationwide Bankruptcy Discharge Class

**COL 55:**  Federal Rule of Civil Procedure 23(b)(1)(B) provides that an action may be maintained as a class action if the prerequisites of subdivision 23(a) are satisfied and "[t]he prosecution of separate actions by or against individual members of the class would create a risk of … adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1)(B).

**COL 56:**  Because class members are not provided notice or an opportunity to opt out of a class certified under Rule 23(b)(1)(B), the rule is narrowly interpreted. Ortiz v. Fibreboard Corp., 527 U.S. 815, 844 (1999); Patton v. Topps Meat Co., LLC, No. 07-00654, 2010 WL 9432381, at *6 (W.D.N.Y. May 27, 2010).

**COL 57:**  Although Rule 23(b)(1)(B) has been used in labor relations cases, certain ERISA suits, and suits in which inmates seek injunctive relief, the traditional and most common use of the rule is in "limited fund" cases. 1 McLaughlin on Class Actions § 5:8 (12th ed.)

In those cases, the rule protects plaintiffs where separate lawsuits might exhaust a defendant's resources, such that earlier plaintiffs might recover to the prejudice or exclusion of later plaintiffs. Id.  In a limited fund class action, the court's adjudicative authority derives from its jurisdiction over the fund, and the concomitant power to decide the claims of all entities asserting rights to the fund. Id.

**COL 58:**  Rule 23(b)(1) does not expressly require a significant degree of similarity among the factual circumstances of putative class members, but courts have interpreted the Rule to include that requirement. Id.

**COL 59:**  Although plaintiffs contend that Rule 23(b)(1)(B) applies outside the limited fund context and where "a statutory defense will impair the rights of all class members," the decisions cited by plaintiffs in support of these points are limited fund or ERISA breach of fiduciary duty cases. (ECF No. 178 at 27 (¶¶ 43-44).)  Plaintiffs cite to no legal authority in which a court has certified a class pursuant to Rule 23(b)(1)(B) in order to adjudicate the effect of a bankruptcy court's order of discharge on claims for damages asserted by claimants after a reorganization plan was confirmed.  The court found no such legal authority.

**COL 60:**  Putting aside this lack of legal authority in connection with plaintiffs' proposed Rule 23(b)(1)(B) class, the court examines whether certification of the proposed nationwide class could nevertheless be appropriate.

**COL 61:**  It remains unclear, even after oral argument and the submission of proposed findings of fact and conclusions of law, what relief plaintiffs seek on behalf of the proposed Rule 23(b)(1)(B) class members. COL 22.  Because, however, there is no relief

that plaintiffs could obtain on behalf of the proposed nationwide class under any possible theory, this deficiency in plaintiffs' submissions is ultimately without consequence.

a.  At oral argument, the named plaintiffs claimed that they sought a ruling, on behalf of the proposed nationwide class, with respect to whether the <u>Frenville</u> test or the <u>Grossman's</u> test applies to any challenge made by Owens Corning to class members' claims on the ground that those claims were discharged by the Bankruptcy Order. FOF 22(a).

i.  The Court of Appeals for the Third Circuit issued a precedential opinion in <u>Wright</u> deciding this precise issue.

a)  The appellate court, applying Third Circuit law to the claims of owners located in both Pennsylvania and Illinois, held that the <u>Frenville</u> test applies to any dischargeability defense raised by Owens Corning because the Bankruptcy Order was entered in 2006, which is before <u>Grossman's</u> was decided. FOF 230-36.

b)  Owens Corning concedes that it cannot relitigate this issue. FOF 233; COL 22(a)(ii). The doctrine of collateral estoppel will prevent it from doing so. COL 22(a)(v).

c)  Plaintiffs recognize that the effect of Owens Corning's Bankruptcy Order will be determined in accordance with the law of the Court of Appeals for the Third Circuit because the United States Bankruptcy Court for the District of Delaware issued the Bankruptcy Order and

that court, and the federal district court in Delaware,

retain jurisdiction under the Bankruptcy Order over all

matters concerning Owens Corning's bankruptcy

proceedings. FOF 234-35; (ECF No. 178 at 28 (¶ 47).)

ii. The question that plaintiffs ask this court to answer on behalf of the

proposed nationwide class is moot in light of the court of appeals'

decision in <u>Wright</u> and cannot be adjudicated by this court. <u>Neale</u>,

794 F.3d at 366 ("[b]efore even getting to the point of class

certification, however, class representatives need to present a

justiciable claim").

    a) Article III, Section 2 of the Constitution limits the

"judicial power" of the United States to the resolution of

certain "cases" and "controversies." <u>Valley Forge</u>, 454

U.S. at 471. The "case" or "controversy" requirement is

enforced through a number of justiciability doctrines,

which include standing, ripeness, mootness, and the

prohibition on advisory opinions. <u>Toll Bros.</u>, 555 F.3d at

137.

    b) A case can become moot when the issues presented are

no longer 'live' or the parties lack a legally cognizable

interest in the outcome. <u>Powell</u>, 395 U.S. at 496.

    c) The supplemental authority submitted by plaintiffs is

inapposite. (ECF No. 179 (citing <u>Campbell-Ewald Co. v.</u>

Gomez, 136 S.Ct. 663 (2016)).) In Gomez, the Supreme

Court held that the parties remained adverse, and the case

and controversy remained live, after a settlement offer

was rejected. Gomez, 136 S.Ct. at 669-72. The facts of

the instant case are distinguishable. Gomez has no

bearing on this case.

b.  To the extent that the named plaintiffs actually seek a ruling, on behalf of the

proposed nationwide class, that the claims of any owner who purchased

Oakridge-brand shingles before September 26, 2006, are not discharged by

Owens Corning's Bankruptcy Order, the court of appeals' decision in Wright

specifically precludes this relief. COL 22(b). This court cannot enter any order

that would contradict the appellate court's rulings.

i.  Under the Frenville test, a court must make a fact-specific inquiry

to determine how Owens Corning's Bankruptcy Order affects an

owner's claim. FOF 2, 232; COL 22(b)(i)(b), 30(b). The legal

claim being asserted, the state law being applied, and facts such as

when the shingles exhibited failure, whether a warranty claim was

made, when property damage was suffered, and when roofing

repairs were made all affect how the test applies to a particular

claim. The Frenville test, by its very nature, cannot be applied

uniformly on a classwide basis to the claims of owners throughout

the country.

ii.  The court of appeals, in <u>Wright</u>, held that the claims of Wright and West were not discharged by virtue of the Bankruptcy Order, but did so only after assessing the facts surrounding Wright's claim and West's claim to determine when those claims accrued under state law, and what notice Wright and West received about Owens Corning's bankruptcy proceedings and what effect that notice had on their due process rights. FOF 232; <u>Wright</u>, 679 F.3d at 105-09. This kind of assessment cannot be made on a classwide basis for claims held by owners throughout the country.

iii.  The court of appeals' decision in <u>Wright</u> precludes this court from making any classwide rulings that claims are, or are not, discharged by Owens Corning's Bankruptcy Order.  The nature of the <u>Frenville</u> test precludes such relief.

**COL 62:**  This court will not certify a nationwide class pursuant to Rule 23(b)(1)(B) because the relief being sought is either moot or must be obtained on an individual, rather than a classwide, basis.

## 2. <u>Rule 23(b)(3) – The Monetary Damages Class</u>

**COL 63:**  A class action can be certified under Rule 23(b)(3) where the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

**COL 64:**  The rule provides that the following matters are pertinent to these findings: (1) the class members' interests in individually controlling the prosecution or defense of separate

actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Id.

### a. **Predominance**

**COL 65:** The predominance requirement of Rule 23(b)(3) imposes a "far more demanding" standard than the commonality requirement of Rule 23(a). Community Bank III, 795 F.3d at 399 (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)).

**COL 66:** The predominance criterion "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Sullivan, 667 F.3d at 296 (citing In re Ins. Broker Antitrust Litig., 579 F.3d 241, 266 (3d Cir. 2009)).

**COL 67:** In assessing predominance, a court "must examine each element of a legal claim 'through the prism' of Rule 23(b)." Marcus, 687 F.3d at 600; see Community Bank III, 795 F.3d at 399-400.

**COL 68:** It is the plaintiff's burden to demonstrate that the elements of each legal claim are capable of proof at trial through evidence that is common to the class rather than individual to its members. Marcus, 687 F.3d at 600 (citing In re Hydrogen Peroxide, 552 F.3d at 311).

**COL 69:** "'Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" Marcus, 687 F.3d at 600 (quoting In re Hydrogen Peroxide, 552 F.3d at 311).

**COL 70:**   Rule 23(b)(3) does not require a plaintiff seeking class certification to prove that each and every element of her claim is susceptible to classwide proof. <u>Amgen Inc. v. Conn. Ret. Plans and Trust Funds</u>, 133 S. Ct. 1184, 1196 (2013).  "What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" <u>Id.</u> (quoting FED. R. CIV. P. 23(b)(3) (alteration and emphasis in the original)).

**COL 71:**   The named plaintiffs seek to pursue four categories of legal claims on behalf of the proposed four-state class: (1) breach of express warranty (PA); (2) breach of implied warranty of merchantability (PA, CA, TX); (3) violation of state consumer protection statutes (IL, CA, TX); and (4) unjust enrichment (PA, IL, CA, TX). FOF 13.  For purposes of the following analysis, and in order to facilitate appellate review, the court puts aside the inherent, and dispositive, problems created by the named plaintiffs' attempts to represent a class that will include members owning structures in four different states, who are each advancing different combinations of legal claims under different state laws than the named plaintiffs, which problems have been discussed previously in these findings and conclusions. FOF 13; COL 31(a), 38(b).

**COL 72:**   According to plaintiffs, Owens Corning engaged in a single course of wrongdoing by manufacturing Oakridge-brand shingles in accordance with design specifications that were defective because they made all Oakridge-brand shingles susceptible and vulnerable to having a useful life of no more than 20 years, even though Owens Corning promised that the shingles would have a useful life of 25 years, or more. (ECF No. 178 at 2-11 (¶¶ 5-46), 46 (¶ 117).)  Based upon the legal claims on which the named plaintiffs seek class certification, it is plaintiffs' burden to demonstrate that it can prove these accusations at

trial through evidence that is predominately common to the class rather than individual to its members.

a. Under plaintiffs' theory of the case, each and every legal cause of action that plaintiffs have elected to pursue on behalf of the proposed four-state class requires proof that Oakridge-brand shingles were defectively designed. (ECF No. 178 at 35, 38, 40, 41, 43 (¶¶ 77, 87, 97, 101, 106).); <u>Cleary v. Philip Morris Inc.</u>, 656 F.3d 511, 516, 519 (7th Cir. 2011) (under Illinois unjust enrichment law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience"); <u>Altronics of Bethlehem, Inc. v. Repco, Inc.</u>, 957 F. 2d 1102, 1105 (3d Cir. 1992) (to prove breach of implied warranty of merchantability under Pennsylvania law, "plaintiffs were required to show: (1) that the product malfunctioned . . ."); <u>Tietsworth v. Sears</u>, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010) (to state a claim for breach of implied warranty of merchantability under California law, "[t]here must be a fundamental defect that renders the product unfit for its ordinary purpose"); <u>Webb v. UnumProvident Corp.</u>, 507 F.Supp.2d 668, 680 (W.D. Tex. 2005) (violation of Texas Deceptive Trade Practices Act can be based upon a failure to disclose defect); <u>Mary E. Bivins Found. v. Highland Capital Mgmt., L.P.</u>, 451 S.W.3d 104, 112 (Tex. App. 2014) (under Texas unjust enrichment law, "[t]o prevail, a plaintiff must show that the defendant obtained a benefit from the plaintiff by fraud, duress, or the taking of an undue advantage. . . . To prevail, a plaintiff must show that a

defendant holds money which in equity and good conscience belongs to the plaintiff."); <u>Peterson v. Cellco P'Ship</u>, 164 Cal. App. 4th 1583, 1593 (2008) ("The elements of an unjust enrichment claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of another."); <u>Lackner v. Glosser</u>, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (under Pennsylvania law, the elements of unjust enrichment involve "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value"); <u>Everett v. TK-Taito, LLC</u>, 178 S.W.3d 844, 853 (Tex. App. 2005) (under Texas law, a product is unmerchantable if a product is defective when it leaves the defendant's possession).

b. Some of the legal causes of action require proof that Owens Corning made affirmative misrepresentations about the useful life of Oakridge-brand shingles. (<u>Id.</u> at 40 (¶ 97)); <u>Durell v. Sharp Healthcare</u>, 183 Cal. App. 4th 1350, 1366-67 (2010) (plaintiff in an action under California Consumer Legal Remedies Act must show that defendant's conduct was deceptive); <u>Sevidal v. Target Corp.</u>, 189 Cal. App. 4th 905, 924 (2010) (California's Unfair Competition Law and False Advertising Law require showing of improper conduct by defendant); <u>Clark v. Experian Info. Solutions, Inc.</u>, 256 F. App'x 818, 821-22 (7th Cir. 2007) ("A claim for consumer fraud under the [Illinois Consumer Fraud Act] contains five elements: '(1) a deceptive act or practice by the defendant . . .'"); <u>Goodman v. PPG Indus., Inc.</u>, 849 A.2d 1239, 1245 (Pa. Super. Ct. 2004)

(express warranties are bargained, "dickered," individualized promises that the goods will perform up to the specific standards set forth in the warranty).

    i.   Under plaintiffs' theory of this case, and based upon the record evidence, the existence of a design defect is fundamental to even plaintiffs' misrepresentation-based claims. The only misrepresentations or omissions that Owens Corning is accused of making are that Oakridge-brand shingles will last for at least 25 years, or for the same number of years as the limited shingle warranty, when, *because of a defective design*, the shingles will last 20 years, at the most. According to plaintiffs, Owens Corning's alleged representations are only false if its design specifications for Oakridge-brand shingles cause them to fail before year 25.

   ii.   As will be detailed in the conclusions that follow, the record before the court and the factual findings previously made by this court render it impossible for plaintiffs to meet their burden to prove a design defect by evidence common to the class in this case. It therefore follows that it is likewise impossible for plaintiffs to meet their burden to prove any misrepresentation claims by evidence common to the class.

  iii.   It follows that predominance cannot be established for any of the legal claims for which the named plaintiffs seek class certification under Rule 23(b)(3). Under these factual circumstances, it is unnecessary for the court to digest the myriad individual issues that

would arise in the context of each legal claim being asserted under each of the four state's laws.  The analysis need not reach this level of detail because the factual record makes it impossible for the named plaintiffs to establish that the two essential elements upon which all their legal claims are based, i.e., design defect and misrepresentation, can be proven by evidence common to the class. This inability precludes the named plaintiffs from meeting the predominance requirement for any legal claims they seek to assert on behalf of the proposed four-state class, regardless of the specific elements of any particular state-law claim.

**COL 73:**  Plaintiffs fail to demonstrate that they could prove the existence of an alleged design defect plaguing Oakridge-brand shingles through evidence that is common to the proposed four-state class for the entire 20-year class period.

a.  As an initial matter, this court recognizes that design defect cases can be properly certified as class actions where plaintiffs establish that a product was manufactured according to uniform design specifications that result in a common, classwide defect. Neale, 794 F.3d at 357 (court deemed predominance satisfied because all legal claims would be based upon whether Volvo's sunroof drainage systems were defectively designed); In re Whirlpool Corp., 722 F.3d at 847 (plaintiffs established that all Duet-brand washing machines were built to designs with "nearly identical engineering" that differed only in the machines' size and aesthetics and expert witness opined that a common defect, failure to self-clean the tub, was present in all machines

regardless of slight design differences); <u>Marcus</u>, 687 F.3d at 602-03 (expert

witness testified, after reviewing "thousands of pages of specifications" that all

tires, regardless of model or size, are substantially similar in construction and

all tires manifest the same defective characteristic, i.e., extra stiffness); <u>Wolin</u>,

617 F.3d at 1172 (same design defect, i.e., a geometry defect in vehicle's

alignment, was present in each class member's car); <u>Pella</u>, 606 F.3d at 391 (all

ProLine casement windows were designed to allow water to seep behind

aluminum casing, which accelerated wood rot); <u>Martin</u>, 292 F.R.D. at 256-59,

267 (class action involved only "second generation" "rear twist beam axle,"

which was manufactured by one company for fewer than five years); <u>Brunson</u>,

266 F.R.D. at 114, 119 (all trimboard suffered from same manufacturing

defects that made it rot, warp, and crack prematurely); <u>Payne</u>, 216 F.R.D. at 23,

28 (hosing used in radiant floor heating system was defectively designed

causing oxidation, hardening, cracks, and eventually, leaks; testing and other

evidence confirmed presence of defect in all hosing).

b. Despite pointed and extended questions from the court at oral argument, ECF

No. 173 at 91-99, plaintiffs offer no legal authority to support their seemingly

novel and illogical theory that admittedly nondefective products can,

nevertheless, be considered defectively designed if a design specification

establishes a range of measurements, some of which will produce defective

products and some of which will produce nondefective products, especially

where, as here, plaintiffs fail to identify where within the range of

measurements the design crosses the line from producing nondefective

products to producing defective products or to quantify how often defective products, versus nondefective products, were produced.

c. In this case, plaintiffs offered no evidence that Owens Corning manufactured Oakridge-brand shingles for use in Pennsylvania, Illinois, California, and Texas for the proposed 20-year class period in accordance with a single, defective design specification, or substantially similar or nearly identical defective design specifications. FOF 104-05. There is likewise no evidence that Oakridge-brand shingles contain a particular design specification measurement that renders all (or even most or many) shingles defective. FOF 209; COL 26(b).

    i. The record reflects, instead, that Owens Corning used more than 500 design specifications during only a portion of the proposed 20-year class period, which specifications differed based upon the location of the manufacturing plant and the technology and raw materials available at the time. FOF 104, 106-08. Plaintiffs proffer no evidence that all these specifications share a common measurement or characteristic that renders them defective, regardless of any differences in the specifications.

    ii. The record reflects that each design specification includes not one specific set of measurements for the individual elements of a shingle, such as mat mass, asphalt mass, and tear strength, but various minimum, maximum, and target measurements for the different features of a shingle, which establish the allowable and

preferred parameters for manufacturing a shingle according to that design specification. FOF 108. Every shingle will not be manufactured to the allegedly defective low-end measurements, which alone is fatal to class certification. <u>Neale v. Volvo Cars of N. Am., LLC</u>, No. 10-4407, 2013 WL 785056, at *4 (D.N.J. Mar. 1, 2013) (at class certification stage, plaintiffs need not prove that all products are actually defective, but must present proof that a common, allegedly defective, design element is present in all products, e.g., sound plugs with a plus-shaped opening at the bottom).

a) Rutila acknowledges that the same design specification can produce both shingles that will last the same number of years as the length of some limited shingle warranties (nondefective shingles) and shingles that will not last for the length of the shortest limited shingle warranty, i.e., 25 years (defective shingles). FOF 194(e) – (g).

b) The record is devoid of any evidence quantifying how often defective, as opposed to nondefective, shingles are produced according to Owens Corning's design specifications. FOF 195. Rutila's own testing of the nearly 300 warranty shingles, which is inherently flawed and biased in favor of identifying defective shingles and has been deemed inadmissible, reveals that defective

shingles were produced only about half of the time. FOF

195(a)(ii); <u>Reyes</u>, 802 F.3d at 485 (the standard is not

whether it is mathematically or scientifically possible that

one of the telemarketing firms used by defendants did not

engage in the allegedly wrongful conduct, but whether

plaintiff established that it is more likely than not that the

telemarketing firms used by defendants engaged in the

allegedly wrongful conduct).

c) Rutila acknowledges that a shingle would have to be

individually inspected to determine whether it is a

nondefective or defective shingle. FOF 194(b).

iii. There is no evidence in the record of any particular measurement or

set of measurements for the individual elements of a shingle that

constitute a design defect.

a) The only evidence of this nature is Rutila's testimony that

a shingle with a mat mass of at least 1.5 pounds-per-100-

square foot will produce a longer-lasting shingle. FOF

194(c)(i), 204(b).  Even this evidence, however, must be

viewed in light of Rutila's other testimony that it is the

way in which the measurements for each element of a

shingle correspond to each other that affects a shingle's

quality. FOF 194(c)(ii).  According to Rutila, a single

measurement, in isolation, cannot be probative of a design defect.

b) Although Rutila opines that shingles manufactured at or near the minimums of Owens Corning's design specifications will be defective because they will not last more than 20 years, Rutila does not articulate how "near" to the minimums a shingle must be in order to be considered defective. FOF 194(c), 209.

d. In this case, although all the legal claims that the named plaintiffs seek to pursue on behalf of the proposed four-state class require proof of a design defect, the evidence of record contradicts the conclusion that all (or even most or many) Oakridge-brand shingles manufactured for use in Pennsylvania, Illinois, California, and Texas between 1992 and 2012 contain any of the three design defects identified.

i. The evidence proffered by plaintiffs fails to substantiate their theory that Oakridge-brand shingles are defectively designed because Owens Corning's design specifications call for an insufficient *quantity* of asphalt. FOF 202, 217.

ii. The evidence proffered by plaintiffs fails to substantiate their theory that a design specification that sets filler percentage at, or above, 66% is defective. FOF 203, 218.

iii. The evidence proffered by plaintiffs fails to substantiate their theory that Oakridge-brand shingles are defectively designed because

Owens Corning's design specifications call for insufficient mat

mass and tear strength. FOF 204, 219-20.

**COL 74:** Although the inability to prove the existence of a design defect by evidence that is

predominantly common to the class is fatal to plaintiffs' misrepresentation-based legal

claims, COL 72, the court nevertheless, for the sake of completeness, will engage in a

predominance analysis of these claims. Plaintiffs fail to demonstrate that Owens

Corning's alleged misrepresentations about Oakridge-brand shingles are capable of proof

at trial through evidence that is common to the proposed four-state class for the entire 20-

year class period.

a. The record reflects that Owens Corning did not engage in a uniform and

consistent marketing campaign that included representations that Oakridge-

brand shingles would have a useful life of at least 25 years, or would not crack,

degranulate, fragment, or deteriorate for at least 25 years. COL 25, 31(b). The

record reflects, instead, that even the named plaintiffs were exposed to

different promotional materials and oral representations from third parties.

FOF 140-46; COL 25.

b. Owens Corning's limited shingle warranties do not qualify as representations

that Oakridge-brand shingles would have a useful life of at least 25 years, or

for the same number of years as the length of the limited warranty. FOF 170-

74.

i. At the hearing on plaintiffs' motion for class certification, the court

questioned plaintiffs about their failure to proffer legal authority to

support their theory that a warranty is a representation about the expected lifespan of a product. (ECF No. 173 at 39-41.)

ii. This court noted that the court presiding over an MDL proceeding involving IKO-brand roofing shingles rejected the precise legal argument being made by plaintiffs in this case about a limited warranty equating to a representation about longevity or durability. The court presiding over that MDL commented on more than one occasion that a "limited warranty itself is not an affirmation of fact about the useful life of [] shingles" but instead "simply means that if the product fails within the warranty period, there may be recourse under the warranty, but does not lead consumers to reasonably believe that the shingles will last for the duration of the warranty." In re IKO Roofing Shingles Prod. Liab. Litig., No. 2:09–md–2104 (C.D. Ill. Jan. 28, 2014) (ECF No. 338 at 35-36 (citing 1/28/2014, 4/12/2013, and 4/15/2013 decisions)); see Brooks, 301 F.R.D. at 233 (recognizing, but finding inapplicable, the IKO MDL court's findings); In re HardiePlank Fiber Cement Siding, 2014 WL 2987657, at *3 ("An advertisement's reference to a formal limited warranty does not, on its own, create a new informal promise that the product will last for a certain amount of time.")

iii. Although plaintiffs represented at the hearing on their motion for class certification that the IKO MDL court's rulings on this point were criticized and reversed by the Court of Appeals for the Seventh Circuit, they were not. (ECF No. 173 at 39-40, 45-46, 100.) While one court of

appeals judge made remarks during oral argument, without supporting legal precedent, that questioned the <u>IKO</u> MDL court's conclusion about the relationship between a warranty and the useful life of a product, (ECF No. 173 at 100), that issue was not the basis for the appellate court's reversal. The court of appeals reversed the <u>IKO</u> MDL court's order refusing to certify the class because that the court mistakenly imposed a "commonality of damages" requirement at the class certification stage. <u>In re IKO Roofing Shingle</u>, 757 F.3d at 603. Notably, in the <u>IKO</u> MDL cases, the central theory advanced by the named plaintiffs was that IKO falsely told customers that its shingles met an ASTM industry standard, when they did not. <u>Id.</u> at 599, 603 (summarizing damages theories as "the difference in market price between a [shingle] as represented and a [shingle] that does not satisfy the [ASTM] standard" and "damages, if nonconformity to the [ASTM] standard caused [shingle] failure"). In this case, plaintiffs' theories are significantly different than those raised in the <u>IKO</u> MDL cases, especially because the parties agree that all Oakridge-brand shingles meet relevant ASTM industry standards. FOF 109, 203(b)(i), 204(d); COL 77(b)(ii)(b)(iv).

iv. Despite this line of inquiry from this court at the class certification hearing, and plaintiffs' contention that the <u>IKO</u> MDL court's findings were rejected by the court of appeals, plaintiffs' proposed findings of fact and conclusions of law still include no citation to any legal authority

to support their foundational contention that a limited warranty of a set number of years is a representation about the useful life of a product. (ECF No. 173 at 39-40, 45-46, 100.)

    v. Plaintiffs' theory is not only novel and unsupported, but also is contrary to law. <u>Rasmussen</u>, 27 F. Supp. 3d at 1035 (the purpose of a warranty is to contractually mark the point in time when the risk of paying for repairs shifts from the manufacturer to the consumer); <u>Keegan</u>, 838 F. Supp. 2d at 940-41 (same); <u>Sears, Roebuck</u>, 833 F. Supp. 2d at 899 (stating that under Texas law, an explicit statement must be made about the useful life of a product in order to assert warranty coverage on that basis).

c. Owens Corning's limited shingle warranties are not consistently understood as representations that Oakridge-brand shingles would have a useful life of at least 25 years, or for the same number of years as the length of the limited warranty. FOF 160-65.

d. There is no other evidence in the record probative of plaintiffs' assertion that Owens Corning made consistent representations to all (or even most or many) members of the proposed four-state class that Oakridge-brand shingles would have a useful life of at least 25 years.

e. The record contains no evidence with respect to what proportion of members of the proposed four-state class were exposed to Owens Corning's representations about Oakridge-brand shingles, which is a relevant deficiency

given that the proposed four-state class includes owners who did not select Oakridge-brand shingles for the structure. FOF 17.

**COL 75:** Even if plaintiffs could establish the two essential elements underlying each of their legal claims. i.e., design defect and misrepresentations, by evidence common to the class, the court would nevertheless conclude that plaintiffs could not satisfy the predominance requirement because individual questions with respect to injury, causation, and damages will predominate over these two common issues.

**COL 76:** Plaintiffs must prove, for each kind of legal claim being asserted on behalf of the class, that injury was suffered. Reese v. Ford Motor Co., 499 F. App'x 163, 167 (3d Cir. 2012) (Under Pennsylvania law, plaintiff's injury must be caused by defect in product in order to recover for breach of implied warranty of merchantability); Cleary, 656 F.3d at 516, 519 (Illinois unjust enrichment plaintiff "must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment"); Clark, 256 F. App'x at 821-22 (Illinois Consumer Fraud Act plaintiffs must establish injury); Mary E. Bivins, 451 S.W.3d at 112 ("To prevail, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to the plaintiff."); Durell, 183 Cal. App. 4th at 1366-67 (relief for violation of California Legal Rights Act limited to those that are injured); Pfizer Inc. v. Superior Ct., 182 Cal. App. 4th 622, 631-32 (2010) ("one who . . . could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution" under California's Unfair Competition Law or False Advertising Law); Cardinal Health 301, Inc. v. Tyco Elecs. Corp., 169 Cal. App. 4th 116, 145 (2008) ("To recover on a breach of warranty cause of action, the plaintiff must show the breach caused the plaintiff to suffer injury, damage, loss[,] or harm.") (internal quotation

omitted); <u>Peterson</u>, 164 Cal. App. 4th at 1594 (a plaintiff must establish "actual injury to bring an unjust enrichment claim"); <u>Gen. Motors Corp. v. Garza</u>, 179 S.W.3d 76, 81 (Tex. App. 2005) ("If a product is shown to be unmerchantable, a plaintiff must then establish that the defect caused him to suffer injury.") (internal quotation omitted); <u>Wall v. Parkway Chevrolet, Inc.</u>, 176 S.W.3d 98, 105 (Tex. App. 2004) (Texas Deceptive Trade Practices Act plaintiffs must prove "economic or mental-anguish damages"); <u>Lewis v. Bayer AG</u>, 70 Pa. D. & C. 4th 52, 86-87 (Pa. Ct. Com. Pl. 2004) ("If an individual . . . suffers no injury, no equitable claim for unjust enrichment can lie.").

**COL 77:** Although plaintiffs acknowledge that injury is a prerequisite to relief for at least some legal claims, plaintiffs fail to specifically address how they intend to prove injury on a classwide basis. (ECF No. 178 at 39 (¶ 91) and 40 (¶ 96) (consumer protection statutes require showing of loss or harm to consumer) and at 42 (¶ 104) (unjust enrichment requires showing that retention of the benefit is unjust).)  Under the circumstances, plaintiffs failed to meet their burden to establish that injury can be proven by evidence that is common to the proposed four-state class.

    a.  Plaintiffs generally contend that certification is proper because "observable injury" is included in the definition of the class. (ECF No. 178 at 33 (¶ 69).) This is presumably a reference to the requirement that class members establish the presence of "any cracking, degranulation, fragmentation, or deterioration" in order to qualify as a member of the proposed four-state class.  The record, however, fails to establish that the presence of one of those conditions in a shingle constitutes injury, harm, or economic loss to the owner.  To the contrary, in their complaints, the named plaintiffs contended that injury was

suffered when property damage occurred or when repair or replacement costs were incurred. FOF 99.

    i. Plaintiffs submit no evidence that a shingle manifesting "any cracking, degranulation, fragmentation, or deterioration" will fail.

    ii. Plaintiffs submit no evidence that a shingle manifesting "any cracking, degranulation, fragmentation, or deterioration" is likely to fail.

    iii. Plaintiffs submit no evidence that a shingle manifesting "any cracking, degranulation, fragmentation, or deterioration" will cause property damage.

    iv. Plaintiffs submit no evidence that a shingle manifesting "any cracking, degranulation, fragmentation, or deterioration" is likely to cause property damage.

    v. Plaintiffs submit no evidence that a shingle manifesting "any cracking, degranulation, fragmentation, or deterioration" requires immediate or imminent shingle repair or replacement.  To the contrary, Owens Corning submitted evidence indicating that not all "cracks" are indicative of imminent shingle failure. COL 48(b)(i).

    vi. The record is devoid of any evidence that possession of a shingle that is cracked, degranulated, fragmented, or deteriorated results, without more, in legally compensable injury to the owner.

b. To the extent that plaintiffs' injury theory is that all class members were injured because they did not "get what they were promised," the record reflects

that this theory cannot be established with evidence that is common to the class.

   i. For purposes of this analysis, although actually dispositive, the court puts aside the fact that plaintiffs failed to establish that: (1) Oakridge-brand shingles share a common defect; and (2) Owens Corning made uniform representations to all (or even most or many) members of the proposed four-state class about the useful life of Oakridge-brand shingles.

   ii. Plaintiffs cannot prove by evidence that is common to the class that all (or even most or many) class members were injured because Owens Corning promised that Oakridge-brand shingles would last 25 years, or more, but delivered shingles that will not last more than 20 years.

      a) The factual circumstances relevant to what was promised and what was delivered are individualized, not common.

         (i) The record reflects that Owens Corning sold Oakridge-brand shingles with limited warranties ranging from 25 years to a lifetime term. FOF 110, 169(d)(iv); COL 24(b).

         (ii) The record reflects that some owners also purchased enhanced warranties. FOF 169.

         (iii) The record reflects that some owners will have installed Oakridge-brand shingles on their

structure 24 years ago, while other owners will have installed Oakridge-brand shingles on their structure 4 years ago. FOF 6.

(iv) The record reflects that some owners' Oakridge-brand shingles will last for more than 30 years. FOF 194(F), 211; COL 26(c).

(v) The record reflects that a determination cannot be made about how long a shingle is likely to last without examining the shingle. FOF 194(b) & (d).

(vi) In support of their motion for class certification, plaintiffs proffered no method by which a comparison could be made, on a collective basis, between what was promised and what was delivered to members of the proposed four-state class such that injury could be established on a classwide basis.

b) Rutila offers no admissible expert opinion from which this court could find that all (or even most or many) members of the proposed four-state class were injured because they failed to receive what they were promised.

(i) Rutila admits that he cannot determine whether a shingle was manufactured to the

low-end of Owens Corning's design specifications without examining the shingle. FOF 194(b).

(ii) Rutila admits that some Oakridge-brand shingles manufactured within Owens Corning's design specification parameters will last 30 years. FOF 194(f).

(iii) Rutila offers no admissible opinion about how frequently Owens Corning manufactured Oakridge-brand shingles at the low-end of its design specifications. FOF 195(a).

(iv) Rutila does not dispute that all Owens Corning design specifications exceed industry standards. FOF 109.

c) Evidence about the warranty claims submitted to Owens Corning with respect to Oakridge-brand shingles is not probative that all (or even most or many) members of the proposed four-state class were injured because they failed to receive what they were promised.

(i) The warranty claims represent less than half of one percent of all Oakridge-brand installations and, therefore, are not statistically significant for the purpose of

proving that all (or even most or many) members of the proposed four-state class did not get what they were promised. FOF 112.

(ii) Owens Corning pays some warranty claims to preserve customer goodwill, not because the shingles are defective. FOF 116.

(iii) Owens Corning's warranty claims process itself contradicts any contention that injury can be proven with classwide evidence in this case. The warranty program requires a case-by-case review and assessment of each owner's situation before a determination is made about what financial remuneration, if any, is appropriate. FOF 115. The fact that such determinations are made on an individual basis, indicates that it is impossible to establish that all (or even most or many) of the proposed four-state class did not get what they were promised on a classwide basis.

d) The quality control issues and internal emails and documents cannot establish injury on a classwide basis because that evidence reflects only sporadic and

inconsistent instances in which concerns about Oakridge-

brand shingles were addressed, and is not probative that

all (or even most or many) members of the proposed

four-state class did not get what they were promised. FOF

147-59, 205-09.

**COL 78:** Plaintiffs must prove causation for each category of legal claims being asserted.

Cleary, 656 F.3d at 516, 519 (unjust enrichment plaintiff "must show a detriment – and,

significantly, a connection between the detriment and the defendant's retention of the

benefit"); Clark, 256 F. App'x at 821-22 (In a case alleging deception under the Illinois

Consumer Fraud Act, it is not possible for a plaintiff to establish proximate causation

unless the plaintiff can show that he or she was, in some manner, deceived' by the

misrepresentation); Altronics, 957 F.2d at 1105 (under Pennsylvania law, to prove breach

of implied warranty of merchantability, "plaintiffs were required to show: (1) that the

product malfunctioned; (2) that plaintiffs used the product as intended or reasonably

expected by the manufacturer; and (3) the absence of other reasonable secondary

causes"); Sevidal, 189 Cal. App. 4th at 929 ("both the named plaintiff and unnamed class

members must have suffered some damage caused by a practice deemed unlawful under

the California Consumers Legal Remedies Act); Uzyel v. Kadisha, 188 Cal. App. 4th

866, 892 (2010) (Under California law, "[a] plaintiff seeking a money judgment . . . as a

remedy for unjust enrichment need [ ] establish a causal connection between the

wrongful conduct and the profits to be disgorged"); Cardinal Health 301, 169 Cal. App.

4th at 145 ("To recover on a breach of warranty cause of action, the plaintiff must show

the breach caused the plaintiff to suffer injury, damage, loss or harm."); Garza, 179

S.W.3d at 81 (under Texas law, "[if] a product is shown to be unmerchantable, a plaintiff must then establish that the defect caused him to suffer injury"); Wall, 176 S.W.3d at 105 (to prevail under the Texas Deceptive Trade Practices Act, a plaintiff must show that the wrongful act was a producing cause of the plaintiff's economic or mental-anguish damages).

**COL 79:** Plaintiffs failed to meet their burden to establish that causation can be proven by evidence that is common to the proposed four-state class.

    a. Based upon this court's prior findings and conclusions, plaintiffs cannot establish that Owens Corning's defective design specifications were the cause of the harm suffered by all (or even most or many) members of the proposed four-state class.

        i. For purposes of this analysis, although dispositive, the court puts aside plaintiffs' failure to establish that Owens Corning's Oakridge-brand shingles share a common design defect. COL 73.

        ii. Even if the named plaintiffs proved that Oakridge-brand shingles had the same design defect, individual inquiries about why a shingle cracked, degranulated, fragmented, or deteriorated, and what caused property damage, if any, are incompatible with the predominance requirement. Marcus, 687 F.3d at 604 (noting that "any tire can go flat for myriad reasons" and "even defective tires can go flat for reasons completely unrelated to their defects").

            a) The record reflects that there are many reasons that a shingle might crack, degranulate, fragment, or deteriorate

that are unrelated to the design specification used to manufacture the shingle, including ordinary and acceptable wear and tear. FOF 196.

b) The record reflects that individual inspection is required to establish the cause of shingle failure, and resultant property damage, if there is any. FOF 197.

iii. Even if the named plaintiffs proved that Oakridge-brand shingles had the same design defect, they propose no method of quantifying, on a classwide basis, the harm that is caused simply by virtue of the fact that a shingle manifests "any cracking, degranulation, fragmentation, or deterioration during the warranty coverage period."

iv. Even if the named plaintiffs proved that Oakridge-brand shingles had the same design defect, they propose no method of quantifying, on a classwide basis, the harm that is caused to all class members given that the harm caused by a shingle lasting for 24 years instead of 25.2 years is different in character and value than the harm caused by a shingle lasting 5 years instead of 50 years.

b. Based upon this court's prior findings and conclusions, plaintiffs cannot establish that Owens Corning's representations about Oakridge-brand shingles were the cause of the harm suffered by all (or even most or many) members of the proposed four-state class.

i. It is plaintiffs' burden to prove, by common evidence, that the proposed four-state class was exposed to a misrepresentation about Oakridge-brand shingles. <u>Mazza v. Am. Honda Motor Co.</u>, 666 F.3d 581, 596 (9th Cir. 2012) (California Unfair Competition Law "does not allow a consumer who was never exposed to an alleged false or misleading advertising . . . campaign to recover damages"); <u>Clark</u>, 256 F. App'x at 821-22 (for Illinois Consumer Fraud Act claim, "it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, in some manner, deceived by the misrepresentation") (internal quotation omitted); <u>Yurcic v. Purdue Pharma, LP</u>, 343 F. Supp. 2d 386, 394 (M.D. Pa. 2004) (for breach of express warranty under Pennsylvania law, "[i]t is important [ ] that the buyer at least be aware of the seller's representation"); <u>Sevidal</u>, 189 Cal. App. 4th at 929 ("Because the majority of unnamed class members did not view the alleged misrepresentation, they could not satisfy this causation element of the [California Legal Remedies Act] claim"); <u>Pfizer</u>, 182 Cal. App. 4th at 631-32 ("[O]ne who was not exposed to the alleged misrepresentations and therefore could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution" under California's False Advertising Law or Unfair Competition Law).

ii. For the reasons set forth elsewhere in these findings and conclusions, the record contradicts a finding that plaintiffs could prove with common evidence that all (or even most or many) members of the proposed four-state class were exposed to the same, or even substantially similar, representations about the useful life of Oakridge-brand shingles. FOF 120-59, 175-80; COL 25, 31(b)(ii)(a).

iii. Even if plaintiffs could prove that all (or even most or many) members of the proposed four-state class were exposed to the same representations, the record contradicts a finding that plaintiffs could prove with common evidence that all (or even most or many) members of the proposed four-state class decided to purchase Oakridge-brand shingles based upon them.

   a) The record reflects that even the named plaintiffs selected Oakridge-brand shingles based upon different factors, including brand name, color, aesthetics, and warranty length. FOF 50, 78, 90.

   b) Plaintiffs propose no method of proving that both current owners who installed Oakridge-brand shingles on the structure, and current owners who purchased a structure with Oakridge-brand shingles previously installed on it relied upon Owens Corning's representations or engaged in the same decision-making process with respect to selecting Oakridge-brand shingles.

 c) Where named plaintiffs proffer no evidence that the class

 members' decision-making process was uniform, the

 predominance requirement cannot be met. <u>Marcus</u>, 687

 F.3d at 607-08.

**COL 80:** Even if the named plaintiffs could prove injury and causation with common proof,

the court finds that plaintiffs failed to proffer any method or theory by which damages

could be determined on a classwide basis so that this court can evaluate how to weigh this

factor in the predominance balance.

 a. Although plaintiffs contend, generally, that there are several "effective

methods for calculating damages" such as informal claims procedures,

hearings before a special master, or summary jury trials, and using "industry

resources such as R.S. Means," they present no damages models or methods

for this court to assess at the class certification stage. (ECF No. 178 at 44-45

(¶¶ 112-13).) Plaintiffs' contention that they have no obligation to do so

because damages discovery has not yet taken place misses the mark. (<u>Id.</u> at 45

(¶ 114).) Plaintiffs need not have access to specific damages discovery from

Owens Corning in order to formulate possible damages models that comport

with their theory of the case and the facts disclosed to date in these

proceedings.

 b. This court acknowledges that "an inability to calculate damages on a classwide

basis will not, on its own, bar certification," because the predominance

requirement directs a court to weigh those issues of law and fact that can be

proven by common evidence, against those issues that cannot. <u>Reyes</u>, 802 F.3d

at 485; <u>Neale</u>, 794 F.3d at 374-75.  There is no requirement that the named plaintiffs prove that damages are calculable on a classwide basis for each member of the proposed four-state class in order to secure certification. <u>City of Sterling Heights Gen'l Employees' Ret. Sys. v. Prudential Fin., Inc.</u>, No. 12-5275, 2015 WL 5097883, at *13-14 (D.N.J. Aug. 31, 2015) (citing <u>Neale</u>, 794 F.3d at 374-75); <u>In re Wilmington Trust Securities Litig.</u>, 310 F.R.D. 243, 246 (D. Del. Sept. 3, 2015) (finding predominance met where plaintiffs presented an expert's "event study methodology" to calculate damages on a classwide basis).  In this case, however, many other issues of law and fact are not susceptible to common proof, and the record indicates not only an inability to measure the exact amount of damages owed to each class member, but also a lack of any method by which entitlement to damages could be determined on a classwide basis based upon the facts, legal theories, and expert testimony presented in this case.  In these circumstances, plaintiffs failure to demonstrate that damages can be proven by common evidence further demonstrates that certification of the proposed four-state class is improper.

c.  Because the named plaintiffs did not advance any damages theory that they will pursue on behalf of the class, the court will examine the most likely damages theories based upon the facts of this case and the legal causes of action being asserted on behalf of the class.

   i.  To the extent the named plaintiffs will seek to recover, on behalf of the class, any costs incurred by class members who replaced their Oakridge-brand shingles, individual questions will predominate.  In

order to recover such damages, the class member would have to demonstrate, among other things, that shingle replacement was required in order to prevent property damage or ensure consistent shingle performance, the cost of the new shingles, the cost of the old shingles, and the age of the Oakridge-brand shingles at the time of replacement for purposes of depreciation. Because there is no basis on this record to assume that every Oakridge-brand shingle replaced had to be replaced because it was defectively designed, class members would have to prove that that shingle failure was not caused by some other condition. FOF 196. This is an individual issue. The record reflects that determining the price actually paid for the Oakridge-brand shingles will not be readily provable on a classwide basis. COL 51(d). This is an individual issue. The named plaintiffs proffer no method by which depreciation of the existing Oakridge-brand shingles could be determined on a classwide basis. This could be an individual issue.

ii. To the extent the named plaintiffs will seek compensation, on behalf of the class, for any property damage suffered when a roof with Oakridge-brand shingles on it leaked, individual questions will predominate. Based upon the record before the court, an individual assessment of each property is required to determine the cause of a leak and any resultant property damage. FOF 197. The record reflects that some of the named plaintiffs who suffered property

damage could not show that Oakridge-brand shingle failure was the cause. FOF 100; Gates v. Rohm and Haas Co., 265 F.R.D. 208, 233 (E.D. Pa. 2010) ("common issues do not predominate as to Plaintiffs' property damage claims"); Martin v. Home Depot U.S.A., Inc., 225 F.R.D. 198, 201-02 (W.D. Tex. 2004) ("[T]here are too many property-specific factors influencing the issues of whether, and to what extent, treated wood leaches, and whether a given property would be contaminated if the wood did leach, to permit certification. . . . [A]djudicating each claim would require intense scrutiny of each potential plaintiff's property to a degree that would not be feasible."). The record further reflects that owners may have received payment for those damages, from an insurer for example, further complicating any damages model that will seek to reimburse class members for property damages. FOF 100(a).

iii. To the extent the named plaintiffs seek to recover, on behalf of the class, on a diminution-in-value theory, innumerable individual issues will predominate.

a) The record reflects that not all Oakridge-brand shingles will be defective, and that individual inspection is required to identify those shingles that were manufactured at the allegedly defective low end of Owens Corning's design specifications. FOF 194(a)-(b). Plaintiffs proffered no evidence from which this court

could determine that it is more likely than not that Oakridge-brand shingles will be defective. FOF 195; COL 73(c)(ii)(b) (citing <u>Reyes</u>, 802 F.3d at 485).  There is no evidence that every, or even most or many, Oakridge-brand shingles will be manufactured using allegedly defective design specification measurements. FOF 195, 213-15; COL 73(c)(ii) (citing <u>Neale</u>, 2013 WL 785056, at *4).  The record reflects that it would be difficult, if not impossible, to make this assessment because plaintiffs do not identify what combination of measurements define the point at which a shingle crosses the line from being nondefective to defective. FOF 194(c), 209.

b)  Based upon the proposed class definition, some members of the proposed four-state class will not have purchased Oakridge-brand shingles, but will have purchased a structure with those shingles already installed on it.  In these circumstances, a diminution-in-value theory does not fit.

c)  Even for those class members who did install Oakridge-brand shingles on the structure, calculating the diminution-of-value will depend on various individual factors, and could not be accomplished on a classwide

basis.  By way of example, the calculation would depend

upon the purchase price of the Oakridge-brand shingles,

adjusting for inflation and market differences, the age of

the Oakridge-brand shingles, and the condition and

expected future lifespan of the Oakridge-brand shingles.

These are individual questions, some of which the named

plaintiffs cannot even answer. COL 51(c).

**COL 81:**  Even if the named plaintiffs could prove injury, causation, and damages with

common proof, the court finds that individual defenses would additionally bar

certification of the class.  Any defense based upon the timeliness of the claims brought by

members of a proposed four-state class in which membership commenced 24 years ago

will raise predominantly individual fact issues.

a.  Determination of statute of limitations defenses can prevent a finding of

predominance. Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 326 (4th

Cir. 2006) (affirming holding that plaintiffs "failed to show that the

predominance requirement of Rule 23(b)(3) has been satisfied because

individualized proof is patently required to litigate the defendants' statute of

limitations defense") (quotations omitted); Barnes v. Am. Tobacco Co., 161

F.3d 127, 149 (3d Cir. 1998) ("we believe that determining whether each class

member's claim is barred by the statute of limitations raises individual issues

that prevent class certification"); In re Actiq Sales and Marketing Practices

Litig., 307 F.R.D. 150, 164 (E.D. Pa. 2015) (statute of limitation issues

rendered putative class unmanageable); Anderson Living Trust v. WPX Energy

Prod., LLC, 306 F.R.D. 312, 450 (D.N.M. 2014) ("Defendants' statute-of-limitations defense also cuts against certification"); In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II), No. 03-4558, 2012 WL 379944, at *36 (D.N.J. Feb. 6, 2012) (denying class certification where defendant's "statute-of-limitations defenses and any applicable discovery rule and/or other equitable tolling doctrine would require inquiries into the individual circumstances of each Plaintiff").

b. In this case different statutes of limitations, ranging from two to five years, apply to the claims being asserted on behalf of the proposed four-state class. 2 years: Texas DTPA, Tex. Bus. & Com. Code. Ann. § 17.565; TX unjust enrichment, Elledge v. Friberg-Cooper Water Supply Corp., 240 S.W.3d 869, 871 (Tex. 2007); 3 years: CLRA, Cal. Civ. Code § 1783(a); FAL, Cal. Code of Civil Procedure Section 338(a); CA unjust enrichment, Allen v. Similasan Corp., No. 12-cv-0376, 2013 WL 2120825, at *6 (S.D. Cal. May 14, 2013); ICFA, 815 ILCS 505/10a(e); 4 years: PA breach of express and implied warranty, Westfield Ins. v. Detroit Diesel Corp., No. 10-cv-100, 2012 WL 1611311, at *7 (W.D. Pa. May 8, 2012); PA unjust enrichment, 42 Pa. Cons. Stat. § 5525(a)(4); CA breach of implied warranty, Mexia v. Rinker Boat Co., Inc., 174 Cal. App. 4th 1297, 1307 (2009); UCL, Cal. Bus. & Prof. Code § 17208; TX breach of implied warranty, Tex. Bus. & Com. Code. Ann. § 2.725(b); 5 years: IL unjust enrichment, 735 ILCS 5/13-205 (2010). Individual factual circumstances with respect to knowledge and notice may affect how those statutes of limitations apply.

174

c.  In addition, equitable doctrines, such as laches, estoppel, and waiver may bar claims of some class members, who could have been aware, as early as 1992, of the alleged defective condition of their Oakridge-brand shingles.

d.  Plaintiffs proffer no way for this court to adjudicate those issues on a classwide basis.

### b. **Superiority**

**COL 82:** "'The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" Community Bank III, 795 F.3d at 409 (quoting Community Bank I, 418 F.3d at 309).

**COL 83:** "[F]requently, a finding that individual issues do not predominate is accompanied by a finding that a class action is not superior," because where "a number of 'mini-trials' would be imperative, the costs associated with a class action would be very high; due to the necessary individual litigation of a number of issues, the cost savings [of class litigation] would not be marked." Sanneman v. Chrysler Corp., 191 F.R.D. 441, 454-55 (E.D. Pa. 2000); see Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 191 (3d Cir. 2001) (court considering superiority requirement "must address 'the difficulties likely to be encountered in the management of a class action.'") (citing FED. R. CIV. P. 23(b)(3)(D)).

**COL 84:** Plaintiffs' superiority argument is that owners will have no financial incentive to pursue their claims individually because "the cost of litigating a federal lawsuit" will overtake the amount of damages. (ECF No. 178 at 43, 44 (¶ 109, 111).)

a. There, however, is no requirement that owners file suit in federal court in order to pursue the legal claims on which class certification is sought, as plaintiffs contend. (ECF No. 178 at 44 (¶ 111).)  In fact, it is unlikely that the amount in controversy requirement could be met on an individual basis to establish diversity jurisdiction in a federal district court in order to pursue the state-law claims being asserted in this case.  Owners have the ability to seek recovery for damages in state court, where claims of several thousand dollars are not uncommon and where procedures to administer claims of that size are available.

b. Plaintiffs' lament that class members will be effectively deprived of representation by counsel if they are forced to litigate their claims individually is not well-founded.  Before proceeding, it is important to note that the correct inquiry is whether owners will be left with virtually no access to counsel, not whether class counsel appearing in this litigation would agree to litigate individual cases.

    i. The claims held by the named plaintiffs, and by extension, the claims held by members of the proposed four-state class, are not financially insignificant and range from $5,000 to $22,000. (ECF No. 178 at 44 (¶ 111); FOF 31, 57, 65, 83-84, 97.  This is not a case in which an individual has suffered harm in connection with a minor or fleeting consumer transaction or service, such as purchasing yogurt or vitamins, paying at a restaurant with a credit card, or using an automated teller machine. See e.g., Reyes, 802

F.3d at 491 (noting that no rational lawyer would represent a party who holds a $30.22 claim).

    ii.   State consumer protection statutes typically provide for fee-shifting, which could incentivize attorneys to represent owners. See e.g., Boehm v. Rivercsource Life Ins. Co., 117 A.3d 308, 336 (Pa. Super. Ct. 2015); Graciano v. Robinson Ford Sales, Inc., 144 Cal. App. 4th 140, 159-60 (2006).

    iii.   There is no basis on this record to find that failure to certify the class will effectively deny owners access to counsel.

c.   Elsewhere in plaintiffs' proposed findings and conclusions, plaintiffs intimate that owners will be unable to pursue litigation individually because it will be too expensive to obtain expert opinions establishing the "modes of failure in their shingles." (ECF No. 178 at 46 (¶ 118).)  The expert opinion that the named plaintiffs presented in this case to obtain class certification was for the purpose of establishing that all Oakridge-brand shingles manufactured in four states over a 20-year time period were defective.  Although the court will not dispute that the opinion, and the discovery and legal proceedings relating to it, were likely expensive, individual owners could be able to establish this fact by experts who developed expertise by experience, i.e., a roofer, building inspector, etc., and whose fees would likely be less than those charged by plaintiffs' expert.

**COL 85:**  In summary, individual issues predominate over common issues and class treatment is not superior to individual litigation of claims under the circumstances of this case.

a. Owners have an interest in individually controlling litigation that affects whether financial remuneration will be provided to repair or prevent property damage. The record reflects that owners' circumstances and experiences with Oakridge-brand shingles are not uniform: some have suffered property damage, while others have not; some have accepted reimbursement from Owens Corning, while others have not; some have likely replaced the shingles on their roofs as a precaution, while others have not; some owners selected Oakridge-brand shingles, while others purchased structures on which they were already installed; some owners have had Oakridge-brand shingles installed on their roofs for almost 25 years, while others had them installed less than 5 years ago. These varying factual circumstances are indicative of an interest in individually controlling litigation.

b. There is no benefit to using the class action mechanism based upon pending litigation because no liability issues have yet been decided in this matter. The record reflects that some owners reached settlement of their claims against Owens Corning without the need to resort to litigation. FOF 97.

c. It is not more desirable to concentrate the litigation in one particular forum because the record reflects that differences in geography affect how shingles are manufactured, and how they are expected to weather in the ordinary course.

d. Finally, as set forth elsewhere in these findings and conclusions, based upon this record, there are innumerable difficulties in managing these claims as a class action.

### 3. __Rule 23(b)(2) – The Injunctive Relief Class__

**COL 86:** Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." In re Processed Egg Products Antitrust Litig., 312 F.R.D. 124, 165 (E.D. Pa. 2015).

**COL 87:** "Subsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.'" Processed Egg Products, 312 F.R.D. at 165 (citing Barnes, 161 F.3d at 142). If monetary damages are appropriate, certification is proper under the standards and requirements applicable to Rule 23(b)(3), not Rule 23(b)(2). Dukes, 131 S.Ct. at 2557-58; In re Ford, 2012 WL 379944 at *38-39 ("In light of the guidance provided by Wal-Mart [v. Dukes], this Court concludes that it would be inappropriate to permit Plaintiffs to sidestep the (b)(3) requirements under the guise of a (b)(2) class.").

**COL 88:** Rule 23(b)(2) classes must be cohesive. Shelton, 775 F.3d at 561 (citing Barnes, 161 F.3d at 143). A Rule 23(b)(2) class is not cohesive if its members raise "disparate factual circumstances" or "significant individual issues." In re Ford, 2012 WL 379944 at *38-39 (citing Barnes, 161 F.3d at 143).

**COL 89:** The Court of Appeals for the Third Circuit has recognized that Rule 23(b)(2)'s cohesiveness requirement may be more stringent than the predominance and superiority requirements of Rule (b)(3) because all class members will be bound by a single judgment and (b)(2) requires no notice and provides no opportunity to opt out. Gates, 655 F.3d at 264 & n.12; see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 & n.3

(1985) (requiring notice and opt-out rights, which are provided in (b)(3) but not (b)(2) class actions, when action is "predominately" for money damages).

**COL 90:**   A Rule 23(b)(2) injunctive relief class is typically used in consumer product class actions to obtain a declaration that a product is defective so that relief can be easily pursued once that defect manifests or causes damages. See e.g., Pella, 606 F.3d at 392 (affirming certification of a Rule 23(b)(2) class of owners whose Pella windows had not yet manifested the alleged design defect (which caused accelerated wood rot) or been replaced).   In such cases, Rule 23(b)(3) class members are entitled to damages because the defect already manifested itself (assuming all other elements of a particular legal claim are established), while Rule 23(b)(2) class members are guaranteed damages if the defect ever manifests and causes harm (again, assuming all other elements of a particular legal claim are established).

**COL 91:**   At the hearing on plaintiffs' class certification motion, plaintiffs explained that, in this case, the proposed Rule 23(b)(2) injunctive relief class was intended to be an alternative in the event that the court declined to certify the proposed Rule 23(b)(3) monetary relief class.   In that event, the Rule 23(b)(2) class would provide class members with a declaration that the shingles are defective or that Owens Corning did not provide what was promised. FOF 3(a) and (b).   Because, however, plaintiffs have not satisfied the requirements of Rule 23(b)(3) and rely upon the same evidence and legal theories in seeking certification under Rule 23(b)(2), they cannot satisfy the requirements of Rule 23(b)(2) in this case.

**COL 92:**   Despite plaintiffs' statements at the class certification hearing, in their proposed findings of fact and conclusions of law, plaintiffs contend that both a Rule 23(b)(3) and a

Rule 23(b)(2) class should be certified because the former will provide relief for owners who have already "suffered substantial product failures" and the latter will "protect class members who have yet to suffer substantial product failures." (ECF No. 178 at 30 (¶ 54)).

**COL 93:** Plaintiffs specifically seek declarations, on behalf of the proposed four-state injunctive relief class, that all Oakridge-brand shingles suffer from a design defect, and that Owens Corning cannot deny warranty claims or make further false representations about Oakridge-brand shingles. (ECF No. 178 at 30 (¶54) and 31 (¶ 56).)

**COL 94:** Despite claiming that the proposed Rule 23(b)(2) class and the proposed Rule 23(b)(3) class will consist of different members and afford its members different relief, plaintiffs continue to assign the same definition to both classes. (ECF No. 178 at 18-19 (¶ 1).)  This alone makes certification of the Rule 23(b)(2) injunctive relief class improper.

    a.   In order to qualify as a member of both classes, an owner need only show that the Oakridge-brand shingles installed on the structure "manifested any cracking, degranulation, fragmentation, or deterioration during the warranty coverage period." FOF 6.  There is no distinction between the classes with respect to the condition of the shingles, whether the shingles have been replaced, or whether the structure has suffered property damage.  Members of both classes have suffered the same level of "product failure."  The proposed Rule 23(b)(2) class, therefore, will not, as plaintiffs contend, protect owners who have not yet suffered "substantial product failure."

    b.   According to plaintiffs' theory of the case, owners were harmed by virtue of the fact that Owens Corning manufactured Oakridge-brand shingles in accordance with specifications that were defective and caused the shingles not

to last as long as Owens Corning promised.  Membership in the Rule 23(b)(3) damages class is not based upon an owner having been forced to replace the shingles on the structure.  Membership in the Rule 23(b)(3) damages class is not based upon an owner having suffered property damage as a result of shingle failure.  Membership in the Rule 23(b)(3) damages class is based upon the mere possession of Oakridge-brand shingles because, according to plaintiffs, they all are "susceptible" to premature failure due to defective design specifications, which, standing alone, constitutes harm.  There is no need, under plaintiffs' theory of the case, for an injunctive relief class to be certified in order to await "substantial product failure" because members of both classes have suffered the same "product failure," i.e., "manifestation of any cracking, degranulation, fragmentation, or deterioration," and the same harm, i.e., possession of shingles that are susceptible to not lasting as long as the length of the limited shingle warranty.

**COL 95:**  To the extent that plaintiffs intended to define the proposed Rule 23(b)(2) injunctive relief class as those owners whose shingles *have not yet* "manifested any cracking, degranulation, fragmentation, or deterioration," certification of the class nevertheless remains improper because, for all the reasons set forth in this court's analysis of the Rule 23(a) and Rule 23(b)(3) requirements, such a class would not be cohesive.  The court need not reiterate here all the "disparate factual circumstances" and "significant individual issues" identified elsewhere herein, but incorporates the following findings and conclusions, and any other pertinent findings or conclusions, by reference: FOF 100-01, 104-11, 115, 118-80; COL 23-27, 31, 38(b), 72-81.

### 4. <u>Rule 23(c)(4) – Certification of "Particular Issues" Class</u>

**COL 96:** Federal Rule of Civil Procedure 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."

**COL 97:** Plaintiffs do not ask this court to certify a class pursuant to Rule 23(c)(4), ECF No. 178 at 18-19 (¶ 1), but their last five proposed conclusions of law address this kind of class, <u>Id.</u> at 45-46 (¶¶ 115-19), and, therefore, in the interest of completeness, the court will address the propriety of certifying such a class.

**COL 98:** Plaintiffs' proposed conclusions of law do not define the scope of the liability-only trial nor propose what common proof would be presented, making certification improper on this basis alone. <u>Gates</u>, 655 F.3d at 274.

**COL 99:** Plaintiffs instead argue, generally and circularly, that "the parties will proceed to trial on the threshold question of liability for the following claims: breach of express warranty under Pennsylvania law; breach of implied warranty under Illinois, Pennsylvania, and Texas law; violation of consumer protection laws in California, Illinois, and Texas; and unjust enrichment" and "that all these claims rest on a common core of facts: design defects in Oakridge; Owens Corning's knowledge of those defects; and deceptive representations about the reliability and durability of Oakridge." (ECF No. 178 at 46 (¶¶ 117, 119).)

**COL 100:** In <u>Gates</u>, the Court of Appeals for the Third Circuit enumerated certain factors that district courts should consider when deciding whether or not to certify an "issue class." Those factors include:

> the type of claim(s) and issue(s) in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; the substantive law underlying the claim(s), including any choice-of-law questions it may present and

whether the substantive law separates the issue(s) from other issues concerning liability or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

Gates, 655 F.3d at 273.

**COL 101:** Although plaintiffs recognize that some of these factors must be considered, they contend simply that certification of a Rule 23(c)(4) class is appropriate because all their legal "claims rest on a common core of facts." (ECF No. 178 at 46 (¶ 117).) This contention is insufficient to meet plaintiffs' burdens and obligations to justify certification of a particular issues class.

**COL 102:** The court finds that the Gates factors do no warrant certifying a particular issues class. The claims being pursued on behalf of the proposed four-state class arise under the laws of four different states. FOF 13; COL 22(b)(i)(b), 31(a)(i), 38(b)(i)(a), 71. The claims involve individual issues, and this court has already set forth the reasons why they are not susceptible to proof by common evidence. COL 23-27, 31, 38(b), 72-81. No efficiencies are gained by litigating specific issues pertinent to these legal claims on a classwide basis.

**COL 103:** In particular, several courts have found unjust enrichment claims to be unsuitable for class treatment where the claim required a highly individualized inquiry in order to determine whether a defendant had been unjustly enriched in a particular circumstance.

Walney v. SWEPI LP, No. 13-102, 2015 WL 5333541, at *15 (W.D. Pa. Sept. 14, 2015)

(citing decisions).

**COL 104:** In particular, the record reflects that the terms of the express warranties held by

Pennsylvania owners will differ, making this claim unsuitable for class treatment. FOF

169.

For the foregoing reasons, plaintiffs' motion for class certification (ECF No. 150)

is denied. An appropriate order will be entered contemporaneously with this opinion.

Dated: March 31, 2016                    BY THE COURT:

                                         /s/ *Joy Flowers Conti*
                                         Joy Flowers Conti
                                         Chief United States District Judge